17

1           experience designing machines, did you?

2    A    Just simple machines.

3    Q    You didn't have any experience designing any

4         machines which were used in the railroad, did

5         you?

6    A    Correct.

7    Q    You didn't have any experience, for instance,

8         designing on-track equipment, correct?

9    A    Correct.

10   Q    Certainly during your education you did not have

11        any experience designing Hy-Rail devices,

12        correct?

13   A    Correct.

14   Q    Did you ever have any experience at all during

15        your education with respect to railroad on-track

16        equipment?

17   A    When I got sent to the academy in Oklahoma City

18        in '82 by D.O.T. it was six months of just a

19        tremendous amount of information both on

20        mechanical equipment, mechanical devices,

21        electrical equipment and devices, things that

22        they wanted me aware of should I come across that

23        and be able to at least know what I was looking

24        at.

```
 1    Q    So just a general orientation?

 2         MR. BYRNE:  Objection.

 3    Q    Is that how you would describe it?

 4    A    That's what I felt it was.

 5    Q    Nothing regarding any design?

 6    A    Correct.  Other than looking at multiple designs

 7         that were already completed, of course.

 8    Q    Nothing regarding the repair of any of these

 9         devices?

10    A    Actually, yes.  They would show us typical

11         failures and typical repairs.

12    Q    Did you get any experience at that time with

13         Hy-Rail devices?

14    A    Yes.

15    Q    What was your experience at that time with

16         Hy-Rail devices?

17    A    They brought us into a yard.  They showed us

18         different types of Hy-Rail gear.   Showed us how

19         it operated.  Had mechanics explain to us

20         problems that they'd encountered, safety issues

21         that they'd encountered, things that we should be

22         aware of for a good amount of time.

23    Q    How long did this course take place?

24    A    The entire course in Oklahoma City was six
```

19

```
 1         months.

 2     Q   So how much time did you spend with Hy-Rail

 3         devices?

 4     A   No more than a week.

 5     Q   Do you know for sure?

 6     A   It's no more than a week.  It was a week.

 7     Q   This is back in 1978, right?

 8     A   It was -- actually I think it was back in '82,

 9         yeah.

10     Q   '82, okay.  Mechanical, electrical, HVAC design

11         and inspection, what's that all about?

12     A   Those are the courses that they gave us in the

13         six months.

14     Q   So it was environmental, health and then all

15         these other things?

16     A   Well actually environmental health was, it was

17         the year before at Cameron University.

18     Q   That had nothing to do with Hy-Rail devices, did

19         it?

20     A   Correct.

21     Q   Any other education that's not listed on your

22         curriculum vitae?

23     A   Well, of course, much like yourself we're

24         required the continuing education requirements
```

1  Q  Did you ever have a Hy-Rail truck assigned to

2     you?

3  A  Oh, no.

4  Q  How often did you actually ride in one during

5     that period of time, '82 to '83?

6  A  Not that often.  Once, twice, three times maybe.

7  Q  In your whole career there, once, twice or three

8     times?

9  A  Correct.

10  Q  You rode in somebody else's Hy-Rail truck?

11  A  Correct.

12  Q  That was some employee of the railroad?

13  A  They would assign them to me and I would be taken

14     to wherever they wanted me to see.

15  Q  Do you recall what type of Hy-Rail devices were

16     attached to those vehicles?

17  A  I do not.

18  Q  Do you recall if they were Fairmont/Harsco

19     Hy-Rail devices?

20  A  I do not.

21  Q  So you don't know if those devices were the same

22     types that were used, that were involved in the

23     case that we're talking about now?

24  A  Correct.

BEACON HILL COURT REPORTING, INC.
617-569-8050

1   Q    Do you have any memory of how those devices

2        operated?

3   A    My memory recall is that they operated manually

4        much like this device.  We used a bar.  We set

5        them in place.  They locked.  And then unlocked

6        it and put 'em back on.

7   Q    Of those two or three times that you rode in the

8        Hy-Railer you say you assisted in getting the

9        wheels on or off the tracks?

10  A    Correct.

11  Q    I mean the pilot wheels?

12  A    Correct.

13  Q    What did you do to assist in that process?

14  A    Raised and lowered them.

15  Q    You actually did it?

16  A    Yes.

17  Q    You were shown how to do it by whom?

18  A    By whoever the operator of the truck was.

19  Q    How many times during that two- or three-year

20       period back in the early '80's did you actually

21       assist in the operation of the Hy-Rail device?

22  A    To raise and lower?

23  Q    Yes.

24  A    No more than a half dozen times.

1  Q   During those times did you ever inspect the plans

2      for any of these Hy-Rail devices?

3  A   Well I certainly saw the manuals as a matter of

4      interest.  They were in the trucks that we were

5      driving in and it was just for me natural to read

6      through them to see how it worked.

7  Q   You did that before you would operate them?

8  A   Actually, no.  The operator showed me what he was

9      doing.  I wanted to do it myself.  And then I

10     would read the manuals as we were driving along

11     the rail.

12 Q   Do you know the names of any of these operators?

13 A   Oh, not at all.

14 Q   Do you know if any of those manuals were similar

15     or the same manual involved in this case?

16 A   I really don't recall.

17 Q   Other than operating the manuals (sic) did you do

18     any further inspection to try to figure out

19     exactly how those Hy-Rail devices worked?

20         MR. BYRNE:  Objection.

21 A   At that time, no.

22 Q   You understand what I mean by that question,

23     don't you?

