

PLAINTIFF'S EXHIBIT A

PETER EBERT - March 31, 2005

1

```
UNITED STATES DISTRICT COURT
COMMONWEALTH OF MASSACHUSETTS
-----------------------------------------------

PAUL T. PAPADAKIS,

                         Plaintiff,

        Vs.

CSX TRANSPORTATION,

                         Defendant.
-----------------------------------------------
```

EXAMINATION BEFORE TRIAL of a Non-Party Witness, PETER EBERT, held pursuant to Subpoena, returnable March 31, 2005, commencing at 10:00 a.m. at the Anderson Group, 125 Wolf Road, Albany, New York 12205, before Kyle Alexy, a Shorthand Reporter and Notary Public in and for the State of New York.

APPEARANCES:

THORNTON & NAUMES, LLP, 100 Summer Street, Boston, Mass. 02110, (ROBERT M. BYRNE, ESQ., of Counsel), Attorneys for the Plaintiff.

FLYNN & ASSOCIATES, 400 Crown Colony Drive, Suite 200, Quincy, Mass. 02169, (MICHAEL B. FLYNN, ESQ., of Counsel), Attorneys for the Defendant.

ALSO PRESENT: Paul Papadakis, Gary Baker.

## COPY

**DIGITAL COURT REPORTING & VIDEO**
866-954-0352

PETER EBERT - March 31, 2005

3

```
 1                  P E T E R   E B E R T,
 2   having been first duly sworn by the notary public,
 3        was examined and testified as follows:
 4   BY MR. BYRNE:
 5   Q.    Good morning, sir.  Would you state your name
 6   for the record, please?
 7   A.    Peter Ebert.
 8   Q.    Where do you live, Mr. Ebert?
 9   A.    Do you want my address?
10   Q.    If you would, please.
11   A.    435 Newry Road, Greenville, New York.
12   Q.    Where are you employed, sir?
13   A.    TNT Repairs.
14   Q.    And what is the nature of that business?
15   A.    Truck and trailer repairs.
16   Q.    Do you have any ownership interest in that
17   business?
18   A.    I own it.
19   Q.    Do you have any partners in the business?
20   A.    No.
21   Q.    Is it a cooperation, sir?
22   A.    Yes.
23   Q.    So you're the sole shareholder in the
```

6

**PETER EBERT - March 31, 2005**

1  A.      Anything from a tractor trailer to a
2  bulldozer.
3  Q.      Would I be correct in assuming from your
4  answer that the equipment that you repaired was not
5  automobiles but rather trucks and commercial
6  vehicles of one type or another?
7  A.      Up until 17 years ago when Lou Frangella came
8  over, we only did tractor trailers and construction
9  equipment.  From that point on, we have from a
10 pickup truck to a car on up; that's everything that
11 deals with the railroad.
12 Q.      And the railroad you're referring to is what
13 railroad?
14 A.      It started out as Conrail with me.  In June
15 of -- six years ago it went to CSX.
16 Q.      What is the relationship between TNT Repair,
17 Inc. and CSX?
18 A.      That's one of my accounts.
19 Q.      Okay, do you have a contract with CSX to
20 perform periodic maintenance and or repair of its
21 vehicles?
22 A.      As far as I know, I'm in two different
23 aspects of fixing and doing other work now with the

```
1   Q.      Do you recall when it was that you first
2   began performing inspection, maintenance or repair
3   on high-rail gear for any railroad?
4   A.      When CSX took over from Conrail they decided
5   that they didn't need their shop doing the high
6   rail, and we started doing it.
7   Q.      And --
8   A.      That was approximately six years ago.
9   Q.      So up until approximately six years ago you
10  had not been involved in inspection, maintenance or
11  repair of high-rail gear?
12  A.      That is correct.
13  Q.      But over the last six years you have done
14  that type of work for these various railroad
15  carriers?
16  A.      Extensively.  Every six months by the federal
17  law they have to be done.
18  Q.      And do you, yourself, sir, perform any of the
19  inspection, maintenance or repair on these high rail
20  vehicles?
21  A.      Yes.
22  Q.      I take it some of your employees may also be
23  involved in that work?
```

```
 1   found during the course of your inspection?
 2   A.      I was asked to check this high-rail gear, but
 3   if I made a report out or not, I don't remember that
 4   if I had or not.  I know there were enough people
 5   standing there that they all seen with their own
 6   eyes.  I don't think -- I can't tell you if I made a
 7   report.  I don't remember.
 8   Q.      Okay, what event are you referring to where
 9   these people were standing around?
10   A.      When this particular truck number --
11   Q.      What truck number is it, sir?
12   A.      Truck number 500285.
13   Q.      And what is the date of the report?
14   A.      It's a little hard to read there.  I'm
15   almost -- I have no idea.  It's a 1401, I can tell
16   you that, but I don't know if, you know --
17   Q.      If I suggest to you --
18   A.      I couldn't -- I don't know.
19   Q.      If I suggest to you 6/14/01?
20   A.      I don't know.
21   Q.      Okay.  Do you recognize whose handwriting
22   appears on Exhibit 2?
23   A.      It's only one person, that's me.
```

