Exhibit "A"

*136 F.3d 838, \*; 1998 U.S. App. LEXIS 2025, \*\*;
48 Fed. R. Evid. Serv. (Callaghan) 1091*

MICHAEL MCGRATH, Plaintiff - Appellant, v. CONSOLIDATED RAIL CORPORATION, Defendant - Appellee. MICHAEL MCGRATH, Plaintiff - Appellee, v. CONSOLIDATED RAIL CORPORATION, Defendant - Appellant.

No. 97-1063, No. 97-1064

UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

136 F.3d 838; 1998 U.S. App. LEXIS 2025; 48 Fed. R. Evid. Serv. (Callaghan) 1091

February 12, 1998, Decided

**PRIOR HISTORY:** [\*\*1] APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS. Hon. William G. Young, U.S. District Judge.

**DISPOSITION:** Affirmed the jury verdict for the employer on McGrath's negligence theory, but vacated and remanded the verdict for Conrail on his Boiler Act claim.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Appellant employee challenged the decision of the United States District Court for the District of Massachusetts, which found in favor of appellee employer on appellant's claims of negligence under the Federal Employers' Liability Act, 45 U.S.C.S. § 51 et seq., and liability under the Federal Boiler Inspection Act, 45 U.S.C.S. § 23.

**OVERVIEW:** Appellant employee fell while working for appellee employer on a locomotive that was idling on a yard track. The district court found in favor of appellee employer on appellant's claims of negligence under the Federal Employers' Liability Act, 45 U.S.C.S. § 51 et seq., and liability under the Federal Boiler Inspection Act (Boiler Act), 45 U.S.C.S. § 23. The court found that the trial judge did not abuse his discretion in allowing appellant's receipt of collateral source benefits into evidence under a Fed. R. Evid. 403 balancing test. The court determined that the trial judge cured any defect by cautioning the jury not to consider the benefits for the purpose of offsetting an award, but only for the issue of appellant's lack of motivation to return to work. The court concluded that the locomotive was "in use," because it was not being stored on the yard track and was ready to move into service, and that the Boiler Act applied. The court found that the trial judge erred by submitting to the jury the legal question of whether the Boiler Act applied, and vacated and remanded the verdict as to that issue. The court affirmed the verdict for appellee on the negligence claim.

**OUTCOME:** The court vacated and remanded the trial court's verdict in favor of appellee employer on the claim under the Federal Boiler Inspection Act, and affirmed the trial court's verdict in favor of appellee on the negligence claim under the Federal Employers' Liability Act. The court found that the Boiler Act applied as a matter of law, and that the issue should not have gone to the jury.

**CORE TERMS:** Boiler Act, locomotive, collateral source, inspection, engineer, repair, railroad, malingering, yard, probative value, case law, train, track, general verdict,

construing, servicing, abuse of discretion, legal question, matter of law, jury verdict, instructing, disability, collateral, vacate, Railroad Retirement Act, evidence admissible, disability pension, sources of income, reversible error, jury instruction

## LexisNexis(R) Headnotes ◆ Hide Headnotes

Evidence > Relevance > Confusion, Prejudice & Waste of Time

**HN1** Under the collateral source rule of evidence, the plaintiff need not offset his or her recovery from the defendant by the amount of any benefits received from a source collateral to the defendant. More Like This Headnote | *Shepardize:* Restrict By Headnote

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

**HN2** The court reviews the trial court's admission of collateral source evidence for abuse of discretion. More Like This Headnote | *Shepardize:* Restrict By Headnote

Evidence > Relevance > Confusion, Prejudice & Waste of Time

**HN3** Fed. R. Evid. 403 confers broad discretion upon the district court to weigh unfair prejudice against probative value. More Like This Headnote | *Shepardize:* Restrict By Headnote

Evidence > Relevance > Confusion, Prejudice & Waste of Time

**HN4** If there is little likelihood of prejudice and no strong potential for improper use, and a careful qualifying jury instruction is given, then receipt of compensation benefits may be admissible under Fed. R. Evid. 403 for the limited purpose of proving another matter. More Like This Headnote | *Shepardize:* Restrict By Headnote

