UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

PAUL T. PAPADAKIS,
        Plaintiff,

v.

CSX TRANSPORTATION, INC.,
        Defendant.

C.A. No.: 04-30189-MAP

**DEFENDANT'S MOTION IN LIMINE TO EXCLUDE THE TESTIMONY
OF THE PLAINTIFF'S LIABILITY EXPERT, RICHARD SANDERSON**

The defendant CSX Transportation, Inc. ("CSX"), hereby files this *Motion in Limine to Exclude the Testimony of the Plaintiff's Liability Expert, Richard Sanderson*. As grounds therefore, the defendant states as follows:

### I.  FACTUAL BACKGROUND:

The plaintiff in this case claims that he was injured on June 13, 2001 as the result of a malfunctioning hy-rail device with which his company-owned pick-up truck had been equipped. The hy-rail device allows a standard pick-up truck to be operated on railroad tracks and was used by the plaintiff in the course of conducting his duties as a track inspection and repair foreman. The device is operated by a bar which rotates an internal mechanism which places a steel guide wheel onto the track (at each corner of the truck) with force sufficient to keep the steel guide wheels keep the truck on the track while it is being driven. The device is also operated essentially in reverse in order to remove the guide wheels from the tracks when the truck is to be driven over the highway.

It is the plaintiff's allegation that the defendant was negligent because the hy-rail device malfunctioned by "over-camming." This means that either the internal mechanism of the device and/or the steel guide wheel itself rotated past a certain point.

The device is equipped with a "stop arm" assembly which includes an adjustable "set screw." This set screw is designed to jam against the device's mounting channel if the operator rotates the device (while raising or lowering the wheels) past a certain point. The purpose of the set screw is to warn the operator that he has reached the furthest recommended point of operation and make it more difficult for the device to be rotated any further. The plaintiff claims that because the set-screw was improperly aligned, the device "over cammed" and he was thereafter unable to get the left front guide wheel back up into the highway position and then injured himself while trying to manually do so. The defendant contends that the guide wheel itself went "over-center" due to the plaintiff's own intentional conduct and/or by his de-railing the vehicle – this is completely at odds with the version of events to which the plaintiff has testified at his deposition.[1] At his deposition, the plaintiff testified that when he went to put the guide wheel into the highway position, it simply fell back down onto the rails. This was a markedly different version of events then he had given to his supervisor immediately after the accident and also is at odds with the physical evidence, the vehicle having been returned to the defendant with the wheel in a completely different position. See *supra* at n.1.

---

[1] When in the highway position, the guide wheels are locked up, off the track and the arm which supports the wheel points back toward the front of the pick-up truck. *See* photograph, a copy of which is attached as Exhibit "A." When the plaintiff returned his vehicle to the defendant following his accident, the wheel and its support arm were pointed in the opposite direction out away from the front of the vehicle. The wheel getting into this position has been referred to as going "over-center". *See* diagram, a copy of which is attached as Exhibit "B." The wheel could only have gotten in this position by the plaintiff's intentional or negligently over-torquing the device or as a result of his having derailed the pick-up truck. Shortly after the accident, the plaintiff told his supervisor that the guide wheel went "over-center" as a result of something in the device breaking. *See* Incident Report, a copy of which is attached as Exhibit "C."

The plaintiff initially retained an expert witness, Ernest Gailor to testify about the condition of the hy-rail device. Mr. Gailor is a licensed professional engineer who has experience in designing equipment and analyzing equipment failures. He was deposed on October 11, 2005. Mr. Gailor testified that in order to reach his opinions on the condition of the device, he had to completely disregard plaintiff's version of how the accident occurred. More specifically, Mr. Gailor testified as follows:

```
10    Q    By the time it got out to TNT what we know is
11         that the wheel was over-centered?
12    A    Correct.
13    Q    In other words, the pilot arm and the wheel were
14         pointing out toward the front of the vehicle, not
15         away from the vehicle as opposed to its normal
16         position which would be back into the vehicle?
17    A    By on center, correct.
18    Q    You understand from reviewing Mr. Papadakis'
19         deposition that it's his testimony that that's
20         not what occurred at all, correct?
21    A    I understand.  That's correct.
22    Q    Mr. Papadakis' testimony was that the wheel never
23         went over center, correct?
24    A    Correct.

112

1     Q    And that the only thing that he had a problem
2          with was getting it back up into the highway
3          position, correct?
```

```
 4      A      Correct.
 5      Q      In your opinion -- to form the basis of your
 6             opinions, which we'll get to a little bit later,
 7             but to get to your opinions do you completely
 8             disregard what Mr. Papadakis says?
 9      A      There are portions of his testimony that I do
10             disregard.
11      Q      That portion being what he says happened to the
12             device itself, correct?
13      A      Correct.
14      Q      You have to completely disregard that to get to
15             your opinion, correct?
16      A      Correct.
```

