# Exhibit "A"





# Exhibit "B"

POSITION POST-ACCIDENT ("OVERCENTER")

"HIGHWAY" POSITION

HY-RAIL DEVICE

PICK-UP TRUCK

# Exhibit "C"

**VIA TRANSPORTATION**

## PERSONAL INJURY/OCCUPATIONAL ILLNESS REPORT

| INCIDENT NUMBER | TYPE OF INCIDENT | TYPE OF REPORT | TRAIN NUMBER |
|---|---|---|---|
| | 1 PI<br>2 RE<br>3 HX<br>4 HX-PI<br>5 HX-RE<br>6 RE-PI<br>7 HX-RE-PI | 1 FRA Reportable<br>2 Non-Reportable<br><br>If FRA Reportable<br>Was Report Changed<br>From Non-<br>Reportable   1 Yes<br>2 No | |
| 01   RD   MO   YR   Div   No   Seq | 02   **1** | 03   **1**   **1** | 04 |

| INCIDENT DATE | INCIDENT TIME (24 HOUR CLOCK) | MILEPOST | R & L CODE | U.S. DOT-AAR GRADE CROSSING NUMBER |
|---|---|---|---|---|
| MO   DAY   YR | | | | |
| 05   **06/13/01** | 06   **1700** | 07   **74.0** | 08 | 09 |

| STREET ADDRESS / HIGHWAY NAME OR NUMBER (IF PRIVATE CROSSING, SO STATE) | NEAREST STATION |
|---|---|
| 10   **PRIVATE** | 11   **SPRINGFIELD** |

| INCIDENT CITY | INCIDENT COUNTY | INCIDENT STATE | INCIDENT DAY |
|---|---|---|---|
| | | | 1 Mon  5 Fri<br>2 Tue  6 Sat<br>3 Wed  7 Sun<br>4 Thur |
| 12   **W WARREN** | 13   **WORCESTER** | 14   **MA** | 15   **3** |

| WEATHER | TEMPERATURE °F | VISIBILITY | ON COMPANY PREMISES | TIMETABLE DIRECTION |
|---|---|---|---|---|
| 1 Clear   4 Fog<br>2 Cloudy  5 Sleet<br>3 Rain   6 Snow | 1 Above Zero<br>2 Below Zero<br>Temp | 1 Dawn   3 Dusk<br>2 Daylight  4 Dark | 1 Yes<br>2 No | 1 North   3 East<br>2 South   4 West |
| 16   **1** | 17   **1**   **95** | 18   **2** | 19   **1** | 20 |

| TRAIN SPEED | AUTHORIZED SPEED | AMTRAK/FOREIGN ROAD INVOLVED | JOINT FACILITY INVOLVED | JOINT OPERATION INVOLVED |
|---|---|---|---|---|
| 1 Estimated<br>2 Recorded | 1 Permanent<br>2 Temporary | 1 Amtrak<br>2 Fgn Road | 1 Yes<br>2 No | 1 Yes<br>2 No |
| 21   MPH | 22   MPH | 23 | 24 | 25   **2** |

| IF FIELD 25 IS YES, ENTER INITIALS AND INCIDENT NUMBER OF OTHER ROAD. | | IF FIELD 25 IS YES, ENTER INITIALS AND INCIDENT NUMBER OF ROAD RESPONSIBLE FOR TRACK MAINTENANCE. | |
|---|---|---|---|
| Initial | Number | Initial | Number |
| 26 | | 27 | |

| TYPE OF MOVEMENT INVOLVED | TYPE OF TRACK USED BY ON-TRACK EQUIPMENT INVOLVED | SUBDIVISION CODE |
|---|---|---|
| 1 Freight Train   6 Yard<br>2 Passenger Train  7 Light Loco(s)<br>3 Work Train   8 Work Equipment<br>4 Single Car   9 Movement Not<br>5 Cut of Cars      Involved | 1 Main  3 Siding<br>2 Yard  4 Industry<br><br>IF MAIN TRACK<br>P = Principal<br>B = Branch<br><br>Typ P/B | |
| 28   **9** | 29   **1 P** | 30   **BC** |

| ID NO. OF INJURED/ILL | NAME OF INJURED/ILL | | AGE | DATE OF BIRTH |
|---|---|---|---|---|
| 31  0788224 | 32  Last Name  PAPADAKIS  FI PI  MI | | 33  53 | 34  Mo 02  Day 04 |

| OCCUPATION | SOCIAL SECURITY NUMBER | DATE HIRED | DEPARTMENT CODE |
|---|---|---|---|
| 35  AIR FOREE, | 36  023384947 | 37  Mo 10  Day 0669 | 38  EWG |

**ADDRESS OF INJURED/ILL**

| Street | INJURED/ILL EMPLOYEE TELEPHONE NUMBER |
|---|---|
| 39  541 CARMEL LANE | 39a  Area  Number |

| City  FEEDING HILLS | St MA | Zip Code 01030 | NAME OF SUPERVISOR |
|---|---|---|---|
| 39 | 40 | | Last Name  RAGG  FI R |

| TYPE OF INJURED/ILL | NATURE OF INJURY | NATURE OF ILLNESS |
|---|---|---|
| A  Employee On Duty<br>B  Employee Off Duty<br>C  Passenger<br>D  Non Trespasser - On RR Property<br>E  Trespasser<br>F  Worker On Duty - Contractor<br>G  Contractor - Other<br>H  Worker On Duty - Volunteer<br>I  Volunteer - Other<br>J  Non Trespasser - Off RR Property | 10 Bruise/Contusion    93 Concussion<br>20 Sprain/Strain    94 Nervous Shock<br>30 Cut/Laceration/Abrasion    95 Internal Injury<br>35 Puncture Wound    96 Loss of Eye<br>40 Electrical Shock/Burns    97 Reaction From One-Time External<br>50 Other Burns      Exposure to Chemicals<br>60 Dislocation    98 One-Time Exposure to Loud Noise<br>70 Fracture      (Explosion)<br>75 Dental Related Injuries    99 Other<br>80 Amputation    9A One-Time Exposure to Fumes<br>90 Fatally Injured      (Does not exceed a single duty<br>91 Foreign Object in Eye      tour/without long term or permanent<br>92 Hernia      consequences) | • Occupational Skin Diseases or Disorders<br>• Dust Diseases of The Lungs (Pneumoconioses)<br>• Respiratory Conditions Due to Toxic Agents<br>• Poisoning (System Effects of Toxic Materials)<br>• Disorders Due to Physical Agents (Other<br>  Than Toxic Materials)<br>• Disorders Due to Repeated Trauma<br>• All Other Occupational Illness of Employees<br><br>(See FRA Guide, Appendix E, for specific code) |
| 41  A | 42  20 | 43 |

| BODY PART AND SIDE INJURED | NUMBER CONSECUTIVE DAYS WORKED | DATE & TIME SHIFT BEGAN (24 HOUR CLOCK) | EXTENT OF INJURY/ILLNESS |
|---|---|---|---|
| 1A Upper Arm    5A Eye<br>1B Elbow    5B Ear<br>1C Lower Arm    5C Nose<br>1D Wrist    5D Mouth/Teeth<br>1E Hand    5E Skull/Scalp<br>1F Thumb/Fingers    5F Neck/Throat<br>3A Upper Leg    6A Spine/Spinal Cord<br>3B Knee    6B Upper Back (muscular)<br>3C Lower Leg    6C Lower Back (muscular)<br>3D Ankle    6D Shoulder<br>3E Heel    6E Collar Bone<br>3F Toes    6F Ribs/Sternum<br>3G Foot    6G Internal Injuries<br><br>6H External Injuries-Other<br>6I Hips/Buttocks<br>6J Genitalia<br>8  Injuries to various<br>   body parts of<br>   relatively equal<br>   severity<br>9  Other Body Parts | 45a  B<br><br>**HOURS OFF PRIOR TO TOUR OF DUTY** | DATE  Mo 06  Day 13  Yr 01<br><br>TIME  0700 | Did this injury/illness result in one or more of the following: medical treatment beyond first aid, days away from work, restriction of work or motion, transfer to another job, termination of employment or loss of consciousness?<br><br>P=Prescription Medication is the only reason for reporting.<br><br>R=Restriction of work or motion is the cause of occurrence only is the reason reporting. |
| 44  6C | 45b  2    1 Right Side<br>      2 Left Side<br>      3 Both | 46a  116 | 47  1    1 Yes<br>      2 No |

| FIRST DAY OFF DUE TO INJURY/ILLNESS | FIRST DAY OF SERVICE AFTER INJURY/ILLNESS | DAYS AWAY FROM WORK DUE TO INJURY/ILLNESS | DAYS OF RESTRICTED ACTIVITY |
|---|---|---|---|
| Mo 06  Day 15  Yr 01 | Mo    Day    Yr | Actual    Estimated | Number of days injured or ill was assigned a temporary job, worked less than full time at a permanent job, or was unable to perform of his or her normally assigned duties. |
| 48 | 49 | 50        5 | Actual    Estimated |
| | | | 51 |

| WAS INJURED/ILL TERMINATED OF PERMANENTLY TRANSFERRED? | IF FATAL DATE OF DEATH | OBJECT/SUBSTANCE CAUSING INJURY/ILLNESS |
|---|---|---|
| 1 Yes<br>2 No  (Position)<br>52 | Mo    Day    Yr<br>53 | 54<br><br>STCC Number |

| PERSONAL PROTECTIVE EQUIPMENT WORN OR USED | EQUIPMENT CONSIST |
|---|---|
| A  None    G  Rubber Gloves<br>B  Safety Shoes    H  Other Type Gloves<br>C  Safety Hat (Hard Hat)    I  Hearing Protection<br>D  Safety Glasses    J  Respirator<br>E  Safety Goggles    K  Leg/Shin Guards<br>F  Face Shield    L  Back Support Belt<br>      M  Tag Lines<br>      N  Safety Harness<br>      O  Other | Locos    Cars Loaded    Empty    Caboose No - |
| 55  BCDH | 56 |

