UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

-------------------------------------------------------X

PAUL T. PAPADAKIS,

          PLAINTIFF        :        CIVIL ACTION

                        :        NO.: 04-30189-MAP

VS.

                        :

CSX TRANSPORTATION,

                        :

          DEFENDANT

-------------------------------------------------------X

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION *IN LIMINE*
TO ADMIT COLLATERAL SOURCE BENEFITS**

**I.**    **Introduction**

    Now comes the Plaintiff in Opposition to the Defendant's Motion in Limine to Admit

Evidence of the Plaintiff's Receipt of Collateral Source Benefits.

    The Defendant has moved the Court for a ruling *in limine* approving the Defendant's

request that it be permitted to offer evidence that the Plaintiff has received a disability annuity

from the U.S. Railroad Retirement Board, as well as supplemental income benefits pursuant to a

policy with the Provident Life and Accident Insurance Company, and the receipt of the dollar

amount of such benefits. Notwithstanding the disfavor courts generally have for collateral

source evidence. Eichel v. New York Central Railroad, 375 U.S. 253, 845.Ct. 316, 11 L.Ed 2d

307 (1963).  The Defendant suggests such evidence should be allowed pursuant to "well

established exception to the 'collateral source' rule" enunciated in McGrath v. Consolidated Rail

Corp., 136 F.3d 838 (1st Cir 1998).

    The Plaintiff respectfully says that the Defendant's Motion should be denied.

## II.    Argument

The general rule in FELA cases is that evidence of payments made from collateral

sources to the plaintiff is not admissible. Eichel v. New York Central Railroad Co., 375 U.S.

253, 84 S. Ct 316 11 L.Ed 307 (1963).

In Eichel, the Defendant railroad argued that the receipt of such benefits while

concededly inadmissible to offset or mitigate damages should be allowed "…as bearing on the

extent and duration of the disability suffered by the petitioner". The Court rejected the railroads

argument and held that

> the likelihood of misuse by the jury clearly outweighs the value of this
> evidence. Insofar as the evidence bears on the issue of malingering, there
> will generally be other evidence having more probative value and involving
> less likelihood of prejudice the receipt of a disability pension." Eichel supra
> at 255.

This would appear to have been the end of the issue until the adoption of the Federal

Rules of Evidence in 1973. Specifically, Federal Rule of Evidence 403 which vested the trial

judge with authority to determine what evidence is relevant and admissible. Since the adoption

of the Federal Rules of Evidence, the issue of the admissibility of Collateral Source benefits has

been the subject of frequent judicial review and, notwithstanding the Defendant's claim that

there is a "well established exception" to the exclusionary rule; the circuits are split on the issue.

For instance the Ninth Circuit has interpreted Eichel to be a total preclusion of collateral

benefits, Sheehy v. Southern Pacific Transportation Co., 631 F.2d 649 (9th Cir. 1980). The Sixth

Circuit also looks unfavorably upon use of such evidence. Wilcox v. Clenchfield Railroad

Company, 747 F.2d 1059 (6th Cir. 1984) as does the Tenth Circuit, Green v. Denver & Rio

Grande Western Railroad Company 59  F.3d 1029 (10th Cir. 1995), cert. denied 516 U.S. 1009,

116 S.Ct. 565. See also, Lee v. Consolidated Rail Corporation,No. CIV.A.94-6411, 1995 WL

734108 (E.D. PA. Dec. 5, 1995). Concededly, the First Circuit has recognized that under certain circumstances the trial judge exercising the discretionary authority accorded him by Fed. R. Evid. 403 may allow the Defendant to offer evidence that the Plaintiff has received benefits pursuant to the Railroad Retirement Act or pursuant to a policy of insurance providing disability benefits McGrath v. Consolidated Rail Corporation 136 F.3d 838 (1st Cir 1998). However, before exercising that discretion, the court must consider whether admission of such evidence presents little likelihood of prejudice to the Plaintiff and whether there is no strong potential for improper use. The Plaintiff suggests that Eichel would further require that the court consider whether there is "…other evidence having more probative value and involving less likelihood of prejudice than the receipt of a disability pension." Eichel 375 U.S. at 255. According to Eichel, only after satisfied that the probative value outweighs the risk of prejudice and that the jury will not use the evidence improperly, and that there is no other more probative evidence available should the court admit the evidence. Moreover, if the evidence is admitted, then a limiting instruction is required. McGrath, 136 F.3d at 841.

The Plaintiff suggests that the Defendant's reference to a Massachusetts state case has no authority in a claim brought pursuant to Federal Statute.

**Facts**

The Plaintiff admits that he has received benefits pursuant to the Railroad Retirement Act and Provident Life and Accident Insurance Company. The Plaintiff further acknowledges that these benefit sources have liens that must be satisfied should the Plaintiff obtain a favorable verdict. The Plaintiff also says that the U.S. Railroad Retirement Board has awarded him a disability pension reflecting its determination that his is totally disabled from gainful employment. Report of Railroad Retirement Board, attached hereto as Exhibit A.

