# Exhibit "C"

VOLUME I
PAGES 1-223
EXHIBITS 1-13

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-30189-MAP

****************************
PAUL T. PAPADAKIS,                  *
        PLAINTIFF,                  *
                                    *
    -VS-                            *
                                    *
CSX TRANSPORTATION, INC.,           *
        DEFENDANT.                  *
****************************

        Deposition of ERNEST GAILOR, taken on behalf
of the Defendant, pursuant to Notice under the
Massachusetts Rules of Civil Procedure, before
Daryll Palma Watts, a Professional Court Reporter
and Notary Public, in and for the Commonwealth of
Massachusetts, at the offices of FLYNN &
ASSOCIATES, P.C., 400 Crown Colony Drive, Quincy,
Massachusetts, on Tuesday, October 11, 2005,
commencing at 10:46 a.m.

BEACON HILL COURT REPORTING, INC.
44 BAYSWATER STREET
BOSTON, MASSACHUSETTS 02128
617-569-8050

---

APPEARANCES:


MICHAEL B. FLYNN, ESQUIRE
VALERIE A. MURPHY, ESQUIRE
    FLYNN & ASSOCIATES, P.C.
    400 Crown Colony Drive - Suite 200
    Quincy, Massachusetts 02169
    Counsel for:  The Defendant.


ROBERT M. BYRNE, JR., ESQUIRE
    THORNTON & NAUMES, LLP
    100 Summer Street
    Boston, Massachusetts 02110
    Counsel for:  The Plaintiff.


ALSO PRESENT:
    Mr. Gary Baker

---

                    I N D E X

Witness                 Direct Cross Redirect

ERNEST GAILOR

By Mr. Flynn        4


                E X H I B I T S

Id.   Description                      Page

1    Curriculum Vitae                   8
2    Folder                            65
3    Folder                            67
4    Correspondence dated February     71
     09, 2004
5    Correspondence dated June 18, 2004  74
6    Correspondence dated May 27, 2004   80
7    Correspondence dated June 18, 2004  82
8    EBT List                          84
9    Memorandum dated June 21, 2005   178
10   Mr. Sanderson's Report           184
11   Report dated August 24, 2005     184
12   Report dated August 24, 2005     185
13   Report dated August 24, 2005     186

---

                P R O C E E D I N G S
                    * * *

        MR. FLYNN:  The usual stipulations;

objections, except as to form, and motions to

strike reserved until the time of trial.

        MR. BYRNE:  Agreed.

        MR. FLYNN:  He'll read and sign?

        MR. BYRNE:  Agreed.

        MR. FLYNN:  Waive the notary.

        MR. BYRNE:  Agreed.

            DEPONENT, ERNEST GAILOR, having

produced satisfactory identification by means of

a New York Driver's License, being sworn, deposes

and states as follows:

EXAMINATION BY MR. FLYNN:

Q   Sir, would you please state your name for the

record?

A   Ernest J. Gailor.

Q   What's your current residential address?

A   4000 Silver Beach Road, Malta Ridge, New York.

Q   What do you do for a living?

A   I'm an engineer.

Q   What kind of an engineer?

A   Civil, environmental, structural.

109

```
1   Q   Mr. Papadakis testified that it did not, you know
2       that, don't you?
3   A   I know that.  But your maintenance guy says it
4       went over center.
5   Q   Wait, wait, wait.  Let's talk about --
6           MR. BYRNE:  Objection.
7   Q   Let's talk about Mr. Papadakis.
8           MR. BYRNE:  Objection.  You should let the
9       witness complete his answer.
10  Q   You did, didn't you?
11  A   Well I was discussing now the maintenance people
12      had said that it overcammed or over-centered and
13      that they had to bring it back around and then it
14      worked properly.  And then you had a memo issued
15      identifying that this is what had happened to the
16      device and that it had been repaired.  And then
17      there was a subsequent suggestion as to what they
18      should do to make sure this doesn't happen again.
19  Q   What happened to Mr. Papadakis --
20          MR. BYRNE:  Is your answer complete?
21          THE WITNESS:  Yes.  I'm sorry.
22  Q   What happened to Mr. Papadakis was unwitnessed,
23      correct?
24  A   Correct.
```

BEACON HILL COURT REPORTING, INC.
617-569-8050

110

```
1   Q   So he's the only one who actually saw what
2       happened to him, correct?
3   A   Correct.
4   Q   The memo came from a fellow named Mr. Evers,
5       correct?
6   A   Correct.
7   Q   He's out in Selkirk, right?
8   A   Correct.
9   Q   He never saw what happened, did he?
10  A   Only was told, that's correct.
11  Q   You've reviewed his deposition, correct?
12  A   Correct.
13  Q   You know that it's based on what other people
14      told him, correct?
15  A   Correct.
16  Q   But not including the plaintiff, correct?
17  A   Correct.
18  Q   In other words, it's secondhand hearsay as we
19      like to call it, correct?
20          MR. BYRNE:  Objection.
21  Q   In other words, somebody, Mr. Papadakis told
22      somebody something and that somebody then told
23      Mr. Evers what happened and then he wrote his
24      memo; is that your understanding of how it
```