24 A   I do.

40

```
 1   Q    For instance, they were using, you felt there was

 2        a bridge in town that couldn't support the

 3        weight?

 4   A    It was falling apart.  Correct.

 5   Q    You were afraid that if the railroad was

 6        operating trains over it that it might affect the

 7        public safety?

 8   A    Correct.

 9   Q    But you weren't involved in the design of any

10        railroad equipment during this time at Gailor

11        Associates?

12   A    No.

13   Q    You weren't involved in failure analysis during

14        this time, were you, '85 to '89, failure design

15        for equipment?

16   A    Equipment, no.

17   Q    You weren't involved in mechanical engineering

18        either at Saratoga Associates or at Gailor

19        Associates, correct?

20   A    Actually we offered mechanical engineering at

21        Gailor Associates.  I had subordinate engineers

22        who were mechanical engineers.

23   Q    Did you, yourself, work as a mechanical engineer

24        at either Saratoga Associates or Gailor
```

BEACON HILL COURT REPORTING, INC.
617-569-8050

41

```
 1          Associates?

 2     A    No.

 3     Q    I take it from '84 to '99 when it was Saratoga

 4          and Gailor you never worked on any Hy-Rail

 5          devices; is that fair to say?

 6     A    Correct.

 7     Q    You never designed any, right?

 8     A    Correct.

 9     Q    You never maintained any, correct?

10     A    Correct.

11     Q    You never repaired any, correct?

12     A    Correct.

13     Q    You never inspected any, correct?

14     A    Correct.

15     Q    You never operated any, correct?

16     A    Correct.

17     Q    I take it you didn't keep yourself up to date

18          with the latest modifications to Hy-Rail devices

19          during that time period from '84 to '99, correct?

20          MR. BYRNE:  Objection.

21     A    Correct.

22     Q    As a matter of fact, you probably didn't review

23          any literature at all pertaining to the Hy-Rail

24          devices during that time period?
```

42

1    A    Up to '99?

2    Q    Right.

3    A    Correct.

4    Q    Now did Gailor Associates do any forensic

5         engineering?

6    A    No.

7    Q    So your work with attorneys did not start until

8         you went to Harlan-McGee?

9    A    For the most part.  I mean, you know,

10        acquaintances who were attorneys would ask for

11        information from time to time, you know, some

12        input or ways to analyze things.  But not really.

13   Q    You never gave -- you were never hired as an

14        expert to give an opinion in a legal case from

15        '84 to '99; is that fair to say?

16   A    I probably was, but they were very minor cases.

17   Q    Nothing involving railroad equipment?

18   A    Oh, no, not at all.

19   Q    Nothing involved Hy-Rail devices?

20   A    Correct.

21   Q    Between '84 and '99 when you were with Saratoga

22        Associates and Gailor Associates is it fair to

23        say that you never had any railroads as clients?

24   A    That's correct.

43

```
 1    Q    Is it also fair to say that you never had
 2         Fairmont/Harsco as a client?
 3    A    That's correct.
 4    Q    Is it also fair to say that you never had as a
 5         client any other entity which manufactured or
 6         designed Hy-Rail devices?
 7    A    Correct.
 8    Q    Now in your curriculum vitae it does say that you
 9         started with Harlan-McGee in 1991 and have worked
10         there until the present.  Is that a typo or a
11         mistake?
12    A    No.  Actually I think they were out there in '91
13         and had approached me and we were just making
14         ourselves available.  It was like -- there wasn't
15         a lot of work with them until after '99.
16    Q    So earlier you said that you might have worked on
17         some minor cases?
18    A    Right.
19    Q    Is that what you were referring to?
20    A    Correct.
21    Q    So those minor cases were things that you did
22         through your contacts with Harlan-McGee?
23    A    Right.  As maybe once or twice a year, if that.
24    Q    Is it fair to say that Harlan-McGee is kind of
```

59

1    Q    Have you ever designed a machine?

2    A    No.

3    Q    Have you ever worked for any company that has

4         designed a machine?

5    A    No.

6    Q    Of course, as I take your experience, you never

7         worked for any company which designed Hy-Rail

8         devices, correct?

9    A    Correct.

10   Q    You never worked for any company which repaired,

11        maintained or inspected Hy-Rail devices, correct?

12   A    Correct.

13   Q    It's never been part of your day-to-day

14        activities of your job at any, for any job that

15        you've held to operate, maintain, repair and/or

16        inspect Hy-Rail devices, correct?

17   A    Other than what's previously mentioned, correct.

18   Q    Other than the two or three times that you

19        operated?

20             MR. BYRNE:  Objection.

21   A    Correct.

22   Q    What I'm saying is through all the jobs you've

23        held it's never been part of your day-to-day

24        activities to go out and operate a Hy-Rail

BEACON HILL COURT REPORTING, INC.
617-569-8050

60

1        device, correct?

2    A    Correct.

3    Q    It's never been part of your day-to-day

4        activities to repair a Hy-Rail device, correct?

5    A    Correct.

6    Q    It's never been part of your day-to-day

7        activities to inspect a Hy-Rail device, correct?

8    A    Correct.

9    Q    Or to repair one, correct?

10    A    Correct.

11    Q    You also claim to be an expert in slip-and-fall

12        accidents?

13    A    Correct.

14    Q    In blasting?

15    A    Correct.

16    Q    In safety devices?

17    A    Correct.

18    Q    For use in construction sites, correct?

19    A    Correct.

20    Q    You also claim to be an expert with respect to

21        pedestrian safety?

22    A    Correct.

23    Q    You claim to be an expert with respect to

24        premises liability?

95

```
 1    Q    Only one site inspection?

 2    A    Correct.

 3    Q    Now earlier you mentioned another Hy-Rail case

 4         that you had.

 5              What was the name of that case?

 6    A    It was with C.P. Rail at the Selkirk yard.

 7    Q    C.P. Rail at the Selkirk yard.  Who were you

 8         retained by, plaintiff or defendant?

 9    A    We were asked to come in -- you know, it never

10         really went to suit.  It was an investigation as

11         to why a piece of gear had derailed in a

12         construction site.

13    Q    An investigation as to how a piece of gear

14         derailed?

15    A    Correct.

16    Q    Who asked you to come in and look at it?

17    A    I think C.P. Rail did.

18    Q    Do you know who at C.P. Rail you dealt with?

19    A    I do not.

20    Q    Did you prepare a report?

21    A    We did.

22    Q    When was this, by the way?

23    A    Oh, this was a few years ago, four or five years

24         ago.
```

1    Q    So Harlan-McGee might still have your report?

2    A    Correct.

3    Q    Did anyone else from Harlan-McGee go out and

4         check this out?