1  A.      That would say $620?

2  Q.      And 89 cents?

3  A.      I don't know if she could or not. I could
4  find out. I know since then she probably eats a
5  computer up every three years, because it's just --
6  I don't know. I can surely -- I don't even know if
7  this work order number would be on there. I don't
8  ever get into that end of it.

9  Q.      Now did there come a time in June of 2001
10 where you were asked to perform an inspection of a
11 particular high-rail gear on a truck, 2500825?

12 A.      285.

13 Q.      285?

14 A.      That one.

15 Q.      That number appears on Exhibit 2?

16 A.      Correct.

17 Q.      And was this an inspection that took place
18 outside the normal periodic inspections that you
19 would have anticipated for that particular vehicle?

20 A.      Yes. I remember this quite good.

21 Q.      All right. Why is it that you remember or
22 believe you have a good memory of this particular
23 inspection?

```
 1   A.      I believe that a truck was coming to the shop
 2   that day, and we were to check it out.
 3   Q.      Did they tell you why they wanted you to
 4   check out this particular truck?
 5   A.      I think it had derailed.  I don't remember.
 6   I don't know the conversation other than it seemed
 7   like people were --
 8   Q.      Had you ever received a request from CSX such
 9   as this previously?
10   A.      No, not at this -- I don't know what the word
11   is.  Many times people derail, and a supervisor will
12   call up and say we're bringing a truck in; we've got
13   to get this done because there is a rail out
14   somewheres, and you've got to get this thing fixed.
15   I mean we're under the gun night and day.
16   Q.      You have no memory, prior to this date in
17   June of 2001, of being asked by a group of four CSX
18   employees, during the course of a conference call,
19   to inspect a particular high rail vehicle that very
20   day?
21   A.      No.
22   Q.      And other than asking you to inspect it you
23   have no particular memory of what else they told you
```

44

PETER EBERT - March 31, 2005

```
 1   the alignments?
 2   A.      It's no different than another one of my men
 3   only doing oil pans.  If I find that he does it the
 4   best and makes the best time on it, then that's what
 5   I do.
 6   Q.      Is that why you and Kevin are the ones that
 7   do the alignments is because you consider yourself
 8   and Kevin to be the most proficient at it?
 9   A.      Yes.  And all through the years of learning
10   anything from how to slide the high-rail gear over,
11   all of the tricks that we've come up with, we've
12   come up with together, and this is --
13   Q.      Okay, so do you have a memory of performing
14   the inspection with Kevin on this particular vehicle
15   in June of 2001?
16   A.      Which inspection, the original high-rail
17   inspection?
18   Q.      Well, how many inspections did you perform at
19   the request of these four gentlemen of this
20   particular high-rail truck?
21   A.      One.
22   Q.      One, and what did you inspect?
23   A.      They brought that truck in.  We put it on our
```

1  rack, and they said that the gear had snapped over,
2  meaning there's a pawl up on top, a dog. I keep
3  saying words until you -- there is a lever up on
4  top. And they said that had gone too far. I put it
5  on the rack, and there's not too many times where
6  people will walk me in a corner. I said, Okay, show
7  me what you did. They reached on the back of the
8  truck and picked up that bar that I brought with me,
9  and it did exactly what they said it did.
10 Q.    Now who were you talking to when this --
11 A.    While I'm doing that?
12 Q.    Yes.
13 A.    A man -- must just tell me this guy's name,
14 because he's the one that actually got the bar out
15 of the truck.
16 Q.    Is it someone you knew?
17 A.    Yes.
18 Q.    Did you know him to be --
19 A.    He was the boss. He was the -- I don't think
20 he's there anymore. I think he either got bought
21 out or they got rid of him.
22 Q.    Was it Dick Ross?
23 A.    Yes.

```
1   A.      He wasn't in the shop for a long time, but
2   yes.
3   Q.      Was he there that day, the day you did the
4   inspection with these other men present?
5   A.      I don't remember.
6   Q.      Who brought the truck into the shop?
7   A.      We would have.
8   Q.      Either you or Kevin?
9   A.      Kevin guides me on that rack. We each have
10  our jobs, so I would say I drove that on the rack.
11  Q.      How many high-rail wheels are there on the
12  truck?
13  A.      Four.
14  Q.      And were you being asked to inspect all four
15  wheels?
16  A.      No.
17  Q.      Which one?
18  A.      The wheels are a different part of it.
19  Q.      Okay.
20  A.      We were instructed to inspect that dog, that
21  lever, that pawl, whatever you want to call it, on
22  top.
23  Q.      Okay.
```