Transportation Law > Rail Transportation > Maintenance & Safety

**HN5** See 45 U.S.C.S. § 23.

Transportation Law > Rail Transportation > Maintenance & Safety

**HN6** Whether a locomotive is "in use" under the Federal Boiler Inspection Act (Act), 45 U.S.C.S. § 23 is a question of law for the trial court to decide and not a question of fact for the jury. Absolute liability under the Act arises only if the locomotive in question is in use. More Like This Headnote | *Shepardize:* Restrict By Headnote

Civil Procedure > Appeals > Standards of Review > De Novo Review

**HN7** The court reviews de novo questions of law. More Like This Headnote

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion 

*HN8* The court reviews the trial court's instructions to the jury for abuse of discretion. More Like This Headnote

Civil Procedure > Jury Trials > Province of Court & Jury 

Transportation Law > Rail Transportation > Maintenance & Safety

*HN9* Whether a locomotive is "in use" under the Federal Boiler Inspection Act, 45 U.S.C.S. § 23, is a question of law for the trial court to decide and not a question of fact for the jury. More Like This Headnote | *Shepardize:* Restrict By Headnote

**COUNSEL:** Alan D. Voos, with whom Collins, Collins & Kantor, P.C. was on brief for appellant Michael McGrath.

Leonard F. Zandrow, Jr., with whom Michael B. Flynn and Brister & Zandrow, LLP were on brief for appellee Consolidated Rail Corporation.

**JUDGES:** Before Torruella, Chief Judge, Godbold, * Senior Circuit Judge, and Barbadoro, ** District Judge.

\* Of the Eleventh Circuit, sitting by designation.
\*\* Of the District of New Hampshire, sitting by designation.

**OPINIONBY:** TORRUELLA

**OPINION:** [*839] **TORRUELLA, Chief Judge.** On June 13, 1995, plaintiff-appellant Michael McGrath ("McGrath") commenced this action for personal injuries he suffered as an employee of defendant-appellee Consolidated Rail Corporation ("Conrail"). McGrath alleges that Conrail was negligent in failing to provide him with a safe work place pursuant to the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 [**2] et seq., and was liable under the Federal Boiler Inspection Act ("Boiler Act"), 45 U.S.C. § 23, n1 for requiring him to work with a locomotive that [*840] was in a defective condition. After a jury trial, the district court entered judgment in favor of Conrail on both the negligence and Boiler Act claims.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 Although the Boiler Act was recodified on July 5, 1994, see 49 U.S.C. § 20701, we will refer to § 23 because that provision was in effect at the time of McGrath's injury. In addition, in charging the jury, the district court applied § 23.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

McGrath appeals on three grounds. Appellant argues that the trial court erred (1) in allowing into evidence McGrath's receipt of collateral source benefits; (2) in submitting to the jury the legal question of whether the locomotive in question was "in use" for purposes of the Boiler Act; and (3) in instructing the jury on the Boiler Act claim. Conrail cross-appeals on the issue of whether the Boiler Act applies to the facts of this case. We find no abuse of discretion **[**3]** with respect to the admission of collateral source evidence. However, the district court erroneously submitted the "in use" question to the jury. As a matter of law, we find that the Boiler Act applies to the instant case. Accordingly, we affirm the jury verdict for the employer on McGrath's negligence theory, but vacate and remand the verdict for Conrail on his Boiler Act claim.

## I. BACKGROUND

On appeal, we summarize the facts in the light most favorable to the verdict-winner, consistent with record support. See Wainwright Bank & Trust Co. v. Boulos, 89 F.3d 17, 19 (1st Cir. 1996). McGrath was a Conrail engineer employed as a "shifter," or an engineer for short runs, who usually moved trains between local depots. He was responsible not only for operating the train, but also for attaching individual cars to the locomotive. On March 21, 1994, he reported to work at Conrail's Beacon Park office in Allston, Massachusetts. McGrath was the engineer on a job identified by Conrail symbol "WABP-11." The crew that worked WABP-11 consisted of an engineer (McGrath), a conductor, and a brakeman. The train used to perform WABP-11 was made up of at least one locomotive and several railroad **[**4]** cars. On March 21, 1994, the WABP-11 was scheduled to service Conrail's industrial customers in South Boston.