*See* the deposition of Ernest Gailor, copies of the relevant portions of which are attached as Exh. D. at p.111-112.  Mr. Gailor also admitted that the plaintiff's version of how the device malfunctioned was, in his opinion, impossible. Id. at p. 114-116.   Shortly after Mr. Gailor's deposition he was withdrawn as an expert witness and the plaintiff currently has no intention of having him testify at trial.  Instead the plaintiff now intends to use Mr. Sanderson as his expert liability witness.[2]

    Mr. Sanderson is a retired railroad road mechanic.  In his experience, Mr. Sanderson worked on many different types of railroad equipment, including hy-rail devices.  *See* deposition of Richard Sanderson, copies of the relevant portions of which are attached as

---

[2] Although Mr. Sanderson was involved "behind the scenes" in this case since the spring of 2005, his identity was not revealed to defendant's counsel until the time of Mr. Gailor's deposition.  At that time plaintiff's counsel had initially referred Mr. Sanderson to Mr. Gailor to use as a "resource."  *See* Exh. D at p.170-172, 181.  The plaintiff had not identified Mr. Sanderson as a witness (expert or otherwise) at any time prior to Mr. Gailor's deposition.

Exhibit "E" at p.8-10.  He did not specialize in repairing or maintaining hy-rail devices. Mr. Sanderson is not an engineer, and has no opinion in this case as to whether or not the device was defectively designed, because, by his own admission, he does not have any expertise in this area.  <u>Id</u>. at p.76.  He has also admitted that he does not even know how the device is designed.  <u>Id</u>.  Mr. Sanderson has no advanced degrees – he graduated from a trade high school where he studied auto mechanics and has received 58 credits toward a business management degree.  <u>Id</u>. at p.190-192.  He has never studied engineering, product design, or, more specifically, the design and/or operation of hy-rail devices.  Moreover, Mr Sanderson has never been consulted as an expert in any case nor has he ever testified in a deposition or at trial as an expert witness.  <u>Id</u>. at p.187-188. Mr. Sanderson is expected to testify to the following opinions:  (1) with the improper bar, an operator of the hy-rail device such as the plaintiff could override the set screw which was designed to prevent "over-camming" from occurring; and (2) that if the set screw is out of adjustment (which Mr. Sanderson feels it was at the time of the plaintiff's accident) the device could "over-cam" or "go over center."  Exh. E at p.77-79, 110, 124.  Mr. Sanderson bases these opinions on the following sources:

- Interviews with the plaintiff, the plaintiff's attorney and Mr. Gailor;
- His inspection of a <u>different</u> hy-rail device;
- His review of <u>selected</u> depositions;
- His review of an <u>outdated</u> hy-rail device manual; and
- His prior experience as a mechanic.

None of these sources provide the requisite basis for Mr. Sanderson's opinion.  First, he, like Mr. Gailor, has admitted that he feels the plaintiff's version of events simply could not have

5

happened and that it was impossible that the device could have malfunctioned as the plaintiff has described.  Exh. E at p. 86-87.

Second, the device he inspected was completely different than the device involved in the plaintiff's accident.  That difference pertained to perhaps the single most important design component - the set screw/stop arm assembly.  Specifically, Mr. Sanderson has inspected a newer model hy-rail device, one in which the stop arm assembly (of the type found on the plaintiff's device) had been replaced and modified.  The plaintiff's device was equipped with a "set screw," which is the very component the plaintiff claims was out of adjustment thereby allowing the device to "over-cam."  Yet on the device Mr. Sanderson inspected, the set-screw had been replaced with a "stop" on the device's "socket," a completely different arrangement.  Exh. E at p.49-51, 73-74.  Mr. Sanderson has never inspected, for this case or otherwise, the type of hy-rail device which was involved in the plaintiff's accident.  Id. at p.49 – 52, 84, 199-200.

Third, with respect to the depositions he reviewed, Mr. Sanderson failed to base his opinion on, or even read, the most crucial depositions in this case.  He has never read Mr. Gailor's deposition.  Id. at p.57, 66.  Nor has he ever reviewed the plaintiff's deposition.  Id. at p. 60, 61, 65, 81.  Instead, he has intentionally ignored these depositions, apparently in order to maintain ignorance and/or plausible deniability, given the problems the plaintiff encountered with Mr. Gailor's testimony.