## CIRCUMSTANCE CODES

(See FRA Guide, Appendix F, for specific codes)

| Physical Act | Location | Event | Result | Cause |
|---|---|---|---|---|
| 710 | A60A1 | 38 | 25 | 09 |

57

**WAS AN EXPOSURE TO HAZARDOUS MATERIAL THE CAUSE OR CONTRIBUTING FACTOR TO THE CONDITION BEING REPORTED?**

1 Yes  2 No  2

57a

### TOX TESTING
If Field 60 is Yes Answer The Following:

(a) Was Employee On Duty When Tested?   1 Yes  2 No

(b) Reason For Testing   1 FRA Req'd  2 Agreement

(c) Urine Sample   1 Yes  2 No

(d) Blood Sample   1 Yes  2 No

(e) Employee Off-Duty, Will Be Tested Upon Return. If Yes, Explain Why In Remarks.   1 Yes  2 No

60a

### TOXICOLOGICAL TESTING

Test Conducted   1 Yes  2 No   2

Test Results

60

## NAME AND ADDRESS OF TESTING FACILITY

Name

Street

City   St   Zip Code

How Were Urine/Blood Samples Shipped?

60b

### TESTING OFFICER

Last Name   FI  MI

Time Employee Arrived At Testing Facility

Time Sample(s) Taken

## SPECIAL INFORMATION FIELD

Injury resulted from lifting or rigging?  1 Yes  2 No ☒
If yes, Rigging equipment?  1 Yes  2 No ☐
Manually lifting?  1 Yes  2 No ☐
Estimated weight: ____ lbs.

61

## IF FIELD 61 CHECKED, COMPLETE THE FOLLOWING:

Exceeded hoist/equipment capacity?  1 Yes  2 No ☐

Employee had Lifting/Rigging Training?  1 Yes  2 No ☐

Supervisor had Lifting/Rigging Training?  1 Yes  2 No ☐

61a

## PHYSICIAN NAME AND ADDRESS

Name  CARRINGTON   FI F  MI H

Street  3717 WALNUT ST EXT

City  AGAWAM   St MA   Zip Code 01001

62

## HOSPITAL NAME AND ADDRESS

Name

Street

City   St   Zip Code

63

## REMARKS: EMPLOYEE/OTHER INJURED PERSON'S ACCOUNT OF ACCIDENT/INCIDENT (Indicate Source(s) of Information)

GEAR ASSEMBLY BROKE. TO RAISE WHEEL I HAD TO USE A KLINING BAR AS A LEVER. I THEN BLOCK WHEEL WITH 4" WOOD BLOCK AT SAME TIME. WHEN I REACHED DOWN WITH BLOCK I FELT SOMETHING SNAP IN MY LOWER BACK (R. APPADAKIS)

64

**65 DESCRIBE THE GENERAL ACTIVITY EMPLOYEE ENGAGED IN PRIOR TO INJURY: (e.g. carrying card)**

HEAT PATROL

**66. DESCRIBE FACTORS ASSOCIATED WITH CASE: (e.g. employee reports he slipped on ballast)**

LEFT HAND RAIL GEAR WENT OVER CENTER

**67 DESCRIBE THE INJURY/CONDITION THAT PERSON SUSTAINED: (e.g. employee complains of pain in his back)**

EMPLOYEE COMPLAINS OF PAIN IN LOWER LEFT BACK

**68 LIST PROCEDURES, MEDICATION, THERAPY, USED FOR TREATMENT OF CONDITION:**

X-RAY, ANAPROX, VALIUM, PERCOCET

**69 CHECK ANY OF THE CONSEQUENCES RESULTING FROM THIS INJURY/CONDITION:**

- [ ] Occupational Illness
- [X] Instructions to Obtain, or Receipt of Prescription Medication
- [X] Medical Treatment Beyond First Aid *(X-RAY)*
- [ ] Hospitalization as Inpatient
- [ ] Multiple Treatments or Therapy
- [ ] Loss of Consciousness

**70 IF ANY OF THE ABOVE CONSEQUENCES OR RESTRICTED/LOST WORK DAYS OCCURRED, THE INJURY/ILLNESS IS ALMOST ALWAYS REPORTABLE. IF YOU BELIEVE THIS CASE DOES NOT MEET THE REPORTING CRITERIA, GIVE A BRIEF EXPLANATION.**

**NAME AND TITLE OF REPORT PREPARER**

| Name | FI | MI | Phone # | Title | REPORT DATE MO | DAY | YR |
|------|----|----|---------|-------|---------|-----|-----|
| ROSS | R | G | 4/31-785-4351 | ROADMASTER | 06 | 15 | 0 |

**TIME AND DATE INCIDENT WAS REPORTED BY THE INJURED EMPLOYEE AND NAME OF SUPERVISOR NOTIFIED**

| Time | Date MO | DAY | YR | Name | FI | MI | Was Employee On Duty When The Incident Was Reported? |
|------|---------|-----|-----|------|----|----|-----|
| 0630 | 06 | 15 | 01 | ROSS | R | G | 1 Yes / 2 No |

**NAMES AND ADDRESSES OF WITNESSES**

| | Last Name FI MI | Street | City | State |
|---|---|---|---|---|
| 1st | NONE | | | |
| 2nd | | | | |
| 3rd | | | | |
| 30a 4th | | | | |

**INSTRUCTIONS FOR FIELD PREPARATION OF FORM PI-1 RRM   PERSONAL INJURY/OCCUPATIONAL ILLNESS REPORT**

**FIELD NO.**

01  Leave blank.

02  Enter code to indicate type of occurrence. For personal injury or occupational illness not resulting from rail equipment or rail-highway grade accident/ incident, enter "1". If personal injury resulted from rail-highway grade crossing collision enter "4". If personal injury resulted from rail equipment accident/ incident, enter "6". If personal injury resulted from rail-highway grade crossing collision with rail equipment and track damage, enter "7". Codes 2, 3 and 5 will not be entered on personal injury/occupational illness reports.

03  Enter code to indicate FRA reportability; if coded 1, enter code to indicate if changed from non-reportable.

04  When Applicable, enter train/yard job number. This field can be blank only when field 28 is coded "9" to indicate movement not involved.

05  Enter date of occurrence resulting in injury/illness. This field cannot be blank.

06  Enter time of occurrence. 24-hour clock or "military time" will be entered. This field cannot be blank.

07  Enter milepost location to the nearest tenth of a mile. If the milepost designation contains both alpha and numeric characters, they must be shown. This field cannot be blank.

08  Leave blank.

09  If personal injury resulted from rail-highway grade crossing collision, enter DOT-AAR Grade Crossing Number, otherwise leave blank.

10, 12, 13,14  Enter address, city, county and state at which the injury/illness occurred. These fields cannot be blank.

11  Enter nearest station as shown in the timetable. This field cannot be blank.

15  Enter code to indicate day of the occurrence. Enter one of the codes shown.

16  Enter code to indicate weather conditions at the time of occurrence. Enter one of the codes shown.

17  Enter temperature and code to indicate above or below zero. This field cannot be blank.

18  Enter code to indicate visibility at time of occurrence. Enter one of the codes shown.

19  Enter applicable code.

20  When applicable, enter code to indicate direction of movement. This field will be blank when field 28 is coded "9".

21  When applicable, enter speed of movement and code to indicate if recorded or estimated. This field will be zero when movement is stopped and will be blank when field 28 is coded "9".

22  When applicable, enter authorized speed at the location and code to indicate if speed limit is permanent or temporary. This field will be blank when field 28 is coded "9".

23  Enter code to indicate Amtrak/Foreign Road involvement Code 1 or 2. If Amtrak/Foreign Road not involved, leave blank.

24  Leave blank.

25  Enter code to indicate if joint operation is involved. Must code "1" or "2".

26, 27  Leave blank.

28  Enter code to indicate type of movement involved. Enter one of the codes shown.

29  Enter code to indicate type of track on which the on-track equipment was operating in space "TYP". If coded 1, enter "P" or "B" to indicate principal or branch main track. This field can be blank when field 28 is coded "9".

30  Enter subdivision code. This field cannot be blank.

31  Enter ID number of injured/ill employee. If ID number does not fill all spaces, enter zero(s) to fill left spaces. For non-employees, enter zero in each of the first six spaces and "1" in the seventh space; for multiple injuries, the second will have "2" in the last space, third injured 3, etc. This field cannot be blank.

32  Enter name of injured/ill person. This field cannot be blank.

33  Enter age of injured/ill person. This field cannot be blank.

34  Enter injured/ill person's date of birth. This field may be blank for non-employee.

35  Enter occupation of injured/ill employee. This field may be blank for non-employee.

36  Enter Social Security Number of injured/ill employee. This field may be blank for non-employees.

37  Enter years of service for injured/ill employee. This field may be blank for non-employee.

38  Enter department code. This field cannot be blank.

39  Enter address of injured person. Include Street Address, City, State and Zip Code. This field cannot be left blank for employee, it may be blank for non-employee if address is not known.

39a  Enter telephone number, including area code, of injured/ill employee. This field cannot be blank for employee; it will be blank for non-employee.