During trial the Plaintiff will offer evidence through his treating physicians that as a result of the injuries sustained on June 13, 2001 he has permanent partial impairments that limit his ability to perform work. Report of Dr. Lawrence Field, attached hereto as <u>Exhibit</u> <u>B</u>. The Plaintiff also proposes to offer the expert opinion of Leona Liberty, Ph.D., that the Plaintiff's current earning capability is limited to work with compensation ranging from $6-$9 per hour and limited to 25-30 hours per week. This report is dated July 13, 2004. Report of Leona Liberty, Ph.D, attached hereto as <u>Exhibit</u> <u>C</u>. This evidence was disclosed to the Defendant months ago in the form of medical records, expert reports and expert depositions. Nevertheless, the Defendant misleadingly says in support of its Motion that the Plaintiff claims a "permanent total disability" which is simply not true. Also not true is the Defendant's assertion that "...the Plaintiff's treating physicians agree with the Defendant's medical expert that the only injury, if any, he suffered as a result of the accident should have disabled him for no more than three months". As the Defendant well knows, Dr. Lawrence Field, the Plaintiff's treating physician has opined that the Plaintiff's torn annulus is causally related to the incident and the injury permanently limits his ability to lift more than fifty pounds. See <u>Exhibit</u> <u>B</u>.

The Plaintiff denies that he is a malinger. However, if counsel seeks to pursue this defense tactic there are several other alternatives more probative and less prejudicial to the Plaintiff to prove malingering. Specifically the Plaintiff chose to reject the Defendant attempts to engage him in an alternative work program, and he has not attempted to find work of the type referred to in Dr. Liberty's report. Assuming the Defendant can lay a proper foundation either or both of these facts is arguably the type of evidence <u>Eichel</u> says is more "probative" and involving less likelihood of prejudice."

In light of the forgoing, the Plaintiff says that upon the current records it would be

impossible for the Court to find that the need for admission of the collateral source benefits

outweighs the potential that the jury may misuse it and prejudice the Plaintiff. The Plaintiff

respectfully says that the Defendant's Motion In Limine for a ruling allowing the admission of

disability benefits paid to the Plaintiff pursuant to the Railroad Retirement Act and/or by the

Provident Life and Casualty Insurance Company should be denied.

> Respectfully submitted,
> Paul Papadakis
> By his attorney,
>
> _____
> Robert M. Byrne Jr.
> BBO# 028620
> Thornton & Naumes LLP
> 100 Summer St. 30th Fl.
> Boston, MA 02110

# EXHIBIT A

RL-210A [3-97]



UNITED STATES OF AMERICA
**RAILROAD RETIREMENT BOARD**
844 NORTH RUSH STREET
CHICAGO, ILLINOIS 60611-2092

OFFICE OF PROGRAMS
ASSESSMENT AND TRAINING

November 22, 2002

Paul Papadakis
54 Carmel Lane
Feeding Hills, MA   01030

In reply refer to:
RRB NO. A-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

Dear Mr. Papadakis:

This is to advise you that we have reconsidered our decision regarding your period of disability ("disability freeze") and early Medicare Coverage.

A disability freeze has been established in your case beginning June 14, 2001.  Your case will be reviewed, and <u>if</u> the disability freeze increases the amount of your annuity payments you will be notified later.

You are entitled to Medicare coverage beginning December 1, 2003. You will be automatically enrolled.  No action is required on your part.

Because your condition meets the Social Security Act definition of disability, all or part of the tier 1 portion of your annuity will be taxed like a social security benefit.   If your period of disability could affect prior tax years, you will receive a special letter with additional information within the next 60 days.

Notify the Railroad Retirement Board (RRB) promptly if your condition improves, if you begin working for pay or become self employed regardless of the amount of your earnings, or if you are convicted of a felony.  Also, notify the RRB if your doctor says that you can return to work.

Your case may be periodically reviewed to determine whether your condition remains severe enough to prevent any work activity to allow your disability freeze to continue. When your case is reviewed, we may ask you for information and evidence or to report for a medical examination.

- 2 -

If you disagree with this decision, you have the right to appeal
to the Bureau of Hearings and Appeals. If an appeal is made, it
must be submitted on Form HA-1 and must be received at an office
of the RRB within 60 days from the date of <u>this notice</u>. A Form
HA-1 may be obtained from any field office of the RRB or by
writing directly to the Director of Hearings and Appeals at the
following address: Railroad Retirement Board, Bureau of Hearings
and Appeals, 844 North Rush Street, Chicago, Illinois 60611.

If you need to personally visit one of our field offices, you are
urged to call for an appointment. You will not be refused service
if you do not have an appointment, but Railroad Retirement Board
representatives can serve you better with an appointment.