BEACON HILL COURT REPORTING, INC.
617-569-8050

111

```
1       occurred?
2           MR. BYRNE:  Objection.
3   A   My understanding is is that the maintenance
4       people found what happened, repaired it and then
5       passed that information along.
6   Q   The maintenance people being Mr. Ebert?
7   A   Correct.
8   Q   At TNT?
9   A   Yes, TNT.
10  Q   By the time it got out to TNT what we know is
11      that the wheel was over-centered?
12  A   Correct.
13  Q   In other words, the pilot arm and the wheel were
14      pointing out toward the front of the vehicle, not
15      away from the vehicle as opposed to its normal
16      position which would be back into the vehicle?
17  A   By on center, correct.
18  Q   You understand from reviewing Mr. Papadakis'
19      deposition that it's his testimony that that's
20      not what occurred at all, correct?
21  A   I understand.  That's correct.
22  Q   Mr. Papadakis' testimony was that the wheel never
23      went over center, correct?
24  A   Correct.
```

BEACON HILL COURT REPORTING, INC.
617-569-8050

112

```
1   Q   And that the only thing that he had a problem
2       with was getting it back up into the highway
3       position, correct?
4   A   Correct.
5   Q   In your opinion -- to form the basis of your
6       opinions, which we'll get to a little bit later,
7       but to get to your opinions do you completely
8       disregard what Mr. Papadakis says?
9   A   There are portions of his testimony that I do
10      disregard.
11  Q   That portion being what he says happened to the
12      device itself, correct?
13  A   Correct.
14  Q   You have to completely disregard that to get to
15      your opinion, correct?
16  A   Correct.
17  Q   Because if you believe what he said there's no
18      evidence of any defect, correct?
19          MR. BYRNE:  Objection.
20  A   If I believe what he said there was a defect, but
21      I was unable to determine what it was.
22  Q   Something happened when he tried to put it back
23      up, but you have no way of explaining it,
24      correct?
```

BEACON HILL COURT REPORTING, INC.
617-569-8050

113

```
 1              MR. BYRNE:  Objection.
 2    A    Short of a material failure.
 3    Q    There's no evidence of a material failure?
 4    A    I have no evidence of a material failure.
 5    Q    But the evidence is that since -- it was working
 6         properly once Mr. Ebert brought it back into the
 7         proper position and the evidence is actually to
 8         the contrary; that, in fact, there was no
 9         material there, correct?
10    A    Correct.
11    Q    Then the vehicle was put in service and is still
12         in service today without a recurrence of any
13         material failure, correct?
14              MR. BYRNE:  Objection.
15    A    I don't know that.
16    Q    Well you have been given subsequent maintenance
17         and repair records, correct?
18    A    Up until a date, up until the date that I have
19         information, yes.
20    Q    About six months ago, a year ago?
21    A    I know of nothing other than up to that date.
22    Q    So the vehicle continued -- so let's just review
23         it.  Ebert inspects it and once he gets it back
24         to the proper position it works properly, right?
```

114

```
 1    A    That's my understanding.
 2    Q    So that's evidence that there was no material
 3         defect, correct?
 4    A    Correct.
 5    Q    Based on the repair records that you have to date
 6         or to the point that you got them the vehicle was
 7         in service for several years afterwards without
 8         any recurrence of this problem, correct?
 9    A    Up to the limit of the records, correct.
10    Q    That's evidence again that there was no material
11         defect at that time or since, correct?
12    A    Correct.
13    Q    To get to your opinion you have to disregard how
14         Mr. Papadakis described the incident as having
15         happened, correct?
16              MR. BYRNE:  Objection.
17    A    His descriptions of how he dropped the gear and
18         then how he tried to raise the gear I believe are
19         accurate.  His descriptions of how he was hurt
20         are probably accurate.  His descriptions of what
21         he thinks happened to the gear I don't think are
22         accurate.
23    Q    That's because you cannot explain how they would
24         have or could have occurred to any degree of
```

115

```
 1         reasonable certainty, correct?
 2    A    That's true.
 3    Q    So then to come to your opinion which you have
 4         based on a reasonable degree of certainty you
 5         start with the assumption that the wheel had
 6         overcammed, correct?
 7    A    I don't think I started with that assumption.
 8         Initially I was looking for some kind of
 9         mechanical error, some material defect, a broken
10         shaft, a broken key, any of those items.  But I
11         didn't see evidence or there was no evidence
12         presented to me that indicated any of that was
13         there.  From there we stepped into the
14         overcamming.
15    Q    So your first instinct in this case based on your
16         professional experience was something must have
17         been wrong with the device in terms of its
18         materials, correct?
19    A    Correct.
20    Q    Did you express that opinion to anybody?
21    A    Oh, yes.
22    Q    Did you tell plaintiff's counsel that?
23    A    I believe we talked about it.
24    Q    Were you persuaded otherwise?
```

116

```
 1    A    Well I went out and did my inspection.  Looked at
 2         the equipment.  Looked at the maintenance
 3         records.  I really was looking for a materials
 4         list as to what was used to fix this thing, and
 5         there was none.  At that time I had to step back
 6         and go a different direction with it.
 7    Q    So even up to the point of the inspection you
 8         were still thinking there's got to be a material
 9         defect?
10    A    Correct.
11    Q    You weren't thinking of overcamming?
12    A    I wasn't.
13    Q    Or how the device could come to overcam?
14    A    Well I knew it could.  I just didn't -- from what
15         I understood of the accident I didn't believe
16         that overcamming had been the cause.
17    Q    When you did your inspection you found no
18         evidence of any material defect, right?
19    A    Correct.
20    Q    Was it at that point that you started to drop
21         that opinion from the list of possibilities?
22    A    I believe -- I don't know if we got maintenance
23         records after that.  I know we got some
24         maintenance records well after that.  But I don't
```