5    A    No.

6    Q    What kind of a piece of equipment derailed?

7    A    It was a pickup truck with Hy-Rail gear driving

8         through a construction site.  There were some

9         improvements going on to the facility at Selkirk.

10        The truck had jumped off the track.  And after

11        all the shouting died down they asked us to

12        figure out what was wrong or what was going on at

13        the site that would make this -- it had jumped

14        off more than once.  Why it was coming off the

15        track.

16   Q    So did you look at the track?

17   A    We looked at the track and we, you know, there

18        was a lot of construction debris in the area.  We

19        felt that the construction debris was

20        contributing to it.  And that the wheel that kept

21        hopping off actually hadn't been adjusted

22        properly, was a little light compared to the

23        weight that was down on the other wheels.  And it

24        had a propensity once it hit the brake to jump

97

1          off the light side.

2     Q    Which wheel was it?

3     A    It was the driver's side front.

4     Q    Same as --

5     A    Oh, same as this, right, yeah.

6     Q    What type of a Hy-Rail gear was it?

7     A    If I recall, it's the same type of gear as this.

8     Q    Was it Fairmont/Harsco?

9     A    Correct.

10    Q    Do you recall whether it was a 307 or 307A or

11         something else?

12    A    I don't recall.

13    Q    Do you recall if it was an easy lift?  Was it

14         manual or hydraulic?

15    A    It was manual.

16    Q    Was it an easy lift with gears or without?

17    A    I don't recall.

18    Q    Or was it not an easy lift?

19    A    My recollection is it was not an easy lift.

20    Q    So then it was different than the type in this

21         case, correct?

22    A    Correct.

23    Q    Because you know that in this case it's an easy

24         lift?

98

```
 1                MR. BYRNE:  Objection.

 2      Q    You know that there's a distinction, correct?

 3      A    Yes.

 4      Q    As I understand it, the easy lift has a socket on

 5           both the top and the bottom, correct?

 6      A    Correct.

 7      Q    Whereas the non-easy lift only has a socket on

 8           the bottom, correct?

 9      A    Right.

10      Q    So it was a different piece of, a different type

11           of Hy-Rail device altogether, correct?

12                MR. BYRNE:  Objection.

13      A    Yeah, it was a different piece of Hy-Rail device.

14      Q    Different in its design, correct?

15      A    Well it hadn't been outfitted with the -- I mean,

16           with the exception of the easy lift apparatus

17           everything else is the same.

18      Q    But that's a big difference, right?

19      A    It is for the operator.

20      Q    The whole operating procedure is different,

21           correct?

22      A    Correct.

23      Q    It's about twice as many steps, correct?

24      A    Well it's tougher, yeah.
```

99

```
 1    Q    You came to the conclusion in that case that

 2         there were two things that were causing the

 3         derailment, right?

 4    A    Correct.

 5    Q    Was anyone hurt in that, by the way?

 6    A    No.  Just a lot of aggravation.

 7    Q    That case never went to suit as far as you

 8         understood it?

 9    A    No.

10    Q    The other thing you found out was that the wheel

11         had been adjusted improperly, right?

12    A    Correct.

13    Q    As I understand, there's like a torque setting on

14         these wheels; is that fair to say?

15    A    You can adjust them so they address the rail at

16         different weights.

17    Q    That's because they have to have a sufficient

18         amount of torque to get the body of, or the frame

19         of the vehicle up off the rail enough so that

20         it's rolling on its guide wheels while still

21         being driven by --

22    A    That's correct.

23    Q    If you go too much you're not going to have, you

24         won't be able to drive it?
```

```
 1    A    You won't go anywhere.

 2    Q    Because the rubber wheels won't be touching the

 3         track?

 4    A    Correct.


 5    Q    If you have not enough it's going to derail

 6         because there's not enough pressure on the pilot

 7         wheel?

 8    A    Correct.

 9    Q    There's a simple adjustment that can be made,

10         correct?

11    A    Correct.

12    Q    What you found in this case for C.P. Rail was

13         that adjustment was improper, correct?

14    A    For that one wheel, correct.

15    Q    It wasn't adjusted high enough, correct?

16    A    Correct.

17    Q    Do you know what was done in response to that?

18    A    It was just adjusted.

19    Q    Then it was fine after that?

20    A    Yes -- well then they kept the debris off the

21         track, yeah.

22    Q    What evidence led you to that conclusion that it

23         was improperly, the torque was improperly

24         adjusted?
```

BEACON HILL COURT REPORTING, INC.
617-569-8050

1    A    We checked them all.

2    Q    You found that the other three were higher?

3    A    Yeah, and the fourth one wasn't.

4    Q    You know in this case the adjustment of the

5         torque has nothing to do with it, in the

6         Papadakis case, correct?

7    A    Correct.

8    Q    I mean, I've read your report.  There's nothing

9         in your report about the adjustment of the

10        torque, correct?

11   A    Correct.

12   Q    In your professional opinion the torque

13        adjustment had nothing to do with it, correct?

14   A    Correct.

15   Q    In fact, you know that there's no evidence in

16        this case that the torque was improperly

17        adjusted, correct?

18   A    Correct.

19   Q    As a matter of fact, you've read Mr. Ebert's

20        deposition, right?