1  Q.    You agree with my question.

2  A.    Correct.

3  Q.    Okay.  Do you have a memory regarding whether
4  or not any one of these employees of CSX who were in
5  the general area told you anything about why they
6  wanted this inspection performed?

7  A.    Yes.

8  Q.    What did they tell you?

9  A.    He hurt his back.

10 Q.    Who hurt his back, Mr. Papadakis?

11 A.    Yes.  What's his first name?

12 Q.    Paul.

13 A.    Paul.  We'll go by Paul.  Paul.

14 Q.    Someone told you that Mr. Papadakis, or Paul,
15 had injured his back?

16 A.    They had said he had injured his back by
17 snapping this gear over in what we are speaking
18 about right now.

19 Q.    Did they indicate what gear was snapped over?

20 A.    No.

21 Q.    Okay, so you didn't focus your attention in
22 the course of the inspection on any particular gear?

23 A.    Our inspection was on all four corners, and

PETER EBERT - March 31, 2005

```
 1    and I know that happened.
 2    Q.    Do you recall how the vehicle left your shop,
 3    who drove it away?
 4    A.    No.
 5    Q.    I have no further questions, sir.  I
 6    appreciate your cooperation.  Thank you.
 7                 MR. FLYNN:  Thanks, Bob.
 8    BY MR. FLYNN:
 9    Q.    Mr. Ebert, let me ask you a few questions.
10    Have you spoken with Mr. Byrne or anyone from his
11    office about this case?
12    A.    Who is that?
13                 THE WITNESS:  You.
14    A.    That was yesterday.
15                 MR. BYRNE:  Yesterday.
16    A.    Yesterday.
17                 MR. FLYNN:  Just for the record,
18          Mr. Byrne pointed to himself, the attorney
19          that has been asking you questions up to this
20          point.
21    A.    Okay.
22    Q.    You've spoken with him before?
23    A.    Yes.
```

```
1   Q.      On how many occasions?
2   A.      Once.
3   Q.      When was that?
4   A.      Yesterday.
5   Q.      Have you ever spoken with anyone else from
6   his office?
7   A.      I would say no.
8   Q.      Have you ever spoken to Mr. Papadakis about
9   this case?  I'm sorry, is that how you say it?
10  A.      Papadakis.
11  Q.      Have you ever spoken with him about it?
12  A.      No.
13  Q.      Have you ever spoken with anyone else
14  purporting to be, who were representing themselves
15  to be representing or speaking with you on behalf of
16  Mr. Papadakis?
17  A.      No-one.
18  Q.      Okay.  Can you tell me everything about your
19  conversation with Mr. Byrne today?  What did he have
20  to say in that conversation?
21  A.      He was sorry he was pulling me down here
22  yesterday.  He was going to make it brief.  I asked
23  him about Paul hurting his back, and I found out
```

PETER EBERT - March 31, 2005

```
 1   daily.  I didn't bill for that.  I just want to make
 2   sure they're happy.
 3   Q.     I see.  Is CSX one of your larger customers?
 4   A.     Yes.
 5   Q.     Could you give me approximately how much in
 6   bills in total on an annual basis you charge to CSX
 7   for work you perform at TNT?
 8   A.     A million.
 9   Q.     Okay, has that been generally the case
10   since --
11   A.     Yeah.
12   Q.     -- CSX took over Conrail's operation six
13   years ago?
14   A.     In the CSX days it has been.  In the Conrail
15   days, like anything, you built yourself up.  We
16   still are heavy on the car holders.  We are as CSX
17   is to us, and people bring in stuff and car haulers
18   to us, also.  People want their car haulers fixed.
19   That's these trucks that people deliver cars on.  We
20   do all of them.
21   Q.     For CSX?
22   A.     No, for other companies.
23   Q.     Okay.  Do you have any memory of any problem
```