McGrath was assigned to locomotive number 2013, which was coupled back-to-back with another locomotive. McGrath approached both locomotives, which had their engines running, and boarded the second locomotive to cross over into locomotive number 2013. As soon as he entered the cabin of number 2013, McGrath started to walk toward the daily inspection card. In the cabin, McGrath lost his balance when he stepped on an acorn-shaped nut. He prevented himself from falling by grabbing the four-foot high engineer's control stand. Consequently, he suffered injuries to his shoulder, neck and back. One of Conrail's defenses at trial was that McGrath was malingering, i.e., feigning physical disability to avoid work and to continue receiving disability payments. For purposes of rendering its verdict, the jury assumed that the accident described above did occur.

## II. DISCUSSION

### A. Collateral Source Evidence

McGrath argues that the district court committed reversible error by allowing into evidence his collateral sources of income, including disability pension payments under the **[**5]** Railroad Retirement Act and supplemental credit disability insurance payments on his automobile. *HN1* Under the collateral source rule, the plaintiff need not offset his or her recovery from the defendant by the amount of any benefits received from a source collateral to the defendant. See Lussier v. Runyon, 50 F.3d 1103, 1107 (1st Cir. 1995). The rule mitigates the danger of the jury finding no liability or reducing a damage award "when it learns that plaintiff's loss is entirely or partially covered." Moses v. Union Pac. R.R., 64 F.3d 413, 416 (8th Cir. 1995); see also Tipton v. Socony Mobil Oil Co., 375 U.S. 34, 36-37, 11 L. Ed. 2d 4, 84 S. Ct. 1 (1963) (per curiam).

However, the rule is not absolute and courts have carved out exceptions to the collateral source doctrine. See Moses, 64 F.3d at 416 (allowing collateral source evidence where the

plaintiff's case itself has made the existence of such evidence of probative value); Santa Maria v. Metro-North Commuter R.R., 81 F.3d 265, 273 (2d Cir. 1996) (holding collateral source evidence admissible if plaintiff puts financial status at issue); Simmons v. Hoegh Lines, 784 F.2d 1234, 1236 [*841] (5th Cir. 1986) (finding [**6] collateral source evidence admissible for limited purpose of proving another matter if little likelihood of prejudice and no strong potential for improper use, and a careful qualifying jury instruction is given). <sup>HN2</sup>We review the trial court's admission of collateral source evidence for abuse of discretion. See Blinzler v. Marriott Int'l, Inc., 81 F.3d 1148, 1158 (1st Cir. 1996).

According to McGrath, the Supreme Court's decision in Eichel v. New York Cent. R.R. Co., 375 U.S. 253, 11 L. Ed. 2d 307, 84 S. Ct. 316 (1963) (per curiam), applies to his FELA action and mandates the exclusion of collateral source evidence in such cases. In Eichel, the Court held that evidence of disability payments under the Railroad Retirement Act was inadmissible due to the fact that the likelihood of misuse by the jury clearly outweighed the value of such evidence. See 84 S. Ct. at 317. In particular, the Supreme Court noted that "insofar as the evidence bears on the issue of malingering, there will generally be other evidence having more probative value and involving less likelihood of prejudice than the receipt of a disability pension." Id.

We do not read Eichel as requiring the per [**7] se exclusion of collateral source evidence in FELA cases. As we noted in DeMedeiros v. Koehring Co., 709 F.2d 734 (1st Cir. 1983), the narrower question in Eichel was simply "whether or not to uphold the district court's discretionary ruling." 709 F.2d at 741. Indeed, although the Supreme Court decided Eichel prior to the enactment of the current Federal Rules of Evidence, the analysis in the Eichel decision "does not appear inconsistent with Rule 403." Savoie v. Otto Candies, Inc., 692 F.2d 363, 371 n.8 (5th Cir. 1982). <sup>HN3</sup>Rule 403 "confers broad discretion upon the district court to weigh unfair prejudice against probative value." 709 F.2d at 741.

In the instant case, we find that the trial judge did not abuse his discretion in allowing the receipt of collateral source benefits into evidence under a Rule 403 balancing. As its motion in limine to admit the collateral source evidence argues, Conrail offered the evidence of McGrath's disability payments on the issue of McGrath's credibility. Specifically, Conrail presented collateral source evidence to show McGrath's lack of motivation for returning to work. In allowing Conrail to question McGrath about collateral [**8] source evidence, the district court, on several occasions, issued cautionary instructions to the jury, advising it to consider the evidence only on the issue of malingering. In one instance where McGrath's tax return was admitted into evidence, the court specifically noted that "any references in there to [collateral] sources of income are not to reduce any compensation he may receive here or to increase it, but only on the issue of his motivation to go back to work . . . ."