Finally, the manual which Mr. Sanderson has reviewed is a 1988 version which has been replaced by a more recent version for devices such as the one which was involved in the plaintiff's accident.  Id. at p.44-45.

Perhaps most importantly, when Mr. Sanderson inspected the vehicle, he was unable to replicate the "over-camming" that he is of the opinion occurred at the time of the plaintiff's accident. Id. at p.72-73. In fact, Mr. Sanderson admitted that he has never "over-cammed" any device he has operated. Id. at p.150.

## II.  DISCUSSION OF LAW:

### A.  Mr. Sanderson's Opinion is Inherently Unreliable:

The plaintiff intends to prove the defendant's negligence through Mr. Sanderson's testimony. However, Mr. Sanderson should be precluded from testifying because his opinions are based on nothing more than his own speculation and, therefore, fail to meet the requirements of Fed. R. Evid. 702 and the standards established by the Supreme Court in Daubert v. Merrill-Dow Pharmaceuticals, Inc., 509 U.S. 579, 592-93 (1993) (requiring that to be admissible, an expert's opinion must be based on "methods and procedures of science," and not simply pure speculation). In the absence of the requisite expert testimony, the plaintiff cannot meet his burden of proving that the condition or design of the hy-rail device caused his injury.

The admissibility of expert testimony is governed by Fed. R. Evid. 702,[3] which states in pertinent part:

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts

---

[3] Fed. R. Evid. 702 and Daubert v. Merrill Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1317 (9th Cir. 1995) govern the admissibility of expert testimony in FELA cases. *See* Claar v. Burlington N. R.R. Co., 29 F.3d 499, 504 (9th Cir. 1994) (explaining that "[t]he standard of causation under the FELA and the standards for admission of expert testimony under the Federal Rules of Evidence do not affect one another."); *see also* Eggar v. Burlington N. R.R. Co., 1991 U.S. Dist. LEXIS 19240, *5-6 (D. Mont. 1991) (stating that the standard of proof applicable to FELA cases does not modify "the evidentiary standards for evaluating the admissibility of expert testimony.").

or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. Rule 702 generally embodies the following factors, which were established by the Supreme Court in Daubert v. Merrill Dow Pharmaceuticals, Inc. and Kumho Tire Co. v. Carmichael, that a trial judge must consider when determining the admissibility of expert testimony:

> (1) whether the expert's technique or theory can be or has been tested – that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability;
> (2) whether the technique or theory has been subject to peer review and publication;
> (3) the known or potential rate of error of the technique of theory when applied;
> (4) the existence and maintenance of standards and controls; and
> (5) whether the technique or theory has been generally accepted in the scientific community.

Fed. R. Evid. 702, *2000 Amendment*; *see also* Daubert, 509 U.S. at 591-95.[4]

Trial judges are responsible for acting as gatekeepers who serve "to exclude unreliable expert testimony." Fed. R. Evid. 702, *2000 Amendments*; *see also* Daubert, 509 U.S. 579. When faced with the proffer of expert testimony under Rule 702, the trial judge, pursuant to Fed. R. Evid. 104(a),[5] must make a preliminary assessment of whether the testimony's underlying reasoning or methodology is scientifically or technically valid and can be properly applied to the facts at issue. Daubert, 509 U.S. at 592-93; Kumho, 526 U.S.

---

[4] Courts have used additional factors in determining whether an expert's testimony is sufficiently reliable to be admitted into evidence. *See, e.g.* Daubert, 43 F.3d at 1317 (stating that one such additional factor is whether an expert is "proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying"); *see also* Claar, 29 F.3d 499 (excluding the expert's testimony for failure to account for obvious alternative explanations). In In re: Paoli R.R. Yard PCB Litigation, the court suggested that the following additional factors should be considered: (1) the existence of standards controlling the technique's operation; (2) the relationship of the technique to methods which have been established to be reliable; (3) the qualifications of the expert witness testifying based on the methodology; and (4) the non-judicial uses to which the method had been put. 35 F.3d 717, 742 n.8 (3rd Cir. 1994).

[5] Under Fed. R. Evid. 104(a), the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence. *See* Bourjaily v. United States, 483 U.S. 171 (1987).

137, 141 (1999).  The Daubert Court reasoned that an expert's opinion must be based on "methods and procedures of science," rather than on "subjective belief or unsupported speculation" to be admissible.  Daubert, 509 U.S. at 592-93.