40  Enter name of injured/ill employee's supervisor. This field cannot be blank for employee; leave blank for non-employee.

41  Enter code to indicate the type of injured/ill person. Must enter one of the codes shown.

**FIELD NO.**

42  Enter code to indicate nature of injury. Must enter one of the codes shown for an injury; if the report covers employee occupational illness, enter zero and code field 43. If this field is coded 90, enter code of death in field 53.

43  Enter code to indicate nature of employee occupational illness; if report covers injury, enter zero and code field 42.

44  Enter codes to indicate body part and side of body injured. Must enter one of the body part codes shown. If side of body is not applicable, enter "0" in the side of body space. If field 42 was coded other than zero, this field must have entries. Leave this field blank for employee occupational illnesses.

45a  Enter number of consecutive days worked.

45b  Enter number of hours off prior to tour of duty.

46a  Enter date & time shift began. 24-hour clock or military time will be entered.

47  If injury meets any of the criteria shown, enter "1" in the space provided. prescription medication is the only FRA reportable criteria met, enter 1 in left space and "P" in P/R space. If restriction of work or motion on the day of injury only is the lone FRA reportable criteria met, enter "1" in the left space and "R" in the P/R space. If none of the criteria shown are met, enter 2 in the left space and leave P/R space blank.

48  If injury/illness results in days away from work, enter date of first day off after the day of occurrence. For injury/illness with no days away from work, enter zeros.

49  If injury/illness resulted in days away from work, enter date employee returned to duty. For injury/illness with no days away form work, enter zeros. If employee remains away from work at the end of the reporting period, enter zeros and estimate of days away from work in field 50.

50  Enter the number of days away from work due to injury/illness. If the actual number of days is known, enter in "Actual" spaces and zeros in "Estimated" spaces; fields 48 and 49 will show dates of disability. If the employee remains away from work at the end of the reporting period, estimate the days and enter in "Estimated" spaces and zeros in "Actual" spaces; field 48 will show date of first day away and field 49 will be zeros.

51  Enter the number of restricted activity days resulting from the employee injury/illness. If the actual number of days is known, enter in "Actual" space and enter zeros in "Estimated" space. If the employee remains on restricted work assignment at the end of the reporting period, enter an estimate of days in "Estimated" space and enter zeros in the "Actual" space.

52  Enter code to indicate if employee was terminated or permanently transferred due to injury/illness; enter 1 or 2 if transferred, show position to which transferred in the space provided.

53  If field 42 is coded 90, enter code of death. Leave blank when field 42 is coded other than 90. If occupational illness, field 43 coded other than zeros, resulted in death, enter date of death, otherwise leave blank.

54  Enter name of object or substance that caused injury/illness. If the substance is hazardous material, enter STCC number in space provided.

55  Enter code(s) to indicate personal protective equipment worn or used by injured/ill employee; enter applicable codes alphabetically. This field can be blank for non-employees.

56  Enter the number of units of equipment in the consist when field 28 is coded other than "9". The first position of "Caboose" space is for the number in consist; in the second position enter "L" if caboose is occupied by operating crew; or "E" if not occupied. If no caboose on train, enter zero in first position and leave second position blank. If field 28 is coded "9", leave blank.

57  Enter applicable circumstance codes.

57a  Enter applicable code.

60  Enter code to indicate if Toxicological Test was conducted. If test results are not known when report is filed, leave results space blank .

60a  If field 60 is coded 1, make appropriate entries in items (a) thru (e). This field can be blank only when field 60 is coded 2.

60b  If field 60 is coded 1, provide information requested; each block must have an entry. This field can be blank only when field 60 is coded 2.

61  If applicable, enter information.

61a  If applicable, enter information.

62  Enter name and address of attending physician. If none, leave blank. This field may be blank for non-employee.

63  Enter name and address of hospital or medical facility when applicable.

65, 66, 67, 68  Enter requested information.

69  Check, if applicable.

70  Complete, if required.

REMARKS  Enter injured/ill person's account of the occurrence that resulted in injury/illness. Enter time and date the incident was reported by the injured employee; enter code to indicate if employee was on duty when the incident was reported. This field cannot be blank for employee injury; this field will be blank for employee occupational illness report and non-employee injury.

# Exhibit "D"

1

VOLUME I
PAGES 1-223
EXHIBITS 1-13

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-30189-MAP

*****************************
PAUL T. PAPADAKIS,                 *
          PLAINTIFF,               *
                                   *
       -VS-                        *
                                   *
CSX TRANSPORTATION, INC.,          *
          DEFENDANT.               *
*****************************

Deposition of ERNEST GAILOR, taken on behalf
of the Defendant, pursuant to Notice under the
Massachusetts Rules of Civil Procedure, before
Daryll Palma Watts, a Professional Court Reporter
and Notary Public, in and for the Commonwealth of
Massachusetts, at the offices of FLYNN &
ASSOCIATES, P.C., 400 Crown Colony Drive, Quincy,
Massachusetts, on Tuesday, October 11, 2005,
commencing at 10:46 a.m.

BEACON HILL COURT REPORTING, INC.
44 BAYSWATER STREET
BOSTON, MASSACHUSETTS 02128
617-569-8050

BEACON HILL COURT REPORTING, INC.
617-569-8050

---

3

I N D E X

| Witness | Direct | Cross | Redirect |
|---|---|---|---|
| ERNEST GAILOR | | | |
| By Mr. Flynn | 4 | | |

E X H I B I T S

| Id. | Description | Page |
|---|---|---|
| 1 | Curriculum Vitae | 8 |
| 2 | Folder | 65 |
| 3 | Folder | 67 |
| 4 | Correspondence dated February 09, 2004 | 71 |
| 5 | Correspondence dated June 18, 2004 | 74 |
| 6 | Correspondence dated May 27, 2004 | 80 |
| 7 | Correspondence dated June 18, 2004 | 82 |
| 8 | EBT List | 84 |
| 9 | Memorandum dated June 21, 2005 | 178 |
| 10 | Mr. Sanderson's Report | 184 |
| 11 | Report dated August 24, 2005 | 184 |
| 12 | Report dated August 24, 2005 | 185 |
| 13 | Report dated August 24, 2005 | 186 |

BEACON HILL COURT REPORTING, INC.
617-569-8050

---

2

APPEARANCES:

MICHAEL B. FLYNN, ESQUIRE
VALERIE A. MURPHY, ESQUIRE
FLYNN & ASSOCIATES, P.C.
400 Crown Colony Drive - Suite 200
Quincy, Massachusetts 02169
Counsel for: The Defendant.

ROBERT M. BYRNE, JR., ESQUIRE
THORNTON & NAUMES, LLP
100 Summer Street
Boston, Massachusetts 02110
Counsel for: The Plaintiff.

ALSO PRESENT:
Mr. Gary Baker

BEACON HILL COURT REPORTING, INC.
617-569-8050

---

4

P R O C E E D I N G S
* * *

MR. FLYNN: The usual stipulations;
objections, except as to form, and motions to
strike reserved until the time of trial.

MR. BYRNE: Agreed.

MR. FLYNN: He'll read and sign?

MR. BYRNE: Agreed.

MR. FLYNN: Waive the notary.

MR. BYRNE: Agreed.

DEPONENT, ERNEST GAILOR, having
produced satisfactory identification by means of
a New York Driver's License, being sworn, deposes
and states as follows:

EXAMINATION BY MR. FLYNN:

Q    Sir, would you please state your name for the
record?

A    Ernest J. Gailor.

Q    What's your current residential address?

A    4000 Silver Beach Road, Malta Ridge, New York.

Q    What do you do for a living?

A    I'm an engineer.

Q    What kind of an engineer?

A    Civil, environmental, structural.

BEACON HILL COURT REPORTING, INC.
617-569-8050

109

1  Q    Mr. Papadakis testified that it did not, you know
2       that, don't you?
3  A    I know that. But your maintenance guy says it
        went over center.
   Q    Wait, wait, wait. Let's talk about --
6           MR. BYRNE: Objection.
7. Q    Let's talk about Mr. Papadakis.
8           MR. BYRNE: Objection. You should let the
9       witness complete his answer.
10 Q    You did, didn't you?
11 A    Well I was discussing now the maintenance people
12      had said that it overcammed or over-centered and
13      that they had to bring it back around and then it
14      worked properly. And then you had a memo issued
15      identifying that this is what had happened to the
16      device and that it had been repaired. And then
17      there was a subsequent suggestion as to what they
18      should do to make sure this doesn't happen again.
19 Q    What happened to Mr. Papadakis --
20          MR. BYRNE: Is your answer complete?
21          THE WITNESS: Yes. I'm sorry.
22 Q    What happened to Mr. Papadakis was unwitnessed,
23      correct?
24 A    Correct.