Sincerely,

David McCann
Reconsideration Specialist

cc:  Field Office
     Boston, MA

BE SURE TO READ THE ATTACHMENT FOR OTHER IMPORTANT INFORMATION

FROM COMPREHENSIVE HEALTH SERVICES          (MON)11·18·02 07/23/ST 17:18/NO. 4862952032 P. 9?
NOV-14-2002  Case 3:04-cv-30189-KPN-L  Document 75-13  Filed 05/15/2006  Page 9 of 25

# MEDICAL CENTER OF EAST SPRINGFIELD, INC.

1410 CAREW STREET

SPRINGFIELD, MASSACHUSETTS 01104

MEDICAL DIRECTOR
DANIEL DRESS, M.D.                                                      (413) 781-1812

October 12, 2002

Comprehensive Health Services
8229 Boone Boulevard
Suite 700
Vienna, VA. 22182-2623

RE:  Paul Papadakis
Claim #:  023384947JA
Railroad Retirement Board

History:  This 54 year old male was evaluated in my office on October 8, 2002.
He complains of the following problems:  #1 - back pain - he claims that he
was injured at work last year and developed low back pain.  Back pain radiates
to the left buttock.  He has pain all the time and the symptoms increase with
any bending or lifting.  Treatment has consisted with physical therapy and
epidural injections no surgery has been advised.  Medication includes
Hydrocodone as needed.  #2 - knee pain - patient states that he had right knee pain
with tendonitis of the right knee last year.  Symptoms have resolved.

Past Medical History:  Hypocholesterolemia, benign prostatic hypertrophy,
esophageal reflux.  Medications:  Zocor, Nexium, Terazosin and Hydrocodone.
Family history negative for diabetes, ETOH - Zero.

Physical Examination:  General - Alert, no acute distress.  Vital signs -
afebrile, pulse 80, respirations 16, blood pressure 116/70, weight 201 lbs.
Head - normocephalic without evidence of trauma.  Eyes - equal and reactive
to light, extraoccular movements are full.  Fundi disclose no hemorrhage,
exudate or papilledema.  Ears - tympanic membrane intact.  Mouth- dentition
is good.  Throat - no inflammation.  Neck - supple, no thyroidmegaly or mass.
Chest - clear to percussion and auscultation.  Heart - regular rhythm, no
gallop, murmur or rub.  Abdomen - soft and non-tender, no organomegaly or
mass.  Back - lumbar spine - motion is as follows flexion - 70 degrees,
extension - 25 degrees.  Right lateral flexion - 20 degrees, Left lateral flexion
20 degrees.  Neurologic exam - deep tendon reflexes are 2+ in the upper
and lower extremities.  Motor exam - strength testing is full in the arms and
legs.  Sensory exam - pin sinse is intact in the upper and lower extremities.
Gait is in normal limits.

Page 2

RE:  Paul Papadakis
Claim #:  023384947JA


Assessment:   Back pain - I believe that this patient has limitations
              with moderate lifting.




Sincerely,



Daniel Dress, M.D.


DD/rg

THE ORIGINAL SIGNEL
BY THE ABOVE DOCTO

# EXHIBIT B



UNITED STATES OF AMERICA
## RAILROAD RETIREMENT BOARD
408 ATLANTIC AVENUE, ROOM 441
PO BOX 2448
BOSTON, MASSACHUSETTS 02208-2448
E-MAIL: boston@rrb.gov

# MEDICAL ASSESSMENT OF
# RESIDUAL FUNCTIONAL CAPACITY

| NAME | RRB CLAIM NUMBER |
|---|---|
| **Paul Papadakis** | **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** |

### INSTRUCTIONS

Complete this form and submit to us along with your narrative report and office records, as requested on Form G-250. Describe below any restrictions in the claimant's ability to perform basic work-related functions within a regular work setting on a day-to-day basis. **Relate any assessed reduction to capacity to particular medical findings.** Do not consider non-medical factors such as age, sex, education, or work experience.

**Note:** You may include this medical assessment in your narrative report, however, we prefer you use this Form G-250a.

When using this form, use the space to the left of a function or condition to enter "NA" if you find that it is NOT AFFECTED by the claimant's impairment(s). If you are unable to assess the claimant's ability to perform an activity or tolerate a condition shown, use the space to show "UNK" indicating UNKNOWN. Otherwise, complete as appropriate, being sure to explain limitations and relate them to specific findings in the space provided.

Please read page 4 for the authorization for this report and other important notices.