21   A    Yes.

22   Q    From TNT Repairs?

23   A    That's correct.

24   Q    By the way, was TNT involved with C.P. Rail?

170

```
 1    Q    They don't show what you believe occurred to Mr.

 2         Papadakis in these photographs, correct?

 3    A    Oh, no, we have no pictures of the overcamming,

 4         no.

 5    Q    Have you ever -- do you have any information from

 6         any source other than the Harsco Web site web

 7         site about overcamming of the wheel?

 8    A    Yes.

 9    Q    What source is that?

10    A    Richard Sanderson.

11    Q    Other than Mr. Sanderson do you have any

12         evidence, any evidence of overcamming with

13         respect to this Hy-Rail device?

14    A    No.

15              MR. BYRNE:  Objection.

16    Q    Who is Mr. Richard Sanderson?

17    A    He's a retired railroad worker.

18    Q    Have you ever met him?

19    A    Only have spoken with him over the phone.

20    Q    Once?

21    A    A couple of times.

22    Q    More than twice?

23    A    Possibly three.   Certainly no more than three.

24    Q    Two to three times?
```

BEACON HILL COURT REPORTING, INC.
617-569-8050

171

```
 1    A    Correct.

 2    Q    How long were these conversations with him?

 3    A    The first one was probably ten minutes.  The

 4         second one was at least half an hour.  If there

 5         was a third one then it was another fifteen

 6         minutes.

 7    Q    So less than an hour total?

 8    A    Correct.

 9    Q    You were put in touch with Mr. Sanderson by

10         plaintiff's counsel, correct?

11    A    Correct.

12    Q    This isn't somebody you sought out, correct?

13    A    Correct.

14    Q    Why was it that plaintiff's counsel put you in

15         touch with Mr. Sanderson?

16    A    He felt he was a very knowledgeable individual.

17    Q    Were you put in touch with Mr. Sanderson because

18         you were having problems coming to an opinion in

19         this case?

20    A    We were working --

21              MR. BYRNE:  Objection.

22    Q    First of all, just yes or no, and then you can

23         explain it for me.

24    A    Oh, I was having no problem coming to opinions.
```

172

```
 1    Q    Even though your first hypothesis was not proven?

 2    A    That was -- that's true.

 3    Q    Are you put in touch with Mr. Sanderson after

 4         your first hypothesis is put aside?

 5    A    It's probably about the same time that we were

 6         trying to come to, I was trying to come to

 7         conclusions.

 8    Q    You were just saying we were trying to come to

 9         conclusions?

10    A    I always say we.  I've got a mouse in my pocket.

11    Q    Did you mean you and plaintiff's counsel?

12    A    No, no, no, no.

13    Q    So you're trying to come to this conclusion.

14         Your first hypothesis you put aside.

15              Are you searching at that point in time for

16         a second hypothesis?

17    A    Well I've got a conflict of information.  I've

18         got, I've got EBT's that are, have conflicting

19         information.

20    Q    So you're having a problem coming to a

21         conclusion?

22    A    I am.

23    Q    At that point in time you don't have any opinion;

24         is that fair to say?
```

```
 1     A    Ah, shoot.

 2     Q    I'll show you one thing, okay, first.  I have a

 3          memorandum.  It's dated June 21, '05 to the Paul

 4          Papadakis file apparently from Mr. Byrne, subject

 5          Mr. Richard Sanderson.  Okay?

 6     A    Good.

 7               MR. FLYNN:  Let me have that marked as the

 8          next exhibit.

 9                    ( Memorandum dated June 21, 2005,

10                      marked as Exhibit No. 9.)

11     Q    Does that refresh your recollection as to when

12          you were put in touch with Mr. Sanderson?

13     A    Yes.

14     Q    That was in about June of 2005?

15     A    That would have been in June of 2005, right.

16     Q    So it's still two months before you prepared your

17          first report, correct?

18     A    Correct.

19     Q    May I see that for a second.  Basically this memo

20          tells you what Mr. Sanderson's qualifications

21          are, correct?

22     A    Correct.

23     Q    You would consider him to be somebody that's more

24          experienced with Hy-Rail devices than you, right?
```

179

```
1     A    Oh, yes.

2     Q    He would be more expert with respect to that

3          issue, correct?

4     A    Correct.

5     Q    You were being put in touch with Mr. Sanderson,

6          sir, for a couple of reasons, correct?

7               MR. BYRNE:  Objection.

8     A    I don't know.

9     Q    Well do you have an understanding as to why you

10         were being put in touch with Mr. Sanderson?

11    A    He was a resource.

12    Q    Because you were having problems coming to an

13         opinion, correct?

14    A    No.

15              MR. BYRNE:  Objection.

16    Q    Was it to help educate you as to how these

17         Hy-Rail devices work?

18    A    No.

19    Q    Was it to help educate you as to how Hy-Rail

20         devices might fail?

21    A    I don't believe so.

22    Q    Well then why were you put in touch with Mr.

23         Sanderson?

24    A    Additional resource.
```

```
1        Q    About what issue?

2        A    You asked me questions about what books I read,

3             what publications were available.  This is the

4             same kind of resource as a book or publication.

5             This is an individual who has 41 years of

6             experience who is maybe able to answer a question

7             or two about the conflicts that are there in the

8             various EBT's.

9        Q    The conflicts in the record?

10       A    In the record, correct.

11       Q    When you go to review any resource it's because

12            you're trying to educate yourself on something,

13            correct?

14       A    It's always good to know what's out there.

15       Q    Well that's what you do when you look at a parts

16            manual, correct?  That's because you want to find

17            out what parts are involved in something, right?

18       A    I understand the question you're asking.  I don't

19            know how much more education other than

20            clarification I would get.

21       Q    But when you're testifying about bleacher design

22            you go look at the actual plans of the bleacher,

23            correct?

24       A    I would.
```

181

```
 1    Q    You go and look at perhaps articles that are
 2         written about how bleachers are put together,
 3         correct?
 4    A    I would.
 5    Q    And you'd look at articles as to the different
 6         formulas and things for the structural analysis
 7         of bleachers, correct?
 8    A    Correct.
 9    Q    You go to those resources so that you can learn
10         those things, correct?
11    A    Learn them, learn them in the same way that you
12         would drive a car.  You don't learn to drive a
13         car every time you get into it.  That's what
14         you're saying.
15    Q    Right.
16    A    I don't learn.  The resources are there to use.
17    Q    Certainly Mr. Sanderson was a resource that you
18         felt that you wanted to take advantage of, right?
19    A    I would, yes.
20    Q    You didn't know about this gentleman until
21         plaintiff's counsel put you in touch with him,
22         correct?
23    A    Correct.
24    Q    Do you know what the relationship is between
```

182

1       plaintiff's counsel and Mr. Sanderson?