In oral argument, McGrath's attorney argued that such instructions did not cure the defect because Eichel precludes the use of such evidence on the precise issue of malingering. However, we do not believe that the Eichel court established a bright-line rule barring the admission of collateral source evidence on the issue of malingering. The Supreme Court simply determined that the district court abused its discretion because the prejudicial impact of the evidence outweighed its probative value. Here, we come to the opposite conclusion. <sup>HN4</sup>"If there is little likelihood of prejudice and no strong potential for improper use, and a careful qualifying jury instruction is given, then receipt of compensation [**9] benefits may be admissible for the limited purpose of proving another matter." Simmons v. Hoegh Lines, 784 F.2d 1234, 1236 (5th Cir. 1986); see also Phillips v. Western Co. of N. Am., 953 F.2d 923, 930 (5th Cir. 1992). We find that the district court properly allowed testimony regarding collateral source income, and thus, we need not reach Conrail's argument that McGrath failed to preserve the issue on appeal.

McGrath also objects to several questions at trial about the value of a home he and his wife were planning to build on a lot in Florida. McGrath interjected a timely objection to a specific question about the home's value and the district court sustained it before the witness, McGrath's wife, could respond. After the objection was sustained, Conrail asked no further questions about the **[\*842]** lot or the home. Under these circumstances, we see no reversible error.

## B. Applicability of Boiler Act

Conrail cross-appeals the district court's orders denying its motion and renewed motion for judgment as a matter of law. Conrail argues that, as a matter of law, the Boiler Act does not apply to McGrath's circumstances because the locomotive in question was not "in use" for purposes **[\*\*10]** of the Act. The Boiler Act provides in pertinent part:

*HN5*

It shall be unlawful for any carrier to use or permit to be used on its line any locomotive unless said locomotive, its boiler, tender, and all parts and appurtenances, thereof are in proper condition and safe to operate in the service to which the same are put, that the same may be employed in the active service of such carrier without unnecessary peril to life or limb, and unless said locomotive, its boiler, tender and all parts and appurtenances thereof have been inspected . . . .

45 U.S.C. § 23 (emphasis added). *HN6* Whether a locomotive is "in use" under the Act is "a question of law for the trial court to decide and not a question of fact for the jury." Pinkham v. Maine Cent. R.R. Co., 874 F.2d 875, 881 (1st Cir. 1989). Absolute liability under the Act arise only if the locomotive in question is "in use." See Crockett v. Long Island R.R., 65 F.3d 274, 277 (2d Cir. 1995). *HN7* We review de novo questions of law. See UNUM Corp. v. United States, 130 F.3d 501, 502 (1st Cir. 1997).

"Congressional intent and the case law construing the statute clearly excludes those injuries directly resulting from **[\*\*11]** the inspection, repair and servicing of railroad equipment located at a maintenance facility." Angell v. Chesapeake and Ohio Ry. Co., 618 F.2d 260, 262 (4th Cir. 1980). In addressing the "in use" question, this court in Pinkham observed that "the determinative factors are the location of the locomotive at the time of the injury and the activity of the injured party . . . ." 874 F.2d at 882. A locomotive may still be considered "in use" although it is motionless. See Crockett, 65 F.3d at 277; see also Brady v. Terminal R.R. Ass'n of St. Louis, 303 U.S. 10, 13, 82 L. Ed. 614, 58 S. Ct. 426 (1938).

The facts of this case do not lend themselves to an easy answer. Locomotive 2013 was neither being serviced in a place of repair, nor operating on Conrail's main line. Instead, the locomotive was idling on a yard track, which is located within the confines of a railroad yard. Yard tracks are used to store, inspect, classify and switch locomotives and railroad cars. In addition, although McGrath was part of a transportation crew, he was also required, as the engineer, to perform certain inspection duties before moving the locomotive.