The more subjective and controversial the expert's inquiry, the more likely the testimony is to be excluded as unreliable.  *See* O'Conner v. Commonwealth Edison Co., 13 F.3d 1090 (7th Cir. 1994).  An expert's opinion cannot be based solely on the weight of his own authority: "[n]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." Polaino v. Bayer Corp., 122 F. Supp. 2d 63, 67 (D. Mass. 2000), *quoting* General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).  In addition, "[t]he expert must explain precisely how [he] went about reaching [his] conclusions and point to some objective source . . . to show that [he has] followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in [his] field." Lust v. Merrell Dow Pharmaceuticals, Inc., 89 F.3d 594, 597 (9th Cir. 1996), *citing* Daubert, 43 F.3d at 1317.

For several reasons, Mr. Sanderson's opinions simply cannot pass muster under Rule 702, Daubert and its progeny.  He has not based his opinions on any regulations, guidelines or industry standards governing the specific condition of the hy-rail device (at least in part because the condition of the hy-rail device did not violate any such standards). He has failed to follow any scientific method and has pointed to no scientific studies or tests to support his opinions.   In sum, his testimony is really not at all based on any scientific principles, but solely on his subjective opinion, based on his own personal experience, that the hy-rail device malfunctioned because it had been improperly maintained, and that CSX failed to provide the correct hi-rail gear hand-lever, which caused the plaintiff's alleged injury. Yet

Mr. Sanderson has admitted he cannot provide an opinion on the design of the hy-rail device. Exh. C at pp. 76, 104. Boiled down to the essentials, Mr. Sanderson's opinion amounts to nothing more than his saying that "because I have seen it elsewhere, and the plaintiff says it happened here, it must have happened here." As such, Mr. Sanderson's opinions are based on nothing more than the *ipse dixit* of his own personal feelings, coupled with his belief in the plaintiff's story.

Moreover, Mr. Sanderson's opinions do not even amount to expert testimony. He is, at best, simply another fact witness who is being offered to testify about his personal observations of hr-rail devices on other equipment, on other railroads, which transpired several years ago. His testimony in this regard is inadmissible because it is irrelevant to what happened on the defendant's railroad, or with the same type of hy-rail device which was involved in the plaintiff's alleged accident. *See* Fed. R. Evid. 401, 402.

Mr. Sanderson's opinions are also not based on sufficient facts or data, nor are they the product of any reliable principles or methods which have been applied to this case. He has not inspected the device in question, or even a substantially similar device. He has never himself "over-cammed' a device of any type. He failed to get the device that he did inspect to "over-cam." He ignored important data (the plaintiff's and Mr. Gailor's deposition) at the same time he relied on outdated irrelevant material (the 1988 manual).

It is clear that under both Rule 702 and Daubert, to be admissible an expert's opinions must be based on scientific methods, not mere speculation or conjecture. That is simply not the case here. Mr. Sanderson's opinions are nothing more than speculation and conjecture, are also irrelevant pursuant to Fed. R. Evid. 401 and 402, and are therefore inadmissible.

### 2. Mr. Sanderson Is Not Qualified:

Mr. Sanderson is expected to offer opinions on the defective design and maintenance of the subject hy-rail device, and how the device was caused to malfunction. Yet he is not an engineer, and he has nor education, training or expertise in machinery design, operational analysis or even accident reconstruction. Instead, he is simply a mechanic who has worked on a few similar devices over the years. Moreover, he has never inspected the device in question. Finally, he has never over-cammed such a device or otherwise replicated the condition which he is prepared to opine occurred to the device at the time of the plaintiff's accident. Given these circumstances, Mr. Sanderson is simply not qualified, as required by Rule 702, to give an opinion on the failure analysis of the hy-rail device and should, for this reason alone, be excluded from testifying as an expert witness in this case.

**WHEREFORE,** for all of the above-stated reasons, the defendant's *Motion in Limine* should be allowed.

Respectfully submitted,
The Defendants,
CSX TRANSPORTATION, INC.,
by its attorneys,

 /s/   Valerie A. Murphy
Michael B. Flynn,    BBO #559023
Valerie A. Murphy,   BBO #661460
FLYNN & ASSOCIATES, P.C.
400 Crown Colony Drive, Suite 200
Quincy, MA 02169
(617) 773-5500

DATED:  April 21, 2006
G:\F & A\CASE FILES\CSX PI\Papadakis\Pleadings\Motions in Limine\MIL excl pls exp Richard Sanderson-1.doc