                BEACON HILL COURT REPORTING, INC.
                        617-569-8050

110

1  Q    So he's the only one who actually saw what
2       happened to him, correct?
3  A    Correct.
4  Q    The memo came from a fellow named Mr. Evers,
5       correct?
6  A    Correct.
7  Q    He's out in Selkirk, right?
8  A    Correct.
9  Q    He never saw what happened, did he?
10 A    Only was told, that's correct.
11 Q    You've reviewed his deposition, correct?
12 A    Correct.
13 Q    You know that it's based on what other people
14      told him, correct?
15 A    Correct.
16 Q    But not including the plaintiff, correct?
17 A    Correct.
18 Q    In other words, it's secondhand hearsay as we
19      like to call it, correct?
20          MR. BYRNE: Objection.
21 Q    In other words, somebody, Mr. Papadakis told
22      somebody something and that somebody then told
23      Mr. Evers what happened and then he wrote his
24      memo; is that your understanding of how it

                BEACON HILL COURT REPORTING, INC.
                        617-569-8050

111

1       occurred?
2           MR. BYRNE: Objection.
3  A    My understanding is is that the maintenance
4       people found what happened, repaired it and then
5       passed that information along.
6  Q    The maintenance people being Mr. Ebert?
7  A    Correct.
8  Q    At TNT?
9  A    Yes, TNT.
10 Q    By the time it got out to TNT what we know is
11      that the wheel was over-centered?
12 A    Correct.
13 Q    In other words, the pilot arm and the wheel were
14      pointing out toward the front of the vehicle, not
15      away from the vehicle as opposed to its normal
16      position which would be back into the vehicle?
17 A    By on center, correct.
18 Q    You understand from reviewing Mr. Papadakis'
19      deposition that it's his testimony that that's
20      not what occurred at all, correct?
21 A    I understand. That's correct.
22 Q    Mr. Papadakis' testimony was that the wheel never
23      went over center, correct?
24 A    Correct.

                BEACON HILL COURT REPORTING, INC.
                        617-569-8050

112

1  Q    And that the only thing that he had a problem
2       with was getting it back up into the highway
3       position, correct?
4  A    Correct.
5  Q    In your opinion -- to form the basis of your
6       opinions, which we'll get to a little bit later,
7       but to get to your opinions do you completely
8       disregard what Mr. Papadakis says?
9  A    There are portions of his testimony that I do
10      disregard.
11 Q    That portion being what he says happened to the
12      device itself, correct?
13 A    Correct.
14 Q    You have to completely disregard that to get to
15      your opinion, correct?
16 A    Correct.
17 Q    Because if you believe what he said there's no
18      evidence of any defect, correct?
19          MR. BYRNE: Objection.
20 A    If I believe what he said there was a defect, but
21      I was unable to determine what it was.
22 Q    Something happened when he tried to put it back
23      up, but you have no way of explaining it,
24      correct?

                BEACON HILL COURT REPORTING, INC.
                        617-569-8050

113

1        MR. BYRNE: Objection.
2   A    Short of a material failure.
3   Q    There's no evidence of a material failure?
    A    I have no evidence of a material failure.
    Q    But the evidence is that since -- it was working
6        properly once Mr. Ebert brought it back into the
7        proper position and the evidence is actually to
8        the contrary; that, in fact, there was no
9        material there, correct?
10  A    Correct.
11  Q    Then the vehicle was put in service and is still
12       in service today without a recurrence of any
13       material failure, correct?
14       MR. BYRNE: Objection.
15  A    I don't know that.
16  Q    Well you have been given subsequent maintenance
17       and repair records, correct?
18  A    Up until a date, up until the date that I have
19       information, yes.
20  Q    About six months ago, a year ago?
21  A    I know of nothing other than up to that date.
22  Q    So the vehicle continued -- so let's just review
23       it.   Ebert inspects it and once he gets it back
24       to the proper position it works properly, right?
         BEACON HILL COURT REPORTING, INC.
                   617-569-8050

114

1   A    That's my understanding.
2   Q    So that's evidence that there was no material
3        defect, correct?
4   A    Correct.
5   Q    Based on the repair records that you have to date
6        or to the point that you got them the vehicle was
7        in service for several years afterwards without
8        any recurrence of this problem, correct?
9   A    Up to the limit of the records, correct.
10  Q    That's evidence again that there was no material
11       defect at that time or since, correct?
12  A    Correct.
13  Q    To get to your opinion you have to disregard how
14       Mr. Papadakis described the incident as having
15       happened, correct?
16       MR. BYRNE: Objection.
17  A    His descriptions of how he dropped the gear and
18       then how he tried to raise the gear I believe are
19       accurate.  His descriptions of how he was hurt
20       are probably accurate.  His descriptions of what
21       he thinks happened to the gear I don't think are
         accurate.
23  Q    That's because you cannot explain how they would
24       have or could have occurred to any degree of
         BEACON HILL COURT REPORTING, INC.
                   617-569-8050

115

1        reasonable certainty, correct?
2   A    That's true.
3   Q    So then to come to your opinion which you have
4        based on a reasonable degree of certainty you
5        start with the assumption that the wheel had
6        overcammed, correct?
7   A    I don't think I started with that assumption.
8        Initially I was looking for some kind of
9        mechanical error, some material defect, a broken
10       shaft, a broken key, any of those items.  But I
11       didn't see evidence or there was no evidence
12       presented to me that indicated any of that was
13       there.  From there we stepped into the
14       overcamming.
15  Q    So your first instinct in this case based on your
16       professional experience was something must have
17       been wrong with the device in terms of its
18       materials, correct?
19  A    Correct.
20  Q    Did you express that opinion to anybody?
21  A    Oh, yes.
22  Q    Did you tell plaintiff's counsel that?
23  A    I believe we talked about it.
24  Q    Were you persuaded otherwise?
         BEACON HILL COURT REPORTING, INC.
                   617-569-8050

116

1   A    Well I went out and did my inspection.  Looked at
2        the equipment.  Looked at the maintenance
3        records.  I really was looking for a materials
4        list as to what was used to fix this thing, and
5        there was none.  At that time I had to step back
6        and go a different direction with it.
7   Q    So even up to the point of the inspection you
8        were still thinking there's got to be a material
9        defect?
10  A    Correct.
11  Q    You weren't thinking of overcamming?
12  A    I wasn't.
13  Q    Or how the device could come to overcam?
14  A    Well I knew it could.  I just didn't -- from what
15       I understood of the accident I didn't believe
16       that overcamming had been the cause.
17  Q    When you did your inspection you found no
18       evidence of any material defect, right?
19  A    Correct.
20  Q    Was it at that point that you started to drop
21       that opinion from the list of possibilities?
22  A    I believe -- I don't know if we got maintenance
23       records after that.  I know we got some
24       maintenance records well after that.  But I don't
         BEACON HILL COURT REPORTING, INC.
                   617-569-8050

169

```
1    inspection?
2  A  No.
3  Q  You also relied on -- you took some photographs,
4     right?
5  A  Correct.
6  Q  Is there anything significant about these
7     photographs which you would like to point out to
8     me that form the basis of your opinions?
9  A  No.  The photographs identified are photographs
10    of a properly operating piece of equipment.  It
11    was the truck that he used the day that he was
12    injured.  Took pictures of the labels and the
13    identification number on the gear just so we were
14    all working from the same page.
15 Q  You've also reviewed -- so these photographs
16    don't show anything wrong with the device,
17    correct?
18       MR. BYRNE:  Objection.
19 Q  They don't show anything defective, correct?
20 A  I could not find any defects when I took the
21    photographs.
22 Q  They don't show anything out of adjustment,
23    correct?
24 A  Correct.
```

170

```
1  Q  They don't show what you believe occurred to Mr.
2     Papadakis in these photographs, correct?
3  A  Oh, no, we have no pictures of the overcamming,
4     no.
5  Q  Have you ever -- do you have any information from
6     any source other than the Harsco Web site web
7     site about overcamming of the wheel?
8  A  Yes.
9  Q  What source is that?
10 A  Richard Sanderson.
11 Q  Other than Mr. Sanderson do you have any
12    evidence, any evidence of overcamming with
13    respect to this Hy-Rail device?
14 A  No.
15       MR. BYRNE:  Objection.
16 Q  Who is Mr. Richard Sanderson?
17 A  He's a retired railroad worker.
18 Q  Have you ever met him?
19 A  Only have spoken with him over the phone.
20 Q  Once?
21 A  A couple of times.
22 Q  More than twice?
23 A  Possibly three.  Certainly no more than three.
24 Q  Two to three times?
```

171

```
1  A  Correct.
2  Q  How long were these conversations with him?
3  A  The first one was probably ten minutes.  The
4     second one was at least half an hour.  If there
5     was a third one then it was another fifteen
6     minutes.
7  Q  So less than an hour total?
8  A  Correct.
9  Q  You were put in touch with Mr. Sanderson by
10    plaintiff's counsel, correct?
11 A  Correct.
12 Q  This isn't somebody you sought out, correct?
13 A  Correct.
14 Q  Why was it that plaintiff's counsel put you in
15    touch with Mr. Sanderson?
16 A  He felt he was a very knowledgeable individual.
17 Q  Were you put in touch with Mr. Sanderson because
18    you were having problems coming to an opinion in
19    this case?
20 A  We were working --
21       MR. BYRNE:  Objection.
22 Q  First of all, just yes or no, and then you can
23    explain it for me.
24 A  Oh, I was having no problem coming to opinions.
```

172

```
1  Q  Even though your first hypothesis was not proven?
2  A  That was -- that's true.
3  Q  Are you put in touch with Mr. Sanderson after
4     your first hypothesis is put aside?
5  A  It's probably about the same time that we were
6     trying to come to, I was trying to come to
7     conclusions.
8  Q  You were just saying we were trying to come to
9     conclusions?
10 A  I always say we.  I've got a mouse in my pocket.
11 Q  Did you mean you and plaintiff's counsel?
12 A  No, no, no, no.
13 Q  So you're trying to come to this conclusion.
14    Your first hypothesis you put aside.
15       Are you searching at that point in time for
16    a second hypothesis?
17 A  Well I've got a conflict of information.  I've
18    got, I've got EBT's that are, have conflicting
19    information.
20 Q  So you're having a problem coming to a
21    conclusion?
22 A  I am.
23 Q  At that point in time you don't have any opinion;
24    is that fair to say?
```