---

A. **Exertional Restrictions** - For all claimants with physical impairments.

1. _____ In an 8-hour workday claimant can STAND and/or WALK, with normal breaks, for:

   ⋀ less than 2 hours total      ⋀ at least 2 hours total      ⋀ 6 hours or more

   ### MEDICAL FINDINGS TO SUPPORT RESTRICTION:

   Chronic low back pain secondary to Torn L4-5 disc

2. _____ In an 8-hour workday claimant can SIT, with normal breaks, for:

   ⋀ less than 6 hours total      ⋀ 6 hours or more

   ### MEDICAL FINDINGS TO SUPPORT RESTRICTION:

   Same as #1

BOSTON, MA DO    NOV 1 2 2002

2

**Paul Papadakis**                                                    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

**Exertional Restrictions**, Continued

| 3. _____ Claimant can LIFT: | Unlimited | Frequently[1] | Occasionally[2] | Never |
|---|---|---|---|---|
| Less than 10 pounds | (∧) | ∧ | ∧ | ∧ |
| 10 pounds | (∧) | ∧ | ∧ | ∧ |
| 20 pounds | ∧ | ∧ | (∧) | ∧ |
| 50 pounds | ∧ | ∧ | ∧ | (∧) |
| 100 pounds or more | ∧ | ∧ | ∧ | (∧) |

## MEDICAL FINDINGS TO SUPPORT RESTRICTIONS:

| 4. Claimant is able to: | Frequently[1] | Occasionally[2] | Never |
|---|---|---|---|
| _____ Bend/Stoop | ∧ | ∧ | (∧) |
| _____ Crouch/Squat | ∧ | ∧ | (∧) |
| _____ Climb | ∧ | ∧ | (∧) |
| _____ Reach above shoulder level | (∧) | ∧ | ∧ |

## MEDICAL FINDINGS TO SUPPORT RESTRICTIONS:

| 5. Claimant can use BOTH HANDS for repetitive: | YES | NO (Limitation **MUST** be explained) |
|---|---|---|
| _____ Simple Grasping | (∧) | ∧ |
| _____ Fine Manipulation | (∧) | ∧ |
| _____ Pushing/Pulling | ∧ | (∧) No lift > 10 lb |

| 6. Claimant can use BOTH FEET for repetitive: | | |
|---|---|---|
| _____ Foot Controls | ∧ | (∧) |

| 7. Claimant can, without restriction: | | |
|---|---|---|
| _____ See | (∧) | ∧ |
| _____ Hear | (∧) | ∧ |
| _____ Speak | (∧) | ∧ |

## MEDICAL FINDINGS TO SUPPORT RESTRICTIONS:

[1] **FREQUENTLY** means occurring one-third to two-thirds of an 8-hour workday; cumulative, not continuous.
[2] **OCCASIONALLY** means occurring from very little up to one-third of an 8-hour workday; cumulative, not continuous.

G-250A (02-00)

Paul Papadakis                                                                                           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

B.   **Environmental Restrictions** - For all claimants, as applicable.

| Claimant is restricted in activities including: | No | Mildly[3] | Moderately[4] | Totally |
|---|---|---|---|---|
| _____ Unprotected Heights | ∧ | ∧ | ∧ | (∧) |
| _____ Driving/Operating Machinery | ∧ | ∧ | ∧ | (∧) |
| _____ Being around moving Machinery | ∧ | ∧ | (∧) | ∧ |
| _____ Uneven Terrain/Stairs | ∧ | ∧ | ∧ | (∧) |
| _____ Exposure to Dust, Fumes, Etc. | (∧) | ∧ | ∧ | ∧ |
| _____ Exposure to Noise | (∧) | ∧ | ∧ | ∧ |
| _____ Exposure to Vibration | ∧ | (∧) | ∧ | ∧ |
| _____ Exposure to Temperature Extremes/Humidity | ∧ | (∧) | ∧ | ∧ |
| Other: | | ∧ | ∧ | ∧ |

## MEDICAL FINDINGS TO SUPPORT RESTRICTIONS:

C.   **Mental Restrictions** - For all claimants with mental impairments.  *N/A  No eval for this*

| Claimant is limited in ability to: | No | Mildly[3] | Moderately[4] | Totally |
|---|---|---|---|---|
| _____ Reason/Use Judgment | ∧ | ∧ | ∧ | ∧ |
| _____ Maintain Appropriate Mood | ∧ | ∧ | ∧ | ∧ |
| _____ Maintain Personal Habits | ∧ | ∧ | ∧ | ∧ |
| _____ Perform Normal Daily Activities | ∧ | ∧ | ∧ | ∧ |
| _____ Make Social Adjustments | ∧ | ∧ | ∧ | ∧ |
| _____ Relate to Other People | ∧ ∧ | ∧ | ∧ | |
| _____ Make Occupational Adjustments | ∧ | ∧ | ∧ | ∧ |
| _____ Maintain Normal Work Pace | ∧ | ∧ | ∧ | ∧ |
| _____ Maintain Normal Concentration | ∧ | ∧ | ∧ | ∧ |
| _____ Remember/Understand/Carry Out Instructions | ∧ | ∧ | ∧ | ∧ |
| Other: | | ∧ | ∧ | ∧ |

## MEDICAL FINDINGS TO SUPPORT RESTRICTIONS:

[3] **Mildly** means tolerance/ability to function is limited but satisfactory.
[4] **Moderately** means tolerance/ability to function is seriously limited, but not precluded.