2   A  I don't.

3   Q  Do you know if there is one?

4   A  I don't.

5   Q  Do you know if they've worked together in the

6       past?

7   A  I don't.

8   Q  What did you do after receiving this memo in June

9       of 2005, Exhibit 9?

10   A  Gave Mr. Sanderson a call.

11   Q  Then you had those two or three conversations you

12       spoke about?

13   A  Correct.

14   Q  In fact, he wrote a memo to you about how the

15       accident, well how he thought the accident

16       occurred, correct?

17   A  Correct.

18   Q  Your report is based in large part on that memo

19       that Mr. Sanderson sent to you, correct?

20       MR. BYRNE:  Objection.

21   A  He had reached the same conclusion I had at that

22       time.

23   Q  Well he actually put it -- when did you get this

24       writing from him?

183

1    A    I don't recall.

2    Q    It was before you did your report, wasn't it?

3    A    I believe it was probably after we were done, or

4         close to being done.

5    Q    Sir, was it before or after you did your report?

6    A    During.

7    Q    During?

8    A    Could very well be during.

9    Q    So what's your best memory?

10   A    I don't recall.

11   Q    You certainly had not committed your opinions to

12        a final writing at the time that you got this

13        letter from Mr. Sanderson, correct?

14   A    I think the letter was more confirmation for us

15        than anything else, for me than anything else.

16   Q    Well actually it reads, in large part it reads

17        almost verbatim in certain parts that your report

18        does, correct?

19   A    That's because I sent him a copy of my report.

20   Q    Is that what happened?  You sent him a report and

21        he sends back this letter?

22   A    I wanted to know his opinion.

23   Q    After you send him your report?

24   A    Correct.

184

```
 1     Q    So he's plagiarizing from your report?

 2     A    I don't think he's plagiarizing.  I think he's

 3          doing a very good job.

 4     Q    Why don't you pull his report out of your file,

 5          sir?

 6     A    Oh, I have a copy of his report, but it was

 7          supplied here by counsel.

 8               MR. FLYNN:  Can we have that marked.

 9     A    It's in here but...

10               MR. BYRNE:  This one came from my file.

11               MR. FLYNN:  Can I mark that one, Bob?

12               MR. BYRNE:  Why don't we make a photocopy of

13          it.

14               MR. FLYNN:  Sure.  Thanks, Bob.

15               Can I have these next two documents marked

16          as Exhibits 11 and 12.  11 is a report on

17          Harlan-McGee, dated August 24, 2005 on

18          Harlan-McGee letterhead.  Exhibit 12 is a report,

19          same date, but it's the one, it's a copy of what

20          you faxed to me on August 31st of 2005.

21                         ( Mr. Sanderson's Report, marked as

22                         Exhibit No. 10.)

23                         ( Report dated August 24, 2005,

24                         marked as Exhibit No. 11.)
```

185

```
 1                    ( Report dated August 24, 2005,
 2                      marked as Exhibit No. 12.)
 3    Q   Now do you have Mr. -- if you can look at Exhibit
 4        10, sir.  It's Mr. Sanderson's report.
 5            You've seen this before, obviously, correct?
 6    A   Yes.
 7    Q   You just don't have a specific memory of when you
 8        received it, correct?
 9    A   Correct.
10    Q   I believe it's been your testimony that it was
11        while you were working on your report, correct?
12    A   Correct.
13    Q   You say that you sent him a draft of your report
14        before he prepared this document, correct?
15    A   I believe so.
16    Q   He does say what he has reviewed in the first
17        eight numbered paragraphs of his letter, doesn't
18        he?
19    A   He doesn't say what he reviewed.  He says, "My
20        opinion is based on".
21    Q   He does not list there anything that he received
22        from you, does he?
23    A   That's good.
24    Q   Does he?
```

BEACON HILL COURT REPORTING, INC.
617-569-8050

186

1   A   That's correct.

2   Q   Then he goes on to describe how he feels the

3       accident happened, correct?

4   A   Correct.

5   Q   Now let's look at Exhibit 11.  By the way, how

6       many different reports have you done in this

7       case?

8   A   Once again, to refresh your memory, I said two.

9   Q   I've got to get another one out.  Hold on a

10      second.

11                      ( Report dated August 24, 2005,

12                        marked as Exhibit No. 13.)

13  Q   Let me show you a copy of Exhibit 13, sir.  It's

14      a report from you dated August 24, 2005, okay.

15      Just look at the second page.   There's no

16      mention of Mr. Sanderson at all, is there?

17  A   Correct.

18  Q   Is that the first draft of your report?

19  A   Yes.

20  Q   Look at Exhibit 11, okay.  That's another draft

21      of your report, correct?

22  A   Correct.

23  Q   That does contain a reference to Mr. Sanderson,

24      correct?

187

1    A    Yes.

2    Q    That one is also dated August 24, 2005, correct?

3    A    Correct.

4    Q    Now, sir, what specific date was your first

5         report, Exhibit 13 committed to writing?

6    A    I don't recall.

7    Q    Was it August 24, 2005?

8    A    It could very well have been.

9    Q    Which was generated from your computer, correct?

10   A    Right.

11   Q    So if you were to download your computer

12        information it would include in the word

13        processing software the dates that you actually

14        prepared these drafts, correct?

15   A    I think it shows you the latest date you worked

16        on it.

17   Q    What kind of software do you have?

18   A    We're using Microsoft Word.

19            MR. FLYNN:  I ask that that be downloaded as

20        it exists and put it on a disk as well as -- I

21        want the current draft as well as any prior

22        drafts.  Okay, Bob?

23            MR. BYRNE:  Give me the list of all of this

24        after the deposition.