However, we agree with the district court's **[\*\*12]** resolution of this issue in its order denying Conrail's pre-trial summary judgment motion. The locomotive in question was not being stored on the yard track or awaiting removal to the engine house for repairs. Rather, "locomotive number 2013 was running on the yard track and ready to move into service." McGrath v. Consolidated Rail Corp., 943 F. Supp. 95, 97 (D. Mass. 1996). Furthermore, as

the district court noted, McGrath's inspection duties were "'incidental to [the] task of operating the train as an engineer.'" Id. citing Rivera v. Union Pac. R.R. Co., 868 F. Supp. 294, 301 (D. Colo. 1994). We hold that the Boiler Act applies to the instant case. Accordingly, we need to address McGrath's grounds for dismissal relating to the Boiler Act.

## C. The Jury Instructions

McGrath argues that the district court erred in submitting to the jury the legal question whether the Boiler Act applies to the instant case. <sup>HN8</sup>We review the trial court's instructions to the jury for abuse of discretion. See United States v. Shadduck, 112 F.3d 523, 526 (1st Cir. 1997). The district court submitted the following instructions, in pertinent part, to the jury:

Mr. McGrath claims [**13] that the Boiler Act was violated and that as a consequence of the violation that was at least one of the causes of injury to him for which he suffered damage. So the first thing you want to consider under the Boiler Act is the [*843] question of whether the Boiler Act applies to him. The congressional intent and the case law construing the Boiler Act excludes from its coverage those injuries directly resulting from the inspection, repair or servicing of railroad equipment located at a maintenance facility. These injuries are excluded from the Boiler Act because they occur in the course of functions necessary to discover and correct the unsafe conditions prohibited by the Boiler Act.

So the first question under the Boiler Act is, is Mr. McGrath, and he's got to prove it by a fair preponderance of the evidence, is he excluded under what I've just told you, or is he included, is he able to recover under the Boiler Act?

Transcript at 627-28 (emphasis added). We reiterate that <sup>HN9</sup>whether a locomotive is "in use" is "a question of law for the trial court to decide and not a question of fact for the jury." Pinkham, 874 F.2d at 881. However, the instructions above ask the jury [**14] to decide this legal issue.

In instructing the jury, the district court repeats almost verbatim the legal considerations the Fourth Circuit employed in Angell. Compare jury instructions above (emphasized language) with 618 F.2d at 262 ("congressional intent and the case law construing the statute clearly excludes those injuries directly resulting from the inspection, repair and servicing of railroad equipment located at a maintenance facility"). However, in Angell, the court itself resolved the issue rather than remanding it for consideration by a jury. That was the proper course.

In the instant case, the jury rendered a general verdict for Conrail on McGrath's Boiler Act theory. In reaching its verdict, the jury may have decided that, as a threshold matter, the Boiler Act did not apply to the facts of McGrath's case. In that instance, it did not need to reach the issue of Conrail's liability under the Act. Alternatively, the jury may have determined that the Boiler Act did apply but Conrail was not liable under the Act. From the general verdict, we cannot tell whether the jury's verdict was based on an improper determination of the "in use" question. The record does [**15] reflect that the jury did consider this threshold issue. One jury question to the judge was: "Is there any case law

that extends the Boiler Act exclusion regarding inspection and repair to inspections and repair outside the maintenance yard?" Under these circumstances, we must vacate the verdict as to the Boiler Act claim and remand. See Dillard & Sons Constr., Inc. v. Burnup & Sims Comtec, Inc., 51 F.3d 910, 916 (10th Cir. 1995) ("erroneous submission of a legal question to a jury compels reversal when the jury returns a general verdict, creating uncertainty as to whether the jury relied upon an improper resolution of the legal issue"). Since we remand for new trial on the Boiler Act theory, we need not reach McGrath's last ground for reversal, which argued that the district court erred in instructing the jury on Boiler Act liability.

## III. CONCLUSION

For the foregoing reasons, we **affirm** the jury verdict for appellee on McGrath's negligence claim, but with respect to the jury verdict on the Boiler Act claim, we **vacate** and **remand** to the district court for proceedings in accordance with this opinion.

# Exhibit "B"

**PAUL T. PAPADAKIS**
**May 16, 2005**

Page 1

UNITED STATES DISTRICT COURT

for the

DISTRICT OF MASSACHUSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

PAUL T. PAPADAKIS,           \*

    Plaintiff            \*

  vs.                      \*   C.A. No.: 04-30189-MAP

CSX TRANSPORTATION, INC.,    \*

    Defendant            \*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEPOSITION OF:  PAUL T. PAPADAKIS

CATUOGNO COURT REPORTING SERVICES

1414 Main Street

Springfield, Massachusetts

May 16, 2005    9:55 A.M.