181

```
 1    Q    You go and look at perhaps articles that are
 2         written about how bleachers are put together,
 3         correct?
 4    A    I would.
 5    Q    And you'd look at articles as to the different
 6         formulas and things for the structural analysis
 7         of bleachers, correct?
 8    A    Correct.
 9    Q    You go to those resources so that you can learn
10         those things, correct?
11    A    Learn them, learn them in the same way that you
12         would drive a car.  You don't learn to drive a
13         car every time you get into it.  That's what
14         you're saying.
15    Q    Right.
16    A    I don't learn.  The resources are there to use.
17    Q    Certainly Mr. Sanderson was a resource that you
18         felt that you wanted to take advantage of, right?
19    A    I would, yes.
20    Q    You didn't know about this gentleman until
21         plaintiff's counsel put you in touch with him,
22         correct?
23    A    Correct.
24    Q    Do you know what the relationship is between
```

182

```
 1         plaintiff's counsel and Mr. Sanderson?
 2    A    I don't.
 3    Q    Do you know if there is one?
 4    A    I don't.
 5    Q    Do you know if they've worked together in the
 6         past?
 7    A    I don't.
 8    Q    What did you do after receiving this memo in June
 9         of 2005, Exhibit 9?
10    A    Gave Mr. Sanderson a call.
11    Q    Then you had those two or three conversations you
12         spoke about?
13    A    Correct.
14    Q    In fact, he wrote a memo to you about how the
15         accident, well how he thought the accident
16         occurred, correct?
17    A    Correct.
18    Q    Your report is based in large part on that memo
19         that Mr. Sanderson sent to you, correct?
20              MR. BYRNE:  Objection.
21    A    He had reached the same conclusion I had at that
22         time.
23    Q    Well he actually put it -- when did you get this
24         writing from him?
```

183

```
 1    A    I don't recall.
 2    Q    It was before you did your report, wasn't it?
 3    A    I believe it was probably after we were done, or
 4         close to being done.
 5    Q    Sir, was it before or after you did your report?
 6    A    During.
 7    Q    During?
 8    A    Could very well be during.
 9    Q    So what's your best memory?
10    A    I don't recall.
11    Q    You certainly had not committed your opinions to
12         a final writing at the time that you got this
13         letter from Mr. Sanderson, correct?
14    A    I think the letter was more confirmation for us
15         than anything else, for me than anything else.
16    Q    Well actually it reads, in large part it reads
17         almost verbatim in certain parts that your report
18         does, correct?
19    A    That's because I sent him a copy of my report.
20    Q    Is that what happened?  You sent him a report and
21         he sends back this letter?
22    A    I wanted to know his opinion.
23    Q    After you send him your report?
24    A    Correct.
```

184

```
 1    Q    So he's plagiarizing from your report?
 2    A    I don't think he's plagiarizing.  I think he's
 3         doing a very good job.
 4    Q    Why don't you pull his report out of your file,
 5         sir?
 6    A    Oh, I have a copy of his report, but it was
 7         supplied here by counsel.
 8              MR. FLYNN:  Can we have that marked.
 9    A    It's in here but...
10              MR. BYRNE:  This one came from my file.
11              MR. FLYNN:  Can I mark that one, Bob?
12              MR. BYRNE:  Why don't we make a photocopy of
13         it.
14              MR. FLYNN:  Sure.  Thanks, Bob.
15              Can I have these next two documents marked
16         as Exhibits 11 and 12.  11 is a report on
17         Harlan-McGee, dated August 24, 2005 on
18         Harlan-McGee letterhead.  Exhibit 12 is a report,
19         same date, but it's the one, it's a copy of what
20         you faxed to me on August 31st of 2005.
21                    ( Mr. Sanderson's Report, marked as
22                    Exhibit No. 10.)
23                    ( Report dated August 24, 2005,
24                    marked as Exhibit No. 11.)
```

# Exhibit "E"

**Richard L. Sanderson**
**December 5, 2005**

1

Volume I, Pages 1-292

Exhibits 1-8

UNITED STATES DISTRICT COURT

for the

DISTRICT OF MASSACHUSETTS

———————————————————————

PAUL T. PAPADAKIS,

    Plaintiff,

v.                            C.A. NO.:  04-30189-MAP

CSX TRANSPORTATION, INC.,

    Defendant.

———————————————————————


DEPOSITION OF:  RICHARD L. SANDERSON

FLYNN & ASSOCIATES, P.C.

400 Crown Colony Drive, Suite 200

Quincy, Massachusetts

December 5, 2005      10:45 a.m.


REPORTED BY: SONYA LOPES/CSR

Richard L. Sanderson
December 5, 2005

8

1    for an approximate period of five years?

2       A.    As an Amtrak employee.  We had the

3    contractor run them -- it's up on the T -- running

4    the commuter rail, work equipment, equipment

5    engineer.

6       Q.    Was that up here?

7       A.    That was in -- yes.  I had all of

8    Charlestown, yes.  And I had control of the shops --

9    one in Salem, one in Boston.

10      Q.    When you retired, what was your position

11   with Amtrak?

12      A.    Lead road mechanic.

13      Q.    What have -- what were the duties and

14   responsibilities of that job?

15      A.    As a lead road mechanic?

16      Q.    Right.

17      A.    Direct other mechanics, get parts, help

18   with repairs on everything, order parts, position

19   people, report to the supervisor, help.

20      Q.    What types of equipment did you work with?

21      A.    Everything that's rail construction from

22   Hy-Rail units right up to 50-ton cranes.

23      Q.    That was not a position which included the

24   maintenance of locomotives and cars?

**Richard L. Sanderson**
**December 5, 2005**

9

1    A.    No.   Work equipment only.

2    Q.    Work equipment only?

3    A.    Correct.

4    Q.    For how long had you had that position?

5    A.    41 years I was work equipment road mechanic

6  with different, you know -- I mean, I from being a

7  road mechanic went to management, management back to

8  road mechanic back up to manager back down to

9  mechanic.

10    Q.    Did you -- so I guess what you're telling

11  me is at the time that you retired a couple of years

12  ago --

13    A.    Yes.

14    Q.    -- you had had 41 years of experience on

15  the railroad.

16    A.    That's correct.   As work equipment.

17    Q.    And it was always in the same craft?

18    A.    Always.

19    Q.    When you hired out with the New York and

20  New Haven, that was as a road mechanic?

21    A.    That's correct.

22    Q.    Somebody who works on all the pieces of

23  equipment that are used in track maintenance --

24    A.    That's correct.

Richard L. Sanderson
December 5, 2005

10

1     Q.    -- and track repair?

2     A.    That's correct.

3     Q.    Would that include construction crane and

4     that types of stuff?

5     A.    Yes.

6     Q.    You work with tampers as well?

7     A.    Yes.

8     Q.    You're working with a wide variety of

9     pieces of equipment?

10    A.    Yes.

11    Q.    Hy-Railers being one of them; correct?

12    A.    That's correct.

13    Q.    Now, one thing I failed to ask you is have

14    you reviewed the Notice of Deposition for this --

15    for your deposition in this case?

16    A.    I probably -- yeah.  Yeah.  I have it.  I

17    had it.  I just --

18    Q.    Let me mark as Exhibit 1 --

19    A.    I'm pretty sure I read it.  It's going back

20    a ways.

21    Q.    Well, can't be going back too far.

22    A.    No.  But, I mean, you know, it's all

23    relative.

24               MR. FLYNN:  Let me have marked for you a

Richard L. Sanderson
December 5, 2005

44

1          The other thing that we have inside of 2A

2    is a letter from Mr. Byrne's firm date -- or

3    Mr. Byrne himself dated April 13, 2005; correct?

4        A.   That's what it says, yes.

5        Q.   And with that letter came some copies of

6    pages of the Hy-Rail manual; correct?

7        A.   Yeah.

8        Q.   And that was a different manual than the

9    one you had in your possession; correct?

10          MR. BYRNE:  Objection.

11       A.   That's not a manual.  I have a manual.

12   That's the difference.  Yeah.

13   BY MR. FLYNN:

14       Q.   What's the difference here?

15       A.   Mine has more pages, more information, more

16   explanation.

17       Q.   Right.  He sent you certain pages from a

18   manual that he had; correct?

19       A.   I guess so, yeah.

20       Q.   And the manual that he had was a different

21   manual than the one you had; correct?