G-250A (02-00)

**Paul Papadakis**                                                                                                                 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

| In your opinion, is the claimant able to handle benefit payments in his/her own best interest | Yes ∧ | No ∧ |
|---|---|---|

| Signature | Date | Phone Number with area code |
|---|---|---|
| *[signature]* MD | 10 3 02 | ( 4 13 ) 846 4330 |

Printed Name, Title, and Address

**Lawrence H. Field, M.D.**
**780 Chestnut Street**
**Springfield, MA 01107**

Please return this form along with your narrative report and copies of your office records to:

### RAILROAD RETIREMENT BOARD
408 ATLANTIC AVENUE, ROOM 441
PO BOX 2448
BOSTON, MASSACHUSETTS 02208-2448
E-MAIL: boston@rrb.gov
PHONE NUMBER      :   (617) 223-8550
FACSIMILE NUMBER :   (617) 223-8551

### PRIVACY ACT AND PAPERWORK REDUCTION NOTICE

The information requested on this form is authorized by Section 7(b)(6) of the Railroad Retirement Act. While you are not required to respond, your cooperation is needed to provide information necessary to complete processing for the claimant named and to determine the claimant's entitlement to disability benefits under the Railroad Retirement Act.

We estimate this form takes an average of 20 minutes per response to complete, including time for reviewing the instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Federal agencies may not conduct or sponsor, and respondents are not required to respond to, a collection of information unless it displays a valid OMB number. If you wish, send comments regarding the accuracy of our estimate or any other aspects of this form, including suggestions for reducing completion time, to Chief of Information Management, Railroad Retirement Board, 844 N. Rush Street, Chicago, IL 60611-2092.

G-250A (02-00)

## Lawrence H. Field, M.D., F.A.A.P.M.R.

### Physical Medicine & Rehabilitation
### Board Certified

780 Chestnut Street
Springfield, MA 01107-1610

Tel. (413) 846-4330
Fax (413) 846-4332

November 5, 2002

Railroad Retirement Board
408 Atlantic Avenue
Room 441
P.O. Box 2448
Boston, MA 02208-2448

Re: Paul Papadakis
023384947

To Whom It May Concern,

Mr. Papadakis was a 53 year old male who was initially evaluated in my office on 6/28/01. He incurred sudden low back pain when bending over on 6/13/01 while performing his usual work responsibilities on the railroad.

A subsequent work-up with an MRI scan performed on 7/07/01 did reveal a small central annulus tear of the L4-5 disc. There was also bilateral neural foraminal narrowing with compression of both L4 nerve roots. These factors contributed to ongoing chronic low back pain. He was evaluated by a neurosurgeon as well as an orthopedic surgeon. No surgery was indicated. His final diagnosis is as follows.

1. Torn L4-5 disc.

2. Myoligamentous lumbosacral strain.

3. L4 nerve root compression.

He has been on several different medications including narcotic pain relievers which were most recently refilled from my office on 7/25/02. He underwent a long course of physical therapy. This therapy was from June 2001 through August 2001. This was unsuccessful. He went for epidural cortisone injections with no significant relief.

BOSTON, MA DO    NOV - 7 2002

Re: Paul Papadakis                          November 5, 2002
Page 2


My prognosis for full recovery is guarded.

If you have any questions please feel free to contact me.

Sincerely,

Lawrence H. Field, M.D.

LHF/mm

# EXHIBIT C

**CAPABILITIES EVALUATION CENTER**

EMPLOYMENT ANALYSIS – LIFE CARE PLANNING
120 DEFREEST DRIVE
RENSSELAER TECHNOLOGY PARK
TROY, NY 12180-7608

PHONE: 518.283.7148
FAX: 518.283.7168
EMAIL: T20@msn.com

July 13, 2004

Robert Byrne, Jr
Thornton & Naumes, LLP
100 Summer Street; 30th Floor
Boston, MA 02110

## EMPLOYABILITY & REHABILITATION ANALYSIS

| | |
|---|---|
| Name of Injured Party: | Paul T. Papadakis |
| Date of Birth | 02/04/1948 |
| Date of Accident: | 06/13/2001 |
| Your File #: | v. CSX |
| Our File #: | B2398-3409 |

### PURPOSE of REPORT
The purpose of this report is to determine the employability potential and rehabilitation needs of Paul T. Papadakis, and identify vocational alternatives (if any), for his return to gainful employment.