BEACON HILL COURT REPORTING, INC.
617-569-8050

```
 1            MR. FLYNN:  We will after we get the
 2       deposition.  Will you agree to provide that, Bob?
 3            MR. BYRNE:  I'll provide what's required by
 4       the rules.  I have to do a little research when I
 5       go home.
 6            MR. FLYNN:  So we don't have an agreement.
 7       A little research?
 8            MR. BYRNE:  Not until I satisfy myself that
 9       you're entitled to it.
10    Q    Now how long did it take you to get from Exhibit
11       13, the draft, unsigned draft dated August 24,
12       2005 to Exhibit 11 which is the draft of the same
13       date on Harlan-McGee letterhead?
14    A    I don't know.
15    Q    Was it days, hours, minutes; how long?
16            MR. BYRNE:  Objection.  Asked and answered.
17    A    Thank you.
18    Q    Well no, you didn't.  You said you didn't know.
19            MR. FLYNN:  I'm trying to probe his memory.
20            MR. BYRNE:  That's his answer.
21    Q    Was it a matter of hours?
22    A    I don't know.
23    Q    Was it a few days later?
24    A    I don't know.
```

189

1  Q   What transpired between the first draft, Exhibit
2      13, and the second one, Exhibit 11?
3  A   I don't recall.

4  Q   Why was it that you decided to insert a reference
5      to Mr. Sanderson in Exhibit 11 which had not been
6      there, which was not there in Exhibit 13?
7  A   Must have spoken with him.
8  Q   Spoken with him?
9  A   Sanderson is in both.  13, 11.  Sanderson is in
10     both.
11 Q   Can I see Exhibit 13, please?
12 A   Sure.
13 Q   In the second paragraph of Exhibit 13 you say
14     that there was a review conducted and that you
15     performed the review, correct?
16 A   Correct.
17 Q   In Exhibit 11 in that second paragraph you have
18     now changed it to say that you and Mr. Sanderson
19     performed the review, correct?
20 A   Oh, okay, correct.  I see Sanderson's name under
21     "information available".
22 Q   Well why did you make that change?
23 A   After additional conversation with him.
24 Q   Did you have -- did anyone tell you to put that

BEACON HILL COURT REPORTING, INC.
617-569-8050

190

1         change in the record?

2    A    No.

3    Q    Did you actually type that in or did somebody

4         else?

5    A    No, I believe I did.

6    Q    In "information available" in Exhibit 13 you say

7         in Line 8, "Richard Sanderson interview".   On

8         Exhibit 11 you say "Richard Sanderson interview

9         and consultation".

10            Did I read that correctly?

11   A    Correct.

12   Q    Why did you make that change?

13   A    I think that was after the second time we spoke.

14   Q    After that you make no other mention of Mr.

15        Sanderson in either of these, do you?

16   A    We list him as under the "respectfully submitted"

17        to identify that he's contributed to the article.

18   Q    If you look at Exhibit 12 this is yet another

19        report, correct?

20   A    Correct.

21   Q    Do you recall the date of that, what the actual

22        date was that you prepared that one?

23   A    I don't.

24   Q    Was it after August 24th of 2005?

191

```
1    A    It was definitely after my first draft.

2    Q    Days after, weeks after; how long after?

3    A    I don't know.

4    Q    You've added a paragraph to Exhibit 12 which is

5         not contained in Exhibit 11 and 13, correct?

6    A    Correct.

7    Q    It's a paragraph about Mr. Sanderson, correct?

8    A    Correct.

9    Q    Now would you refer to Exhibit 13, please, or

10        actually you can go to Exhibit 12.  I would like

11        you to also get out the Sanderson letter which is

12        Exhibit 10, I believe.  Sir, your report, Exhibit

13        12, on the third page at the very top of it, the

14        first full sentence reads, "This is accomplished

15        by removing the lock pin and then inserting the

16        hand lever into the lower socket pushing downward

17        to release the pressure on the locking Paul.

18        This releases the mechanical lock and allows the

19        guide wheel to be placed into the lower rail

20        position", end of quote.

21             Did I read that correctly?

22   A    Correct.

23   Q    Look at Mr. Sanderson's letter dated, undated

24        letter, if you look at the second full paragraph,
```

```
 1          the last sentence of it?

 2     A    Got it.

 3     Q    Quote, This is accomplished by removing lock pin

 4          and then inserting hand lever into lower socket

 5          and pushing downward to release pressure on

 6          locking Paul lever releasing the mechanical lock

 7          and lower guide wheel assembly to lower rail

 8          position, end of quote.

 9               Did I read that correctly?

10     A    Yes, you did.

11     Q    It's virtually the same thing that you've written

12          in your report, isn't it?

13     A    That's correct.

14     Q    Did you copy what he either told you or put in

15          his report?

16     A    I believe we both got it out of your manual.

17     Q    Sir, it's almost the exact same language as this

18          report, correct?

19     A    Obviously he had input to this final report that

20          was released.

21     Q    Is it just a coincidence that you were both using

22          the exact same language?

23          MR. BYRNE:  Objection.

24     A    I don't think so.  Why would that even be a
```

BEACON HILL COURT REPORTING, INC.
617-569-8050

1        problem?

2    Q    Because I have a letter from a person who has not

3         been identified as an expert who you were put in

4         touch with because you were having problems

5         getting an opinion.  Then all of a sudden --

6              MR. BYRNE:  Objection.

7    Q    -- we have a report which has the exact same

8         language in it.

9              MR. BYRNE:  Objection.

10   Q    Did I answer your question now?

11   A    Not very well, but keep on going.

12   Q    Do you see where my concern is?

13             MR. BYRNE:  Objection.

14   A    I see what you're trying to do.  But go ahead.

15        Continue.

16   Q    Let's look at the next sentence of your report.

17        Quote, He then removed a hand lever.

18             That wouldn't have come from a manual, would

19        it?