Kelly M. Bruce

COURT REPORTER

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

**PAUL T. PAPADAKIS**
**May 16, 2005**

Page 206

1  A.  And I saw an independent medical
2  examiner.
3  Q.  You saw an independent medical
4  examiner?
5  A.  Yes.
6  Q.  Who was that?
7  A.  Dr. Dress. I think D-R-E-S-S.
8  Q.  First name?
9  A.  No idea. Springfield.
10  Q.  Do you know where?
11  A.  On, I believe it's Saint James
12  Avenue.
13  Q.  Okay. When did you see Dr. Dress?
14  A.  Prior to being awarded the total
15  disability.
16  Q.  Somewhere in --
17  A.  -- 2002.
18  Q.  Do you have a copy of his report?
19  A.  No, I don't.
20  Q.  Have you ever seen it?
21  A.  No.
22  Q.  And did the RRB make their decision
23  to give you your disability annuity at least --
24  strike that.

Page 207

1  Is it your understanding that the
2  RRB's decision to give you your annuity was
3  based on what Dr. Dress told them?
4      MR. BYRNE: Objection.
5      THE WITNESS: I don't know.
6  Q.  (By Mr. Flynn) You don't know, okay.
7  Was it in connection with your reconsideration
8  of the RRB's initial decision regarding total
9  disability that they sent you to see Dr. Dress?
10      MR. BYRNE: Objection.
11      THE WITNESS: I don't know.
12  Q.  (By Mr. Flynn) Do you know when it
13  was in that period of time; in other words, you
14  applied for a total disability, they said, no,
15  you're only disabled from railroad work. You
16  then reapply or appeal that decision and were
17  ultimately granted a total disability, correct?
18      MR. BYRNE: Objection.
19      THE WITNESS: Yes.
20  Q.  (By Mr. Flynn) When in that process
21  did you go to see Dr. Dress?
22  A.  Between getting the occupational
23  disability and being awarded the total
24  disability.

Page 208

1  Q.  Do you receive wage continuation from
2  the railroad?
3  A.  No.
4  Q.  You also had a supplemental insurance
5  policy, correct?
6  A.  Yes.
7  Q.  And that was through a company called
8  U-N-U-M, Unum?
9  A.  Yes.
10  Q.  And you received a benefit from them,
11  correct?
12  A.  Yes.
13  Q.  Okay. How long after your accident
14  did you apply for that benefit?
15  A.  Whatever the waiting period was. I
16  don't recall.
17  Q.  So your accident happens, you wait
18  the minimum waiting period, and then you file
19  the application?
20  A.  Yes.
21  Q.  And you received the benefit,
22  correct?
23  A.  Yes.
24  Q.  Okay. Was that in addition to what

Page 209

1  you received from the RRB?
2  A.  Yes.
3  Q.  All right. And that was about $1,000
4  a month?
5  A.  Yes.
6  Q.  And for how long did you receive that
7  benefit?
8  A.  Until I got my disability.
9  Q.  Okay. So your occupational
10  disability or your total disability?
11  A.  My occupational.
12  Q.  And when did you receive that?
13  A.  Effective December 1, 2001.
14  Q.  Okay. So for the first six months
15  you received sickness benefits from the RRB?
16  A.  Yes.
17  Q.  And you received a supplemental
18  benefit from Unum, correct?
19  A.  Yes.
20  Q.  The sickness benefits you received
21  from the RRB, were those also $2,400 a month?
22  A.  No.
23  Q.  How much was that?
24  A.  The total of both of them was around

53 (Pages 206 to 209)

PAUL T. PAPADAKIS
May 16, 2005

Page 278

1 age, that you would qualify for the railroad
2 retirement pension benefits?
3   A.  Yes.
4   Q.  Okay. And was it your intention,
5 even before this accident, to work only until
6 the age of 60 and then retire?
7   A.  When I was hurt, the age was 62.
8   Q.  Okay. And had you -- was it your
9 intention to work only to the age of 62?
10  A.  Yes.
11  Q.  And since that time, there's been
12 legislation passed that has decreased that age
13 to 60, correct?
14  A.  Correct.
15  Q.  And once that legislation was passed,
16 was it your intention thereafter to only work to
17 60?
18      MR. BYRNE: Objection.
19      THE WITNESS: I would like to say
20 yes, but with the insurance bills and my
21 wife's conditions, that I don't know.
22  Q.  (By Mr. Flynn) Now, you've received,
23 either directly or through your attorney,
24 several letters from CSX's medical and