22          MR. BYRNE:  Objection.

23       A.   I'm not sure what he had.

24   BY MR. FLYNN:

Richard L. Sanderson
December 5, 2005

45

```
 1      Q.    Your manual was the '88 manual; correct?
 2      A.    I have the original manual.
 3      Q.    You don't know the dates?
 4      A.    I don't.
 5      Q.    That wouldn't be important to you?
 6      A.    No, not at all.
 7      Q.    You didn't look to see whether these dates
 8 were in the same manual?
 9      A.    No.  It's not important to me.
10      Q.    And he references in this letter you are
11 meeting at the Amtrak New Haven station; correct?
12      A.    Yes.
13      Q.    All right.  Now, did you have any
14 conversation with him before that meeting?
15      A.    I don't remember.
16      Q.    All right.  Now, how long did the meeting
17 take place?
18      A.    I don't know.
19      Q.    What's your best recollection?
20      A.    An hour.
21      Q.    Where did it take place?
22      A.    At the Dunkin' Donuts.
23      Q.    Anywhere else?  Just at the Dunkin' Donuts?
24      A.    Also looked at the Hy-Rail at the Amtrak
```

Richard L. Sanderson
December 5, 2005

49

```
 1      A.    I said I'm going to look at the Hy-Rail, is
 2   that okay.   End of conversation.   That was it.
 3      Q.    There was one there?
 4      A.    Yes.
 5      Q.    What type was it?
 6      A.    It was a Fairmont.
 7      Q.    What model?
 8      A.    0307.
 9      Q.    Was it an Easy-Lift?
10      A.    Yes.
11      Q.    Was it the same type involved in this case?
12      A.    No.
13      Q.    Was it a different type?
14      A.    Yes.
15      Q.    How was it different?
16      A.    More current.
17      Q.    Did it operate in the same fashion?
18            MR. BYRNE:   Objection.
19      A.    Similar.
20   BY MR. FLYNN:
21      Q.    Similar.   Do you know the type that was
22   involved in this case?
23      A.    Yes.
24      Q.    Which type was involved in this case?
```

Richard L. Sanderson
December 5, 2005

50

```
 1      A.    0307A.

 2      Q.    This was a different type altogether?

 3            MR. BYRNE:  Objection.

 4      A.    A newer one.

 5  BY MR. FLYNN:

 6      Q.    A newer one.  Okay.  Did it have sockets on

 7  the top and bottom?

 8      A.    Yes.

 9      Q.    Did it operate the same way?

10      A.    Similar.

11      Q.    How was it different?

12      A.    It had a newer modification.

13      Q.    Which is what?

14      A.    Which is a socket that does not allow it to

15  go over centre.

16      Q.    So it was something that high -- that

17  Fairmont had put out since the 0307 was in -- was

18  being manufactured?

19      A.    I don't know.

20      Q.    You say it's newer.  When did they come

21  out?

22      A.    I don't know.

23      Q.    So with respect to the socket, how does the

24  socket on the device that you looked at prevent the
```

Richard L. Sanderson
December 5, 2005

51

1    wheel from camming over centre?

2        A.    It has a -- nubs cast into it.

3        Q.    Can you describe that any better for us?

4    Where are they cast?

5        A.    In the socket.  They're cast one on either

6    side, so they're reversible for side to side.  And

7    it's a -- I'm trying to think of -- it's a

8    protrusion of a three seven inch.

9        Q.    Is it about in the same area where the set

10   screw is on the 0307?

11       A.    No, it isn't.

12       Q.    How's it different?

13       A.    It's on the opposite side.  It's on the

14   socket.

15       Q.    And how does it prevent overcamming?

16       A.    It hits a mounting bracket.

17       Q.    Is that something that's different as well,

18   or is that the same thing?

19       A.    No.  It's the same mounting bracket as the

20   rest of the vehicles.  Just the socket is different.

21       Q.    All right.  Do you understand the way the

22   0307 that was involved in Mr. Papadakis's case that

23   the set screw is what hits the -- the set screw on

24   the socket hits the mounting bracket?

Richard L. Sanderson
December 5, 2005

52

1            MR. BYRNE:  Objection.

2      A.   Not aware of any set screw on the socket

3   that hits the bracket.

4   BY MR. FLYNN:

5      Q.   So as far as you understand, in

6   Mr. Papadakis's case there was no set screw on the

7   socket.

8            MR. BYRNE:  Objection.

9      A.   There is no set screw on the socket that

10  hits the frame.

11  BY MR. FLYNN:

12     Q.   Where is the set screw on the 0307, as far

13  as you understand?

14     A.   Okay.  Which model?  0307?

15     Q.   The one involved in Mr. Papadakis's case.

16     A.   It would be on the right side of the socket

17  shaft.

18     Q.   All right.  Does it hit the bracket?

19     A.   It hits the mounting channel.

20     Q.   The mounting channel?

21     A.   If it's adjusted properly, it will hit the

22  channel.  That's correct.

23     Q.   That gives an indication to the operator

24  that he's -- that if he goes any further, he can cam

Richard L. Sanderson
December 5, 2005

57

1    questions and answers; correct?

2        A.    Yup.

3        Q.    You know that you're giving a deposition

4    today; right?

5        A.    Yes.  I do now.

6        Q.    The process has been described to you?

7        A.    Yes.  It has now.

8        Q.    And the report, it's completely different;

9    right?

10       A.    Yes, it is.

11       Q.    That's just something that Mr. Gailor put

12   together and signed; correct?

13       A.    Yes.  I guess so.  Yeah.

14       Q.    So as we sit here today, you've never

15   reviewed Mr. Gailor's deposition, have you?

16       A.    No.

17       Q.    You've only received one version of his

18   report; correct?

19       A.    Yes.  That's all I have.

20       Q.    And let's have this report -- by the way,

21   for the record, it has attached to it a letter from

22   Mr. Byrne dated August 31, 2005; correct?

23       A.    Okay.

24       Q.    Right?

Richard L. Sanderson
December 5, 2005

60

1  pawl, comma, disengaging it, end of quote.  Did I

2  read that correctly?

3      A.    Yes.

4      Q.    You disagree with that?

5      A.    Yes.

6      Q.    Why?

7      A.    Because that's not the way you would

8  release the locking pawl.

9      Q.    That's not the way you would do it

10  properly; correct?

11      A.    That's correct.

12      Q.    In other words, if you did it this way, it

13  would have been improperly done; correct?

14      A.    It wouldn't work.

15      Q.    Because it was done improperly; correct?

16      A.    Yes.

17      Q.    Do you have, by the way, Mr. Papadakis's

18  deposition where he described what happened?

19      A.    No, I don't.

20      Q.    Then what is the basis -- and you

21  understand this is a description that Mr. Gailor

22  gave of what Mr. Papadakis said happened; correct?

23      A.    No.  I didn't know that.

24          MR. BYRNE:  Objection.

Richard L. Sanderson
December 5, 2005

65

1    Q.   And putting it down on the track, is he

2    not?

3    A.   Doesn't say that.  That statement doesn't

4    say that.  Says disengaging the lock.

5    Q.   Actually, what he's describing there is

6    what he's doing to take the wheel up; correct?

7    A.   May I read it again?

8    Q.   Yes.  Sure.  Read the whole paragraph.

9    A.   I better.  Yes.  I read it now.

10   Q.   And?

11   A.   And the question was again?

12   Q.   This was when he was trying to take the

13   wheel back up -- the guide wheel back up from the

14   rail position to the highway position; correct?

15   A.   Yes.  He was trying to get -- go from rail

16   to highway.  That's correct.

17   Q.   Can I see that for a second?

18   A.   Yes.

19   Q.   What else did you disagree with -- by the

20   way, you have not reviewed Mr. Papadakis's

21   deposition, have you?

22   A.   I don't think so.  It's not in the file.  I

23   never saw it.

24   Q.   So that's never been produced to you?

Beacon Hill Court Reporting, Inc.
(617) 569-8050

Richard L. Sanderson
December 5, 2005

66

1    A.    I've never seen it.

2    Q.    You've never read Mr. Gailor's deposition

3  either; right?

4    A.    Apparently not.

5    Q.    Have you asked for either one of those

6  things?

7    A.    No.  I might have asked for

8  Mr. Papadakis's.

9    Q.    You've never received it?

10    A.    No.

11    Q.    Do you think it would be important to

12  somebody -- you've been retained now to give an

13  expert opinion in this case; correct?

14            MR. BYRNE:  Objection.

15    A.    What?

16  BY MR. FLYNN:

17    Q.    Let me -- have you been retained?

18    A.    I'm not sure.  May I explain?

19    Q.    Go ahead.

20    A.    Originally, when I got involved in this

21  thing, I was just going to give my experienced

22  opinion originally.  And that was going to be it.

23  And then as it went on, I got more involved in it.

24  And at that point I said I can no longer donate that

Richard L. Sanderson
December 5, 2005

72

1      A.    Verbally.

2      Q.    Over the phone?  In person?

3      A.    No.   When we were in person.

4      Q.    What did you say?

5      A.    I don't remember word for word what I said.

6    I believe I showed Mr. Byrne -- it had to do with

7    overcamming.  And I believe I showed Mr. Byrne the

8    operation of a Hy-Rail that's in New Haven.  I

9    showed him how a Hy-Rail actually operates.

10     Q.    That was the first time you went down to

11   Amtrak?

12     A.    I believe so.

13     Q.    Go ahead.

14     A.    And, you know, I showed him the operation

15   of the vehicle, how a Hy-Rail goes up and down and

16   work and what it does.  And then I expressed what

17   overcamming is.  I showed him what overcamming was

18   or the term they use as overcamming, and I also

19   showed him what could happened when it overcammed or

20   what could not happened when it overcammed.

21     Q.    So the device that you used to demonstrate

22   this, you were able to get the device to overcam?

23           MR. BYRNE:   Objection.

24     A.    No.

Richard L. Sanderson
December 5, 2005

73

```
 1   BY MR. FLYNN:

 2       Q.   You said you showed him what happens when

 3   you overcam and when you don't overcam.

 4       A.   Visually.  Yes.  I showed him the units and

 5   what they do.  I could not have that happen.  I

 6   could not disable a Hy-Rail.  I just showed him the

 7   working, functioning parts.

 8       Q.   And did you ever -- in either of the times

 9   that you met with Mr. Byrne to show him a Hy-Rail,

10   did you use the same device that was involved in

11   Mr. Papadakis's case; in other words, the 0307?

12            MR. BYRNE:  Objection.

13       A.   Yeah.  It needs to be more clarified.  Yes,

14   it was an 0307 that I showed Mr. Byrne.

15   BY MR. FLYNN:

16       Q.   Was it the newer type?

17       A.   It was a newer type.

18       Q.   It wasn't the type that was involved in

19   Mr. Papadakis's accident?

20       A.   It was not the same -- it's the same model

21   but not the same parts.

22       Q.   Specifically, the part that was different

23   as it applies to this case was the stop on the

24   socket; correct?
```

Richard L. Sanderson
December 5, 2005

74

1       A.    One of them, yes.

2       Q.    As opposed to the set screw; correct?

3       A.    That would be one of the changes, yes.

4    That would be one, yeah.

5       Q.    All right.  And you showed him how that

6    device was able to overcam; correct?