### METHOD
Information and evidence to draw conclusions were obtained, in part, by reviewing the following records or other documents:

Medical reports:
  Dr. Carrington
  Dr. Cowan; New England Orthopedic Surgeons
  Dr. Field
  Dr. Kaye; Valley Neurological Surgery
  Dr. Khayata; Lahey Clinic
  Dr. McGuire; Baystate Medical Center
  Dr. Pfeifer, Lahey Clinic
  Baystate MRI & Imaging Center
  Baystate Pain Management Center
  Mercy Medical Center
  Springfield Anesthesia
  Stop & Shop Pharmacy

In addition Mr. Papadakis participated in a Vocational Evaluation on 4/12/2004, where a face to face interview was conducted and vocational tests were administered.

## BACKGROUND AND HISTORY

Paul T. Papadakis is a 56 year old married individual. He is right-handed and wears corrective lenses. He resides with his spouse at 54 Carmel Lane, Feeding Hills, MA 01030. He has two adult children who live independently. He receives disability retirement benefits from his past employer. He has a valid driver's license, but will take a Valium before driving, due to anxiety and other problems.

## EDUCATION & VOCATIONAL TRAINING

Mr. Papadakis graduated from a high School in Springfield, MA, in 1965. He indicated English and History were his favorite or best subjects while his least favorite class was math. He subsequently attended Holyoke Community College, but dropped out in his sophomore year, due to lack of academic interest. Vocational training includes having taken various classes and other training through the railroad or through his union. He served in the US Naval Reserve in the active status for about six months and in the inactive status for one year. He received an early honorable discharge, due to experiencing anxiety when having to travel. He has basic computer literacy and familiarity with the keyboard.

## MEDICAL

Mr. Papadakis sustained serious injuries on June 13, 2001 when working for CSX as a railroad track inspector. At the time of the incident he was unable to raise the railroad truck with wheels off the track and had to place a block under the wheel, twisting his back and suffering severe musculoskeletal spasm. An MRI scan revealed a torn L4-5 disc with bulges at L1 through S1 levels. Surgery has not been recommended. Rather doctors have suggested he undergo IDET treatments. However he reported his insurance carrier has not approved this procedure and he lacks the funds for self-pay.

Mr. Papadakis indicated he suffers from low back and leg pain. He experiences chronic burning pain in the center of his lower back, at L4-5, and sharp pain in the sacroiliac joint on the left side He is weather sensitive and more symptomatic when it is cold or rainy. He was treated with two series of epidural injections into the sacroiliac joint on August 30, 2001 and October 15, 2001 and found this to be so painful that he never returned to the pain clinic.

Mr. Papadakis wears a back brace for support when attempting an activity such as gardening. He finds lying down helps relieve pain, while prolonged sitting or standing in one place aggravates his condition. He sleeps with a pillow between his legs, and his knees drawn up. He has been prescribed Vicodin for pain and Xanax for anxiety and sleep.

Mr. Papadakis sees a massage therapy monthly, as he finds this helps with muscle spasms. These treatments are not covered by his insurance. As a result he must pay $ 45 per session out of his own money.

Other medical history includes work related injuries to his wrist and being diagnosed as suffering from bilateral carpal tunnel syndrome for which he underwent surgery in 1997. He was out of work about three months for what was referred to as an occupational hazard. He reported he

occasionally experiences numbness in his right hand and fingers, but not of a disabling nature. He has some hearing loss, more on the left, with tinnitus, and finds background noise can be distracting. He has been diagnosed with diverticulosis, anemia, and reflux and controls symptoms through diet.

## HOBBIES or DAILY ROUTINE, PRE-POST INJURY

Mr. Papadakis reported he has good and bad days, and when he does not feel well he does little. On good days he sometimes goes to the library to take out books about WWII, as he enjoys reading fiction books about this topic. He likes gardening and watching sports and sometimes goes to the park to see games. He lives close to his elderly parents and visits them frequently. He has a treadmill that he uses on the average twice a week. Prior to the accident he had enjoyed golf and deep sea fishing, and was active in the Elks Lodge and other activities.

## NEED FOR HOME MAINTENANCE ASSISTANCE

Mr. Papadakis has limitations for doing heavy chores around his home. Consequently he might need to hire others to do some of the work he would have ordinarily done pre-injury. A conservative estimate for this need ranges from ten to twenty-five percent. A professional economist could translate this into an economic or financial cost.

## EMPLOYMENT HISTORY

Mr. Papadakis worked for CSX, previously known as ConRail and Penn Central, since 1969, or for about 31 years. He was initially hired as a trackman, received on the job training, then moved on to more complex positions. His job at the time of the accident was as a railroad track inspector. Job duties included inspecting about 54 miles of the track for broken rail, sagging joints, malfunctioning switches, or other problems. He worked alone and liked the independence of his job. He also reported he enjoyed working with his hands.

## ANALYSIS OF PRIOR EMPLOYMENT

The U.S. Department of Labor has described a classification system that identifies work by exertional level to perform specific jobs. There are five exertional levels, ranging from the most physically demanding classification of Very Heavy to the least physically demanding classification of Sedentary, as follows:

Very Heavy work involves exerting in excess of 100 pounds of force occasionally, up to 1/3 of a workday; 50 pounds of force frequently, 1/3 to 2/3 of the workday; or 20 pounds of force constantly, 2/3 or more of the workday, to move objects.