20             Sir, would you review your report, please?

21   A    I can see it.

22   Q    Well I would like you to read along with me

23        because I'm going to ask you if I read it

24        correctly.  Or do you have enough of a memory

194

```
1          that you know what it says?

2                MR. BYRNE:  Objection.

3     Q    You know it well enough without looking at it?

4                MR. BYRNE:  Objection.  He said he was

5          looking at it.

6                MR. FLYNN:  He's not.

7                MR. BYRNE:  You're being abusive.  He's

8          looking at his report.

9                MR. FLYNN:   I'm asking the man to look at

10         it.  He's looking right at me.

11               MR. BYRNE:  He's looking at his report.

12         It's right in front of him.

13               MR. FLYNN:  Well let's let the record

14         reflect what's going on.

15    Q    Quote, He then removed the hand lever and

16         inserted it into the upper socket of the easy

17         lift assembly.  He then pushed down on the hand

18         lever forcing the guide wheel down until the

19         spring-loaded locking mechanism fully engaged

20         securing the assembly in the rail position.  He

21         then inserted the lock pin into place securing

22         the locking Paul, end of quote.

23               Did I read that correctly?

24    A    Correct.
```

BEACON HILL COURT REPORTING, INC.
617-569-8050

195

1    Q    If you look at the very next sentence of Mr.

2         Sanderson's report, quote, He would then remove

3         the hand lever and insert it into, in the upper

4         socket of the easy lift conversion assembly and

5         push down on the hand lever forcing the guide

6         wheel down until the spring-loaded locking

7         mechanism fully locks securing the assembly in

8         the rail position.  He would then insert the lock

9         pin securing the locking Paul, end of quote.

10             Did I read that correctly?

11   A    Correct.

12   Q    It's virtually the same thing in your report that

13        we find in Mr. Sanderson's report, correct?

14   A    It's the same description of what happens when

15        you use the equipment.

16   Q    Which did not come from the manual, did it?

17   A    Well what you're reading from are two different

18        letters.

19   Q    I understand that.  But your explanation as to

20        the coincidence earlier was that it was just you

21        both put down what was in the manual?

22   A    That's what the manual says to do.

23   Q    The manual says that, "He then removed the hand

24        lever"?

BEACON HILL COURT REPORTING, INC.
617-569-8050

196

```
1   A   This is what the manual says to do to use this

2       equipment.  That's what Mr. Papadakis did to use

3       this equipment.

4   Q   With respect to the sentence I just read did you

5       copy that from Mr. Sanderson's report?

6   A   No.  I believe we both discussed the way this is

7       done.

8   Q   You discussed -- did you have a discussion

9       specifically with respect to what I just read?

10  A   I believe we did.

11  Q   Did you put down into your manual what you

12      learned from, or in your report what you learned

13      from your discussion with him?

14  A   We both discussed it.  Both put it in writing.

15      And we each have copies of what we wrote.

16  Q   Going down, sir, to the next page of your report,

17      the third paragraph down which begins with "the

18      use of the incorrect hand lever".  Your report

19      says, quote, The use of the incorrect hand lever

20      allowed Papadakis to go over center with the

21      pivot arm when he engaged the Hy-Rail gear into

22      the rail position.  When he attempted to raise

23      the guide wheel at the end of his inspection he

24      experienced free movement of the upper socket
```

197

```
 1          when he pushed down to release the wheel, end of
 2          quote.
 3               Did I read that correctly?
 4     A    Correct.
 5     Q    If you would look down at Mr. Sanderson's report,
 6          fifth paragraph down which begins with the words
 7          "what I believe happened", okay.  Further in the
 8          sentence, quote, While using an incorrect hand
 9          lever from a different model to put the Hy-Rail
10          guide wheels into rail position, went over center
11          with the pivot arm allowing left front guide
12          wheel to lock in the rail position.   However, at
13          the end of his trip when he went to release the
14          pressure on the left front guide wheel unit he
15          experienced free movement of the upper socket
16          when he pushed down to release the loaded
17          pressure, end of quote.
18               Did I read that correctly?
19     A    Yes.
20     Q    It's virtually the same thing that you have in
21          your report, correct?
22     A    Correct.
23     Q    Right?
24     A    Correct.
```

198

```
 1    Q    Again, did you copy this statement that you made

 2         in your report from Mr. Sanderson's report?

 3    A    No.

 4    Q    It's just, it's your testimony that the language

 5         you used was so close to the language that Mr.

 6         Sanderson used because you had a conversation

 7         about this?

 8    A    We were on the phone together discussing how this

 9         could have happened, correct.

10    Q    Were you writing at the time you were --

11    A    Yes.

12    Q    So you were writing at the same time you were

13         talking with him?

14    A    We were talking.  I told him I wanted notes on

15         his end and I would give him notes on my end.

16    Q    So you're having this telephone conversation as

17         you're actually typing your report?

18    A    He was making notes about what I was saying.  I

19         was making notes about what he was saying.  And

20         then we exchanged copies to make sure we were

21         both on point.

22    Q    Well let me just back up.  You were making

23         handwritten notes or you were typing a report?

24    A    Making handwritten notes.
```

199

```
 1    Q    Because at the beginning of the deposition I
 2         asked you about notes.  You said the only notes
 3         you had in that bag were notes pertaining to your
 4         inspection.  Do you remember that?
 5    A    That's all I got in that bag.
 6    Q    That was your answer.  My question was:  do you
 7         have any notes?
 8    A    I don't.
 9    Q    Well you just told me about these notes that you
10         have with respect to your conversation with Mr.
11         Sanderson?
12    A    Yeah.
13    Q    Well do those fall under the definition of notes
14         in this case?
15    A    You asked me if I had any notes.  I don't have
16         those notes.
17    Q    Where are they?
18    A    Probably in the landfill somewhere.
19    Q    You threw them out?
20    A    I make notes, a million notes a day off the
21         phone.  When I'm done with them I get rid of
22         them.
23    Q    You had notes of a conversation with a potential
24         witness in this case, you have virtually
```

```
 1        identical language in your report that he has in

 2        his, you're now telling me that you were making

 3        these notes contemporaneous in time with your

 4        conversation with him and you threw them out?

 5              MR. BYRNE:  Objection.  Asked and answered.

 6    Q   Is that what you're saying, sir?

 7              MR. BYRNE:  The question has been asked and

 8        already answered.

 9    Q   You threw them out, sir?  You don't want to

10        answer it again?

11              MR. BYRNE:  He's already answered it.

12    A   I've already answered the question.

13              MR. BYRNE:  He already answered it.

14    Q   Does your report essentially reflect what you had

15        written in those handwritten notes?

16    A   Yes.

17    Q   Going further down in that same paragraph we just

18        read from your report, the last two sentences,

19        quote, When he pushed down to raise the guide

20        wheel to the highway position, he could not lock

21        it into position because the pivot arm was over

22        center.  He would have to raise the wheel by

23        other means and chain it to the frame in the

24        upper position for highway travel, end of quote.
```

1              Did I read that correctly?

2      A    Correct.

3      Q    Going over to Mr. Sanderson's report, the very

4           bottom of the paragraph we were earlier reading

5           from, quote, the last two sentences, midway

6           through, quote, When he inserted the bar into the

7           lower socket and pushed down to raise guide wheel

8           to highway position he would not be able to lock

9           it because pivot arm would be in the way.  He

10          would have to either raise the vehicle high

11          enough to replace the pivot arm or manually raise

12          the wheel and tie or chain it in the upper

13          position for highway travel, end of quote.