Page 279

1 vocational departments; is that fair to say?
2   A.  Yes.
3   Q.  And they asked you if you'd want to
4 become involved in vocational rehabilitation at
5 the railroad, correct?
6   A.  Yes.
7   Q.  And you understand -- you received a
8 brochure and videotape about their rehab
9 program, right?
10  A.  Yes.
11  Q.  And initially you -- back in 2001,
12 you indicated that you were interested in
13 retraining for some other job, correct?
14  A.  Yes.
15  Q.  And has your opinion changed since
16 then?
17  A.  It goes back to what I said just a
18 little while ago, I can't conceive of what job
19 is out there that I could do.
20  Q.  So as we currently speak, you are not
21 interested in vocational rehabilitation?
22  A.  No.
23  Q.  You agree with what I said, you're
24 not interested?

Page 280

1   A.  I don't like the word "interested."
2 That, to me, makes me sound like a slacker. You
3 know, I would love to go back to doing what I
4 was doing before I got hurt. I love the job
5 that I did. I was real good at it. Ed Tubbs
6 asked me what it would take to go back and work
7 as a supervisor again, so he must have been
8 impressed with the way I did my job. I got high
9 evaluations on all my quarterly inspections with
10 the engineers of track. The FRA inspector, Phil
11 Grady, asked me if I would be interested in
12 taking an inspector's position with the FRA. I
13 loved what I was doing, and that's what I would
14 like to do, but I can't.
15  Q.  So these other positions you have
16 decided not to follow up on?
17  A.  Mr. Flynn, I can tell you that -- let
18 me tell you a quick thing about this one
19 guy that --
20      MR. BYRNE: Just answer the
21 question.
22      THE WITNESS: Okay. I'm sorry.
23  Q.  (By Mr. Flynn) There were these
24 positions that were mentioned to you, and you

Page 281

1 decided not to follow up on them?
2   A.  That's correct.
3   Q.  And currently, as we speak today,
4 you're not -- you don't have an intention of
5 pursing CSX's vocational rehabilitation program?
6   A.  No.
7   Q.  Or any other for that matter,
8 correct?
9   A.  No.
10  Q.  Okay. You have seen a specialist, a
11 vocational specialist named Leona Liberty,
12 correct?
13  A.  Yes.
14  Q.  And you were sent to her by your
15 counsel, correct?
16  A.  Yes.
17  Q.  Okay. And you saw her back in July
18 of 2004, right?
19  A.  If that's what it says. I don't
20 remember.
21  Q.  Okay. Have you seen her report?
22  A.  Yes.
23  Q.  Okay. And you've read it, right?
24  A.  Yes.

71 (Pages 278 to 281)

**CATUOGNO COURT REPORTING SERVICES**
Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI

# Exhibit "C"

UNITED STATES OF AMERICA
**RAILROAD RETIREMENT BOARD**
DISABILITY BENEFITS DIVISION
844 NORTH RUSH STREET
CHICAGO, ILLINOIS 60611-2092

PAUL PAPADAKIS
54 CARMEL LN
FEEDING HILLS MA
01030

JUN 1 3 2002

**RRB CLAIM NUMBER**
▼
**A 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**
ALWAYS USE THESE LETTERS AND
NUMBERS WHEN WRITING US

Dear Mr. Papadakis:

Your application for benefits based on disability under the Railroad Retirement Act is also an application for a period of disability ("disability freeze") under the Social Security Act. Disability freeze is described in the enclosure.

To be eligible for a disability freeze, you must meet both a disability <u>and</u> an earnings requirement.

After careful review, it has been determined that even though you are entitled to a railroad retirement disability annuity because you are unable to work in your regular occupation, your condition is not severe enough to prevent you from performing <u>any</u> substantial gainful work. Your age, education, training, and experience have been considered in this decision.