7              MR. BYRNE:   Objection.

8       A.    I may not have showed him that.

9    BY MR. FLYNN:

10      Q.    What did you show him?

11      A.    I showed him the functioning of a Hy-Rail.

12      Q.    Now, what was your opinion as you expressed

13   it to Mr. Byrne at that time?

14      A.    I don't remember.

15      Q.    What's your best recollection of what you

16   expressed to him?

17      A.    My best recollection would be to say that I

18   went through the proper operation of a Hy-Rail.  And

19   I showed Mr. Byrne how a Hy-Rail works -- how it

20   goes up, how it goes down, how it locks, how it

21   unlocks -- and, also, visually pointed to what would

22   go -- how you would go overcam and allow the wheel

23   to misfunction -- malfunction.

24      Q.    Did you express to him -- so you expressed

Richard L. Sanderson
December 5, 2005

76

```
1       A.   I don't know how the device is designed.
2   I'm not an engineer.
3   BY MR. FLYNN:
4       Q.   I'll get to that in a little bit, but go
5   ahead.
6       A.   So that would be one way.
7       Q.   Wait.  So you don't know how the device is
8   designed because you are not an engineer?
9       A.   Yeah.
10      Q.   That's not something within your expertise;
11  correct?
12      A.   Engineering?
13      Q.   Right.
14      A.   I have no engineering degree.
15      Q.   You have no opinion in this case as to
16  whether or not the device was defectively designed;
17  correct?
18      A.   I wouldn't know that.
19      Q.   You only know based on your experience that
20  -- given the way the device is designed -- that if
21  the operator puts too much pressure on the bar when
22  you're putting it down into the rail position that
23  that can cause the guide wheel to overcam; correct?
24      A.   That's not what I said.
```

Richard L. Sanderson
December 5, 2005

77

```
 1      Q.    What did you say?
 2      A.    What I said was if he has -- I'm not sure
 3   what I said.  But if he has the proper bar and
 4   everything is set up, it's pretty much hard to go
 5   over centre.  But if he does not have the proper bar
 6   or if he has a different bar -- a lining bar or
 7   something like that -- then it's possible for him to
 8   overcome the second level of protection.
 9      Q.    That being the set screw?
10      A.    That being the set screw.
11      Q.    On the old model.
12      A.    On the older model.
13      Q.    Which is not what you used -- it's not the
14   model that you used when you showed Mr. Byrne --
15      A.    That's correct.
16      Q.    -- this in connection with your opinion.
17      A.    No, it isn't.
18      Q.    So it was based on your experience with
19   using these other types.
20      A.    Yes.
21      Q.    All right.  So you knew that if you had the
22   wrong bar, the operator could put too much pressure
23   on it and then overcome the --
24      A.    Secondary level of protection, which would
```

Richard L. Sanderson
December 5, 2005

78

1    be the set screw.

2        Q.    All right.

3        A.    That's one.

4        Q.    That's one.  With respect -- go ahead.  The

5    other one was if he had the improper bar?

6        A.    A would be the improper bar.

7        Q.    I think you said that even with the

8    improper bar -- with the improper bar it's hard to

9    go over centre but not impossible; correct?

10       A.    No.    That's not what I said.

11       Q.    I wrote it down, improper bar it's hard to

12   go over centre.  I believe those were your words.

13   If I'm wrong, the record will reflect it.

14           MR. BYRNE:  The record will reflect it.

15       A.    Well, if you have the improper bar, he

16   could put it over centre by overcoming the

17   resistance of the set screw.

18   BY MR. FLYNN:

19       Q.    He can still do that even with the improper

20   bar.

21       A.    That's what I'm talking about.

22       Q.    What about with the proper bar?

23       A.    With the proper bar, it should hit the

24   bumper before that happened.

**Beacon Hill Court Reporting, Inc.**
**(617) 569-8050**

Richard L. Sanderson
December 5, 2005

79

1     Q.    The bar itself?

2     A.    The bar itself, A.

3     Q.    Go ahead.

4     A.    B would be if the stop itself was out of

5     adjustment, the possibility exists that it could go

6     over.  He can also overcam it or -- I'm trying to

7     think of what else would do that.  It could also be

8     worn, the position of the -- I'm trying to think of

9     a word for you.  We'll call it a lug that the cam

10    contacts.  If that were worn, the possibility exists

11    that the cam could get by that.

12    Q.    Anything else?

13    A.    At the moment I can't remember anything

14    more.

15    Q.    Now, did you express all of these opinions

16    to Mr. Byrne prior to your involvement with

17    Mr. Gailor?

18    A.    I don't remember.

19    Q.    So you don't remember exactly what you

20    expressed to Mr. Byrne, although you now know that

21    at least these four different alternatives -- these

22    are four alternative causes to overcamming that you

23    know of, based on your experience.

24    A.    Yes.

Richard L. Sanderson
December 5, 2005

81

1     Q.    You said one of the things that could cause

2    -- let me back up.    Did you express to Mr. Byrne,

3    when you first expressed your opinion to him, an

4    opinion as to how Mr. Papadakis's accident occurred?

5     A.    No.

6     Q.    You only expressed to him an opinion as to

7    based on your experience how the device might go

8    over centre; correct?

9     A.    Yes.

10     Q.    To this day, you have not read

11    Mr. Papadakis's deposition; correct?

12     A.    I have not read it, no.

13     Q.    And at the point that you gave the opinion,

14    had you gotten information from any source as to how

15    Mr. Papadakis says his accident happened?

16     A.    I don't remember.

17     Q.    Have you ever spoken with him?

18     A.    Yes, I have.

19     Q.    When did you speak with him?

20     A.    Between, you know -- between April and

21    August, somewhere in there.

22     Q.    Was it prior -- was it prior to your

23    meeting with Mr. Byrne?

24     A.    No.

**Richard L. Sanderson**
**December 5, 2005**

84

```
 1       Q.    So this is when he was trying to put the --

 2       A.    Hy-Rail gear.

 3       Q.    -- into the highway position?

 4       A.    That he would push down on the bar to put

 5  it up into that locking position, but it would fall

 6  right back down again.

 7       Q.    By the way, sir, you've never inspected the

 8  actual device that was involved in Mr. Papadakis's

 9  case, have you?

10       A.    No.

11       Q.    You've never even seen it; correct?

12       A.    No.

13       Q.    You've never seen it?

14       A.    I've never seen it.  That's correct.

15       Q.    What else did he tell you -- so then go on.

16  What else did he tell you?

17       A.    And then he said -- let me see.  He said he

18  was at the crossing, he tried to raise the Hy-Rail

19  unit, it went up to the top and fell back down and

20  it happened a couple of times.  And he was not able

21  to lock it into the position.  And then he said

22  somehow he had chained the wheel up with a chain,

23  and that was pretty much it.  And that was it.

24       Q.    When did he say that he got hurt?
```

Richard L. Sanderson
December 5, 2005

86

1    A.   Okay.  Going back to the very beginning, I

2  never -- we never finished that conversation, if you

3  can understand what I'm saying.  He told me, you

4  know, that that happened, he pushed the bar.  And

5  what I said was I don't see how that could happen.

6  I don't see how, you know, when he pushed the bar up

7  that the wheel would fall.  I said the -- and why it

8  would not lock.

9    Q.   Wait a minute.  Is that still your

10  professional opinion?  Is it still your professional

11  opinion that the way he described it to you could

12  not happen?

13    A.   To raise the wheel, no.  The way the wheel

14  fell, yes.

15    Q.   So make sure the record is clear.  He says

16  to you I'm trying to put it back up, I got the bar

17  in the lower socket, I'm pushing down, the wheel's

18  coming all the way up and falling back down.

19    A.   That's what he told me, yes.

20    Q.   It's your opinion that that could not

21  happen; correct?

22         MR. BYRNE:  Objection.  Go ahead.

23  BY MR. FLYNN:

24    Q.   Correct?

Beacon Hill Court Reporting, Inc.
(617) 569-8050

Richard L. Sanderson
December 5, 2005

87

1    A.    Yes.

2    Q.    And you explained that to him in your

3    conversation with him even before you -- before you

4    became involved with Mr. Gailor; correct?

5    A.    Yeah.  Yes.  I'd say so.

6    Q.    I think you just told me you said to him I

7    don't see how that could happen.

8    A.    Yeah.  Yeah.

9    Q.    That's still your opinion; correct?

10   A.    Yes.  Yes.

11   Q.    What was the next part of that

12   conversation?

13   A.    And then I said -- then he took off, said

14   he had to chain the wheel up to lock it.  And I said

15   well, to me it sounds like it's overcammed.

16   Q.    So you told him that?

17   A.    That was my suggestion, yes.

18   Q.    You said that it sounds like it's

19   overcammed?

20   A.    Yes.  I said that.

21   Q.    Which was completely different from what he

22   described to you; correct?

23          MR. BYRNE:  Objection.

24   A.    No.

Richard L. Sanderson
December 5, 2005

1    Q.   And we know that the -- from the only

2    person who measured it after the accident,

3    Mr. Ebert.  He found that it was within the proper

4    adjustment; correct?