Heavy work involves exerting 50 to 100 pounds of force occasionally, 25 to 50 pounds of force frequently, and up to 20 pounds of force constantly to move objects.

Medium work involves exerting 20 to 50 pounds of force occasionally, 10 to 25 pounds of force frequently, or up to 10 pounds of force constantly to move objects.

Light work involves exerting up to 20 pounds of force occasionally, or up to 10 pounds of force frequently, or a negligible amount of force constantly to move objects. If the weight is negligible

walking or standing to a significant degree, or sitting most of the time, but with pushing or pulling of arm or leg controls, or working at a production pace entailing constant pushing or pulling of materials could be required.

Sedentary work involves exerting up to 10 pounds of force occasionally or a negligible amount of force frequently to lift, carry, push, pull, or otherwise move objects. Sitting most of the time, with walking and standing occasionally could also be required.

In a similar fashion, occupations are assigned a skill level, from one to nine, referred to as the Specific Vocational Preparation, SVP, needed to perform a job in a competent manner, where the higher the SVP, the more skilled the position.  This information is typically organized by ranking a particular job title as Skilled, Semiskilled, and Unskilled.

Mr. Papadakis' past job according to the above criteria is referred to as a Track Repairer, # 910.684-014. This type of work is considered semiskilled, level 4, heavy employment.

Mr. Papadakis has been seen by several physicians and has undergone various treatments. Dr. Field opined in his report to the Railroad Retirement Board on November 5, 2002 that Mr. Papadakis' prognosis for full recovery is guarded.

Hence it could be concluded that Mr. Papadakis lacks the wherewithal to resume his prior job. As a result he will have to seek a new career.

## TRANSFERABLE SKILLS

Transferable skills are skills an individual possesses, either natural, acquired or residual (following disability), through work, training, education, hobbies, or general life experiences, that could be used for various vocational possibilities. Mr. Papadakis did not acquire any skills he could transfer to jobs outside the railroad industry. Consequently training for a new career with assistance for locating a future employer might be required.

## PARENTS/SIBLINGS OCCUPATIONS

Mr. Papadakis father continues to work at 82 years old as a maintenance supervisor. His mother, also in her 80's, is a homemaker. His sister works in a doctor's office. His adult daughter is a singer; his son's career is a boiler maker.

## RESULTS OF VOCATIONAL TESTING

A battery of vocationally related tests was provided to Mr. Papadakis on 4/12/2004.  The purpose of this assessment was to identify skills, aptitudes or interests for future employment. The following chart depicts the variety of standardized tests administered to him. An analysis and discussion follow.

| Test | Norm Referenced | General |
|------|-----------------|---------|
| WRAT - Arithmetic | 117 Standard Score | High Average |
| WRAT - Reading | 113 Standard Score | High Average |
| ORAL DIRECTIONS | 66%ile | Above Average |
| GATES-MacGINITIE Vocabulary | >12th Grade | Above Average |
| EMPLOYEE APTITUDE Clerical | 90%ile | Above Average |
| REVISED BETA | 114 | High Average |
| ETCH-A-SKETCH w/OVERLAY (Time & Accuracy) | 11 minutes, 5 errors | Below Average |
| BASIC INFORMATION | 98%ile | Above Average |
| SELF DIRECTED SEARCH | Realistic, Investigative, Enterprising | |
| VOCATIONAL PREFERENCE | Investigative, Artistic, Realistic | |

## SKILLS ANALYSIS AND DISCUSSION

Mr. Papadakis arrived early for his appointment. He worked in a cooperative fashion on all assignments presented to him throughout the approximate four hours that comprised the evaluation. He stood up several times during this interim to stretch or take a short break. Behavioral observations included that he demonstrated good interpersonal and conversational skills. He implied he misses working and being productive. Furthermore he indicated that when and if able he would like to volunteer at either the Red Cross or the library, as he realizes it unlikely that he could return to his job at the railroad.

Mr. Papadakis described himself as having strong values for following through with any commitment he makes. Consequently it could be assumed he takes pride being a reliable worker, a criteria supported by his long tenure with one employer.

The results of testing found strengths in all academic and vocational areas that were tested. That is, Mr. Papadakis demonstrated proficiencies for solving language and math problems, and for applying general logic to solve problems. Too, his score on the Oral Directions test indicated he listens well and that his loss of hearing is not at a debilitating or handicapping level. Moreover he developed a strategy for working in an efficient and accurate manner. Overall his test scores imply he likely was a valuable employee who had the potential to think and plan before acting.

One hands-on fine motor assignment was administered to Mr. Papadakis. He worked slowly on this task, but traced the maze with precision and neatness. Consequently his below average score is not representative of poor eye-hand coordination. Rather his score was a function of working in a deliberate or careful fashion, a value that further supports him to be a valuable worker.