14             Did I read that correctly?

15     A    Yes, you did.

16     Q    Again, it's about the same thing that you have in

17          your report, correct?

18     A    Significant differences and noting as we're

19          talking, but, yeah, it's close.

20     Q    So there are no significant differences, correct?

21     A    I just said there were.

22     Q    What's the significant difference, sir?

23     A    Well I had discussed how the pivot arm would be

24          over-centered.  He discussed how it would be in

```
1            the way.

2       Q   Anything else?

3       A   Well he's discussing how high enough he'd have to

4            lift the vehicle to replace the pivot arm.

5       Q   You left that part out, right?

6                              (Whereupon, witness places eye

7                               glasses on conference table)

8       Q   Did you leave that part out?

9       A   These are my notes.  These are the notes I took

10           during our conversation.  These are the notes he

11           took during his conversation.  You can compare

12           them all you want.

13      Q   I'm going to continue to do so.   So that

14           statement that I just read was again something

15           that you guys were talking about and that you

16           wrote down in these notes which you've now thrown

17           out contemporaneous in time with the

18           conversation, correct?

19      A   You're testifying now so I can't answer what

20           you're testifying for me.

21      Q   No, sir, I'm not testifying.

22      A   You're telling me everything I did.

23      Q   I'm just trying to get it clear, sir.  I'm going

24           to ask it again.  The statement I just read from
```

203

```
 1          your report was something that you wrote down in

 2          these handwritten notes contemporaneous to the

 3          time that you actually had the conversation with

 4          Mr. Sanderson, correct?

 5     A    Correct.

 6               MR. BYRNE:  Objection.

 7     Q   What you wrote down was based on your

 8          conversation with Mr. Sanderson, correct?

 9               MR. BYRNE:  Objection.

10     A    No.

11     Q   Ultimately that statement found its way into your

12          report, correct?

13     A    What statement are we speaking of?

14     Q   The one you wrote down and the one which I just

15          read.

16               MR. BYRNE:  It is in his report.  You've

17          already marked it as --

18     Q    Right?

19     A   My report is my report.  You're reading sections

20          of it and asking if I wrote it.  Yes, I did.

21     Q    The statement I just read came from your notes

22          that you took based on your conversation with Mr.

23          Sanderson, correct?

24               MR. BYRNE:  Objection.
```

1   A   I've answered that already.

2   Q   No, you haven't.

3   A   Several times.

4   Q   No, you haven't.

5       MR. BYRNE:  Could I ask you to have the

6       court reporter read that question again.

7       MR. FLYNN:  I'll read it again.

8   Q   The statement that I just read, and we'll go back

9       and read it if you want to, but the statement I

10      just read was a statement which was in your

11      handwritten notes which were made at the time you

12      were speaking with Mr. Sanderson and was

13      ultimately, and which you ultimately put into

14      this report, correct?

15      MR. BYRNE:  Objection.

16  A   Once again, correct.

17  Q   Good.  The next paragraph of your report says in

18      the first sentence, quote, There are safety

19      features of the Hy-Rail gear that are built into

20      this unit to prevent it from going over center or

21      overcam.  The correct lever as identified in the

22      Hy-Rail gear literature has bends in it which

23      cause the lever to hit the crane or the ground

24      before allowing the gear to overcam, end of

205

```
 1          quote.

 2              Did I read that correctly?

 3     A    Correct.

 4     Q    The first sentence of the next paragraph of Mr.

 5          Sanderson's report is, quote, There are safety

 6          appliances built into the 0307 Hy-Rail easy lift

 7          conversion which helps prevent the unit from

 8          going over center or overcamming.  The correct

 9          hand lever has bends which hit before allowing

10          over-centering, end of quote.

11              Did I read that correctly?

12     A    Correct.

13     Q    That's pretty much the same as what you've

14          written in your report, correct?

15     A    My report has the notes I took during our

16          conversation.

17     Q    That was going to be my next question.  But it's

18          pretty much the same as what's in Mr. Sanderson's

19          report, correct?

20     A    His report indicates his recollection of our

21          conversation.  His comments and my comments, as I

22          recollect them, were what we discussed that day.

23     Q    That's how you generated your report, correct?

24     A    No.
```

206

1    Q    Well it was based in part on your conversations

2         you had with Mr. Sanderson, correct?

3              MR. BYRNE:  Objection.   Asked and answered.

4         It's already been explained.

5    Q    Right?

6              MR. BYRNE:  The testimony was that Sanderson

7         was a resource.  That was the testimony today.

8              MR. FLYNN:  I understand.  It's a different

9         question.  Could you read back the question,

10        please, and have him answer it.

11                  ( Whereupon, Court Reporter reads back

12                  Question located on Page 205, Line 17)

13   A    And Sanderson was a resource.  He's identified in

14        the report as a resource.  His name is on the

15        bottom line same as mine is as a resource and as

16        a developer of the report.

17   Q    The next sentence, the first sentence in the next

18        paragraph is, The vehicle did not have an

19        operational manual in the vehicle for Papadakis

20        to consult at the time of this accident, end of

21        quote.

22              Did I read that correctly?

23   A    Yes.

24   Q    You have read his deposition, correct?