Therefore, you do not meet the disability requirement. Your application for a disability freeze and early Medicare coverage is denied. This decision has no affect on your monthly annuity payments. You will continue to receive payments at the same monthly rate.

If you are under age 62 and do not meet the Social Security Act definition of disability, the entire Tier I portion of your annuity must be taxed as a contributory private pension, like the Tier II portion of your annuity. If you are age 62 through 64 and do not meet the Social Security Act definition of disability, a part of the Tier I portion of your annuity must be taxed as a contributory private pension, like the Tier II portion of your annuity.

The following medical records were used in this decision:

New England Orthopedic Surgeons, November 16, 2001;
Lawrence H. Field, M.D., June 28, 2001 – November 1, 2001;
Baystate MRI & Imaging Center, July 7, 2001;
Thomas S. Kaye, M.D., August 28, 2001;
Robert B. Steinberg, Ph.D., M.D., August 30, 2001;
Baystate Medical Center, August 30, 2001;
Internal Medicine, P.C., June 7, 1999 – October 23, 2001;
Office Notes, March 19, 1999 – June 25, 2001; and
Franklyn Carrington, M.D., March 12, 1999 – June 13, 2001.

RL-260 (12-01)

RRB Claim Number: **A 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**

You claim you became unable to work on June 14, 2001, because of torn lumbar discs. The medical evidence shows that range of motion of the low back is limited. You have pain with motion. Tenderness of the low back was noted. You have full range of motion of the hips and knees. Your deep tendon reflexes are normal at the knees, reduced but equal at the ankles. Motor strength is normal. There is no muscle wasting. Sensation is intact. You should be able to lift or carry 50 pounds occasionally, 25 pounds frequently; stand, walk or sit at least six hours in an eight hour workday; climb stairs frequently; climb ladders occasionally; stoop occasionally; and kneel, crouch or crawl frequently.

If your condition becomes more severe, contact the nearest field office of the Railroad Retirement Board (RRB) about filing another application. If your condition is severe enough before age 65 to meet the disability requirement described in the enclosure, you may be entitled to early Medicare coverage under a special provision of the Railroad Retirement Act.

If you have any questions about this notice or if you need additional information, contact the nearest field office of the RRB. If you visit the office, you are urged to call for an appointment and to bring this letter and any other information you have about your claim with you. You will not be refused service if you do not have an appointment, but RRB representatives can serve you better when an appointment is made.

Sincerely,

*Robert J. Duda*

Robert J. Duda
Director of Operations

Enclosure
    Form AB-32

cc:   Field Office
      Boston, MA

# Exhibit "D"

ATTORNEYS AT LAW

# Thornton & Naumes LLP

Michael P. Thornton (NH, ME & MA)
John T. Barrett (NH & MA)
Robert T. Naumes
Neil T. Leifer (ME, NJ & MA)
David I. McMorris
Edwin L. Wallace
Robert M. Byrne, Jr.
David C. Strouss
Joseph R. Donohue (ME & MA)
Patricia M. Flannery
Andrew S. Wainwright
Michael A. Lesser
Marilyn T. McGoldrick
Garrett J. Bradley
Brad J. Mitchell
Kristen Marquis Fritz

100 Summer St. • 30th Floor • Boston, MA 02110 • 617-720-1333
Toll Free 800-431-4600   FAX# 617-720-2445
www.tenlaw.com

December 18, 2002

Thomas G. Cook, M.D.
CSX Transportation, Inc.
P.O. Box 40586
500 Water Street, J290
Jacksonville, FL  32203-0586

RE:  Paul T. Papadakis
     54 Carmel Lane
     Feeding Hills, MA  01030
     SS#:  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
     DOB:  2/4/48
     D/L:  6/13/01

Dear Dr. Cook,

I am responding to your letter to my client, Paul Papadakis, and the injuries he sustained during the course of his employment with CSX on June 13, 2001.

Paul has not yet returned to full-time employment and is still treating for his L4-L5 disc injury. Attached is a copy of a recent report from his treating physician, Dr. Field. If you need additional information, please do not hesitate to give me a call.

Mr. Papadakis may be interested in your rehabilitation services once his medical condition has stabilized.

Very truly yours,

Robert T. Naumes

RTN/sg
Enc.
cc:  Paul Papadakis
papadakis\csx.2