5    A.   He said that.

6    Q.   So do you have an opinion, sir, that the

7    stop arm adjustment had anything to do with causing

8    Mr. Papadakis's accident?

9    A.   I think it did, yes.  Yes, I do.

10   Q.   What do you say it had to do with?

11   A.   I believe it did not supply the second

12   level of resistance.

13   Q.   It never hit the cross channel, according

14   to what you say.

15   A.   I believe it might have went by the cross

16   channel.

17   Q.   So it missed it altogether?

18   A.   The gouges were there already, I believe.

19   Q.   Hold on.  Obviously, if the gouges are

20   there, that means it's hitting the cross channel;

21   right?

22   A.   At some point.

23   Q.   What you're saying is, No. 1, it was out of

24   adjustment; correct?

Richard L. Sanderson
December 5, 2005

124

1    A.    Contributing cause.  That's a good word.

2    Yes.

3    Q.    All right.  And it's your opinion that what

4    happened was the stop arm just never hit the cross

5    channel; correct?

6    A.    It never offered the resistance that it

7    should have.

8    Q.    Or the communication to Mr. Papadakis when

9    he was operating it that he had gone that far;

10   correct?

11        MR. BYRNE:  Objection.

12   A.    If he could feel it, yeah.

13   BY MR. FLYNN:

14   Q.    Assuming that the adjustment was correct --

15   taking into account for the gouge -- and assuming

16   that when Mr. Papadakis operated the device to put

17   it into the rail position that it did, in fact, hit

18   -- the stop arm did, in fact, hit the cross channel

19   and he went further than that to overcam it, his --

20   the overcamming, then, would have been caused by his

21   own conduct; correct?

22        MR. BYRNE:  Objection.

23   A.    Would have been caused by him having the

24   wrong angled bar.

Richard L. Sanderson
December 5, 2005

150

1    went beyond that point that the wheel itself -- the

2    guide wheel itself -- would still have looked as if

3    it had not been -- the shaft had not been

4    overcammed; correct?

5        A.    Yes.

6        Q.    And that you have experience with that.

7        A.    Sure.

8        Q.    You have seen that before?

9        A.    Sure.  You can actually replicate that, if

10   you wanted to.

11       Q.    Have you?

12       A.    Yes.  Ebert's done it.

13       Q.    Did you do that?

14       A.    No, never in my career.  Yes.  Not in here.

15   Ebert did.

16       Q.    He did what?

17       A.    They overcammed that one on the rack.

18       Q.    They did?

19       A.    Just like I'm saying.  It says it in there.

20       Q.    What did he say about how it would appear

21   to the operator?

22            MR. BYRNE:  Objection.

23       A.    I'm just talking about the overcamming.

24   BY MR. FLYNN:

Richard L. Sanderson
December 5, 2005

187

1    that he actually received an injury; correct?

2        A.    No.

3        Q.    Correct?   Right?

4        A.    I'm sorry.   Correct.

5        Q.    So you don't have any opinion as to what

6    caused his injury; correct?

7        A.    No.

8        Q.    You agree with what I said?

9        A.    I'm sorry.   Yes.   Yes.

10       Q.    Now, have you ever been retained to give an

11   expert opinion in a case before?

12       A.    Never.

13       Q.    Have you ever been consulted with respect

14   to your expertise?

15       A.    Well, in a case, you mean?

16       Q.    Yes.

17       A.    Never.

18       Q.    So you've been consulted when you were an

19   employee; correct?

20       A.    Oh, sure, all the time.

21       Q.    Never involved in a litigation; correct?

22       A.    No.

23       Q.    You've never testified in a deposition,

24   have you?

Richard L. Sanderson
December 5, 2005

188

```
 1       A.    Many, many years ago I might have.

 2       Q.    When was the last time you testified?

 3       A.    25 years ago maybe.

 4       Q.    And was that as an expert, or was that just

 5  as a witness?

 6       A.    No.  Just as a witness.

 7       Q.    To a personal injury?

 8       A.    Yeah.

 9       Q.    Did it have anything to do with the

10  operation of a Hy-Rail device?

11       A.    No.

12       Q.    Do you currently plan to make it a practice

13  to testify as an expert in cases involving injuries?

14       A.    I don't know.  I'm not clear.  I don't

15  know.

16       Q.    Well, most of the time when we have expert

17  opinions, they're people that do this -- at least in

18  part -- for a living.  Okay?  Do you have any plans

19  to do this for a living?

20       A.    I'm not sure.

21       Q.    You're thinking about it?

22       A.    I don't know.  I'm serious.  I don't know.

23  I have to see how this goes and how I feel.

24       Q.    Fair enough.  Did you receive any training
```

Richard L. Sanderson
December 5, 2005

190

```
1   may have been something else that may have been

2   produced as part of Mr. Gailor's disclosure

3   information.

4           MR. FLYNN:  Yes.  But it was your memo.

5           MR. BYRNE:  If you want to ask him about

6   it, I think you'll find --

7           MR. FLYNN:  Maybe I will.

8           MR. BYRNE:  -- it was a statement

9   regarding his experience.

10          MR. FLYNN:  All right.

11  BY MR. FLYNN:

12     Q.   Sir, would you describe for us your

13  educational -- your education?

14     A.   Okay.  My education.  Well, I went to high

15  school.

16     Q.   Where?

17     A.   I went to trade school, Eli Whitney Tech.

18     Q.   Where did you go to high school?

19     A.   Eli Whitney Tech.

20     Q.   That's a high school?

21     A.   Yes.  It's a trade school.  Both.

22     Q.   When did you graduate?

23     A.   I graduated in -- oh, boy.  That's '60, I'm

24  guessing.  And then I went back.  I was too young at
```

Richard L. Sanderson
December 5, 2005

191

1    the time to get a job.  I had to go back.  So I

2    postgraduated (sic) -- postgraduate, one more year.

3    So I was full trade.

4        Q.    At the high school?

5        A.    That's right.  At the same school.  Then

6    from there --

7        Q.    What was the field of study as a

8    postgraduate?

9        A.    Automotive mechanics for the four years.

10   Then from there I went to work on the railroad.  And

11   then while working at the railroad, I went to many

12   trade -- many OEM machine-type schools.  I went to

13   welding schools, electrical schools -- machine

14   schools, for lack of a better word.  Then I went to

15   college for 50 -- I think I had 58 credits.

16       Q.    Where did you go to college?

17       A.    Several places.  I went to Middlesex

18   Community in Connecticut, and I went to Middlesex

19   Community in Massachusetts.  Then I took some

20   courses in Salem, and that's it.

21       Q.    And did you receive any degree?

22       A.    No.  No, I have not.

23       Q.    It's classes here and there?

24       A.    Well, it's a part of a degree.  I stopped

**Richard L. Sanderson**
**December 5, 2005**

192

1  going because I retired.

2     Q.   I see someplace that there was some

3  studying you've done with respect to business

4  management.

5     A.   Yes.  That was it.  That was my degree --

6  program.

7     Q.   So during the course of your railroad

8  experience, you'd from time to time take some

9  courses in furtherance of a business management

10  degree.

11     A.   Yes.

12     Q.   But you never --

13     A.   Finished.

14     Q.   You never finished, and you're not pursuing

15  that now.

16     A.   No.  No need to.

17     Q.   And the -- have you ever received any OEM

18  training in the railroad with respect to Hy-Rail

19  devices?

20     A.   Other than the -- what I spoke about

21  earlier.

22     Q.   Which was the representative from Fairmont?

23     A.   Yes.  And -- yes.  And that occurs every

24  eight, ten years that that happens.  And when you

**Richard L. Sanderson**
**December 5, 2005**

199

1    Q.    So you went into the bed of the truck.

2    A.    It was just there, yeah.

3    Q.    And you took it out of the bed?

4    A.    Yeah.

5    Q.    And then operated it?

6    A.    Yes, I did.

7    Q.    And did you take any pictures?

8    A.    I didn't, no.

9    Q.    Did you make any notes?

10   A.    No.

11   Q.    Did Mr. Byrne take any pictures?

12   A.    I don't think so.

13   Q.    Did Mr. Byrne take any notes?

14   A.    I don't remember.

15   Q.    Did you write up a report of that first

16   inspection?

17   A.    No.

18   Q.    What did you do during that inspection?

19   A.    Just to show him what a Hy-Rail was.

20   Q.    Did the Hy-Rail -- was it the same type of

21   Hy-Railer involved in Mr. Papadakis's accident or

22   case?

23          MR. BYRNE:    Objection.    Asked and

24   answered.

Richard L. Sanderson
December 5, 2005

200

```
 1      A.    It was the same model.

 2   BY MR. FLYNN:

 3      Q.    It was an 0307?

 4      A.    Yes.  But a newer model.

 5      Q.    So it was the one with the --

 6      A.    Yes.

 7      Q.    -- with the new --

 8      A.    Yes.  Yes.

 9      Q.    -- stop arm; correct?

10            MR. BYRNE:  Wait for him to complete the

11   question, please.

12   BY MR. FLYNN:

13      Q.    Right?

14      A.    Yes.

15      Q.    Then you had a second meeting with

16   Mr. Byrne.  When did that take place?

17      A.    After that.  I don't remember.  At least 30

18   days, I'm assuming.

19      Q.    Where did this second meeting take place?

20      A.    New Haven.

21      Q.    Same place?

22      A.    No.

23      Q.    Where?

24      A.    The Dunkin' Donuts.
```