Two interest inventories were administered to Mr. Papadakis to learn career interests. The results of both tests were consistent for occupations classified as Realistic, i.e., working with tools or machines, or with one's hands, and Investigative, occupations that require research and inquiry. As this is descriptive of his past job Mr. Papadakis likely has an understanding of the types of employment that have the potential to provide him satisfaction. This is important, as workers who

---

are satisfied with their job have longer tenure and may be more productive than workers who are lack intrinsic satisfaction. Additionally these results further support that Mr. Papadakis' past employment with the railroad was a good match for him, and reinforces the belief that he would have remained with the railroad until the typical retirement age customary in this occupation, or in his union.

The conclusion to the vocational testing includes that Mr. Papadakis possesses a variety of skills and aptitudes that could be utilized for employment. However he has no work experiences outside the railroad and thus would require training to access a job that commensurate with his potential.

## FUNCTIONAL LIMITATIONS FOR EMPLOYMENT

Functional Limitations for employment are restrictions that prevent an individual from engaging in activities that involve physical exertion. It can also include mental health and environmental limitations and can include the handicapping nature of chronic pain and limitations for driving.

Background information suggests Mr. Papadakis would have the following functional limitations:

Need to avoid prolonged sitting, standing, walking, bending, balancing, climbing, lifting, carrying, kneeling, crouching or crawling. Additionally his concentration could be impaired, due to chronic pain. Too he reported he has limitations for driving. Moreover, as he has good and bad days, his reliability for showing up for work every day could be compromised. These restrictions imply that Mr. Papadakis might be best suited for light duty types of employment and working fewer than the typical 37.5-40 hour workweek.

## POST-INJURY EARNING POTENTIAL

The results of this vocational evaluation suggests that Mr. Papadakis' earnings potential is entry level, or a little higher, where earnings range from $ 6 to $ 9 per hour. Too, it would be more reasonable to project that the number of hours he could reasonably work would range from 25 to 30 hours per week.

## VOCATIONAL OR RETURN TO WORK ASSISTANCE

Mr. Papadakis could seek out the services of the state vocational rehabilitation program for retraining. However his physical limitations will limit the number and types of training he could participate in. For example, his ability for working at a computer is limited. Too, any training will take him longer than others to complete a similar training. Hence it might not be reasonable for him to pursue formal training. Rather he could seek out the services of the state vocational rehabilitation program for placement assistance.

## REHABILITATION NEEDS AND COSTS

Mr. Papadakis is not medically stable, despite having undergone various treatment modalities and may have to seek out medical services the remainder of his life. The following chart has been developed to identify a conservative estimate of some of the future treatments or expenses Mr. Papadakis may require in his ongoing rehabilitation.

| ITEM/SERVICE | COST | FREQUENCY | COMMENTS |
| --- | --- | --- | --- |
| Physician Visits<br>  Orthopedic/diagnostic w/testing<br>  Physiatrist<br>  Pain Management w/injections | $ 320<br>$  55<br>$ 175-600 | Each appointments is scheduled to occur every 2-6 years/Life | Referrals to other specialists might be required. Newer treatments could be more costly. |
| Physical Therapy | $ 40-80/visit | 8-10x Year/Every 2-6 Years/Life | Maintenance for containment of symptoms |
| Massage Therapy | $45/visit | Monthly, next one-two years | |
| Medications | $ 650/year | Annual/Life | Newer or other more costly meds could be substituted |
| Y or Fitness Club | $ 700 | Annual/Life | Maintenance |

## SUMMARY

Paul T. Papadakis was injured in an accident at work on June 13, 2001. His injuries include back and leg pain, for which he has been treated conservatively. In addition he has undergone injections for pain management. As his condition is not likely to improve he will require monies to pay for medical treatments throughout his life. Some of these costs were identified under the section of rehabilitation needs and costs.

Mr. Papadakis cannot do the heavy maintenance work around his home. As a result he may have to hire others to do the tasks he would ordinarily done. A conservative estimate for this need or loss ranges from ten to twenty-five percent. A professional economist could translate this into an economic or financial cost.

Mr. Papadakis is not able to resume his long career as a railroad worker. Yet testing indicated he was well suited for his past employment and likely would have remained with the railroad until the typical retirement age customary in this occupation.

Mr. Papadakis lacks transferable skills for a new career and has functional limitations that could impede his ability to locate a suitable employer. Consequently he may have to apply to the state vocational rehabilitation program for placement assistance. His future earnings potential ranges from $ 6-9 per hour. Too, it was opined that the number of hours he could reasonably work would range from 25 to 30 hours per week

Thank you for this referral.

Submitted:

*Leona H. Liberty*

Dr. Leona H. Liberty, Ed.D., CRC, NCC, CLC                    B2398-3409

---